UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HOWARD UNIVERSITY,

        *Plaintiff-Counterclaim Defendant,*

  - against -

LARRY BORDERS and
VIRGINIA BORDERS,

        *Defendants-Counterclaim Plaintiffs,*

*CENTRALIA MADONNA,*
A DRAWING.

        *Defendant-in-rem.*

No. 20-CV-4716 (LGL)

**MEMORANDUM OF LAW OF
DEFENDANTS-COUNTERCLAIM PLAINTIFFS
LARRY AND VIRGINIA BORDERS IN OPPOSITION
TO THE MOTION FOR SUMMARY JUDGMENT OF
PLAINTIFF-COUNTERCLAIM DEFENDANT HOWARD UNIVERSITY**

Dated: 2021-June-28

**OLSOFF | CAHILL | COSSU** LLP

Paul S. Cossu
John R. Cahill
Jonathan A. Olsoff
3 Water Street
Ellenville, NY 12428
212-719-4400

*Attorneys for*
*Larry Borders and Virginia Borders*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................. ii

PRELIMINARY STATEMENT .......................................................................................................... 1

STATEMENT OF FACTS ................................................................................................................... 2

ARGUMENT ........................................................................................................................................ 9

I.     LEGAL STANDARD ................................................................................................................. 9

II.    CHOICE OF LAW .................................................................................................................. 10

III.   THE UNIVERSITY'S CLAIMS ARE BARRED BY THE APPLICABLE STATUTE OF
       LIMITATIONS ........................................................................................................................ 12

       A.   North Carolina's Statute of Limitations for Replevin Claims ....................................... 12

       B.   Washington D.C.'s Statute of Limitations for Replevin Claims ..................................... 13

IV.    THERE IS NO EVIDENCE THAT THE ARTWORK WAS STOLEN AND MUCH EVIDENCE
       THAT IT WAS NOT ................................................................................................................ 13

       A.   The University Never Identified the Artwork as Stolen and, by No Later Than 1976, Stopped
            Identifying the Artwork as Being in the University's Collection ................................... 14

       B.   The May 28th Sotheby's Email Reflects Evidentiary Admissions by the University that a Sale or
            Other Authorized Transfer of the Artwork Took Place in the 1970s ............................. 15

       C.   The Remainder of the University's Assertions are Unavailing or Irrelevant ................. 17

V.     THE BORDERS' LACHES DEFENSE IS ADEQUATELY SUPPORTED BY THE LIMITED
       DOCUMENTATION ...AND THE LOSS OF RECORDS AND WITNESS TESTIMONY AND AS
       SUCH CANNOT BE DISMISSED AT THIS STAGE ........................................................... 17

       A.   The University Had Knowledge of Its Claim to the Artwork No Later Than 1976 ....... 18

       B.   The University Inexcusably Delayed in Taking Action ................................................. 19

       C.   The Borders Have Been Prejudiced by the University's Delay ...................................... 20

       D.   The University's Arguments Against Laches are Unsupported ...................................... 21

            1.   The Cases Cited by the University are Inapplicable ............................................... 21

            2.   The University's "Expert" Report Lacks Any Reliable Methodology and Must Be Excluded
                 for Attempting to Usurp the Role of the Fact Finder ............................................... 23

VI.    THE BORDERS' ADDITIONAL AFFIRMATIVE DEFENSES ARE LEGALLY AND
       FACTUALLY SUPPORTED .................................................................................................... 24

CONCLUSION .................................................................................................................................... 26

**TABLE OF AUTHORITIES**

**Cases**

*Angiolillo v. Christie's, Inc.*,
64 Misc.3d 500 (N.Y. Sup. Ct. 2019) ........................................................................... 12

*Bakalar v. Vavra*,
619 F.3d 136 (2d Cir. 2010) ................................................................................... 11-12

*Bakalar v. Vavra*,
819 F. Supp. 2d 293 (S.D.N.Y. 2011) ......................................................... 17-18, 19, 21

*Callahan v. Wilson*,
863 F.3d 144 (2d Cir. 2017) ........................................................................................ 23

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..................................................................................................... 10

*Deanda v. Hicks*,
137 F. Supp. 3d 543 (S.D.N.Y. 2015) ........................................................................... 8

*Fieger v. Pitney Bowes Credit Corp.*,
251 F.3d 386 (2d Cir. 2001) ......................................................................................... 10

*GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc.*,
449 F.3d 377 (2d Cir. 2006) ......................................................................................... 10

*Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc.*,
98 Civ. 7664(KMW), 1999 WL 673347 (S.D.N.Y. Aug. 30, 1999) ............................... 19, 20, 21

*Holborn Corp. v. Sawgrass Mutual Ins. Co.*,
304 F. Supp. 3d 392 (S.D.N.Y. 2018) ..................................................................... 10-11

*In re Dana Corp.*,
574 F.3d 129 (2d Cir. 2009) ...................................................................................... 9, 15

*Katz v. Goodyear Tire and Rubber Co.*,
737 F.2d 238 (2d Cir. 1984) ...................................................................................... 9-10

*Kyoei Fire & Marine Ins. Co., Ltd. v. M/V Maritime Antalya*,
248 F.R.D. 126 (S.D.N.Y. 2007) ................................................................................. 24

*Kunstsammlungen Zu Weimar v. Elicofon*,
536 F. Supp. 829 (E.D.N.Y. 1981) .............................................................................. 12

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.,*
700 F.2d 785 (2d Cir. 1983) .......................................................................................... 16

*Massa v. N.Y.C. Hous. Auth.,*
95 Civ. 2712 (LAK), 1996 WL 655812 (S.D.N.Y. Nov. 8, 1996) ............................... 16

*Matter of Flamenbaum,*
22 N.Y.3d 962 (2013) ................................................................................................... 22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) ......................................................................................................... 9

*Nimely v. City of N.Y.,*
414 F.3d 381 (2d Cir. 2005) .......................................................................................... 23

*Redd v. New York Div. of Parole,*
678 F.3d 166 (2d Cir. 2012) .......................................................................................... 10

*Reif v. Nagy,*
175 A.D.3d 107 (1st Dep't 2019) ................................................................................. 12

*Robins Island Pres. Fund, Inc. v. Southold Dev. Corp.,*
959 F.2d 409 (2d Cir.1992) ........................................................................................... 20

*Sanchez v. Trustees of the Univ. of Perm.,*
04 Civ. 1253(JSR), 2005 WL 94847 (S.D.N.Y. Jan. 18, 2004) .............................. 19, 20

*Schwabenbauer v. Bd. of Ed. of City School Dist. of City of Olean,*
667 F.2d 305 (2d Cir. 1981) ............................................................................................. 9

*S.E.C. v. Obus,*
693 F.3d 276 (2d Cir. 2012) ............................................................................................. 9

*Shea v. Fridley,*
123 A.2d 358 (D.C. 1956) .............................................................................................. 13

*Solomon R. Guggenheim Found. v. Lubell,*
77 N.Y.2d 311 (1991) ............................................................................................... 11, 20

*Sotheby's, Inc. v. Shene,*
04 Civ. 10067 (TPG), 2009 WL 762697 (S.D.N.Y. Mar. 23, 2009) ........................... 22

*State v. United Parcel Service, Inc.,*
253 F. Supp. 3d 583 (S.D.N.Y. 2017) ........................................................................... 18

*Thomas v. Stone Container Corp.*,
922 F. Supp. 950 (S.D.N.Y. 1996) ........................................................ 16

*U.S. v. Kaiser*,
609 F.3d 556 (2d Cir. 2010)................................................................. 16

*Vivenzio v. City of Syracuse*,
611 F.3d 98 (2d Cir. 2010)..................................................................... 9

*Wertheimer v. Cirker's Hayes Storage Warehouse, Inc.*,
300 A.D.2d 117 (1st Dep't 2002) ...................................................19-20

*White v. Consol. Planning, Inc.*,
166 N.C. App. 283 (N.C. Ct. App. 2004) .......................................12-13

*White Plains Coat & Apron Co. v. Cintas Corp.*,
460 F.3d 281 (2d Cir. 2006)................................................................. 10

*Zuckerman v. Metro. Museum of Art*,
928 F.3d 186 (2d Cir. 2019)................................................................. 20

**Rules, Statutes & Legislative Materials**

D.C. CODE § 12–301(2) ........................................................................ 13

FED. R. CIV. P. 26 .................................................................................. 16

FED. R. CIV. P. 30 .................................................................................. 24

FED. R. CIV. P. 37 .................................................................................. 24

FED. R. CIV. P. 56 ........................................................................... *passim*

FED. R. EVID. 702 .................................................................................. 24

FED. R. EVID. 801 .................................................................................. 16

FED. R. EVID. 803 .................................................................................. 16

N.C. GEN. STAT. § 1–52(4) .................................................................... 12

Restatement (Second) of Conflict of Laws § 147 ................................. 11

U.C.C. § 2-403 ...................................................................................... 25

Larry Borders and Virginia Borders (together, the "Borders"), by their attorneys, Olsoff | Cahill | Cossu LLP, respectfully submit this Memorandum of Law in Opposition to the Motion for Summary Judgment of Howard University (the "University").

## PRELIMINARY STATEMENT

In or about 1973, the University transferred possession, and title, to a work of fine art by Charles White (the "Artwork"). For nearly 50 years thereafter, the University never held itself out as owning or possessing the Artwork. During that time, the University and its Gallery of Art (the "Gallery") went through numerous administrations, such that there is not a single person left at the University with knowledge of the day-to-day operations of the Gallery in the 1970s.

Notwithstanding the University's "error prone" system and "admittedly imperfect paper records" (in the words of the University's *own expert*), when contacted by Sotheby's, Inc. ("Sotheby's") with regard to the University's publicly known prior ownership of the Artwork, the University claimed to still own the Artwork, despite the lack of evidence—literally none—that suggests that the Artwork was stolen. The University advised Sotheby's in writing in June 2020 that "Howard has documentation proving that…as of the 1976 Collection Inventory, the [Artwork] was missing from the Collection."

Even the University's *own investigation* led it to believe that the Artwork was consigned back to an art gallery closely associated with the University itself, the Barnett-Aden Gallery (where the Artwork was exhibited, and potentially acquired from, in 1947) in the early 1970s and then sold, eventually ending up in the hands of the Borders. The Borders, who received the Artwork as a *gift*—and therefore should not be expected to have any "bills of sales" that the University disingenuously references in its motion, do not, and should not have to, bear the burden of proof nearly 50 years after the newly alleged "theft. The University's sudden change in position, which comes after an unreasonable almost fifty-year delay, given its written admission that it knew that

1

the Artwork "was missing" from its collection as of 1976, has irreparably prejudiced the Borders by making it impossible for them to marshal evidence to vindicate their rightful ownership of the Artwork. Every relevant witness is deceased, and the University has destroyed records kept by previous curators of the Gallery that would have concerned the Artwork and its disposition.

The timing of the University's claim is also opportune. Contrary to protestations that it "never" sells artworks, the University was then in discussions with Sotheby's (and likely others) about selling artworks from its collection to raise funds for the University (which is consistent with University records showing that works of fine art have come in and out of the University's collection since at least the 1960s).

For the reasons set forth below, the University's motion for summary judgment should be (1) denied in its entirety, and (2) the Borders should be granted summary judgment as a matter of law due to (a) the failure of the University to bring any claim within the relevant statute of limitations, and (b) the application of laches.

## STATEMENT OF FACTS

### The Borders Receive and Live with the Artwork for Nearly 50 Years

The Borders are an elderly couple that have lived with, and loved, the Charles White Artwork for nearly all of the almost 50 years of their marriage. (Borders Response to University's 56.1 Statement and Counterstatement of Material Facts ("Borders 56.1") ¶¶ 94, 97.) In the early 1970s, a friend of the Borders, J.D. Kibler, gifted the Artwork to the Borders. (*Id*. ¶ 94.) For over four decades, the Borders cherished the Artwork, took it with them when they moved homes, and never realized that it had any significant monetary value. (*Id*. ¶¶ 95-96.) At the time of the gift, the Borders had no reason to believe that the Artwork was particularly valuable. (*Id*.) The Artwork was accompanied by another gift of artwork, which was not then and is not now particularly valuable, and which is not claimed by the University to have been stolen from its collection. (*Id*.)

**The Borders Decide to Sell the Artwork Through Sotheby's and Learn of University's Claim**

In or about February 2020, the Borders were watching an episode of Antiques Roadshow when several prints created by Charles White were noted to be "valuable" by an appraiser on the program. (*Id*. ¶ 97.) Having no reason to believe that there were any ownership issues with the Artwork, the Borders contacted Sotheby's and subsequently consigned that Artwork to Sotheby's for sale by public auction. (*Id*. ¶ 98.)

Prior to the planned sale of the Artwork, the Borders were informed by Sotheby's that Sotheby's had contacted the University and the University had claimed that the Artwork had gone missing from its collection, and that the University was claiming to still own the Artwork. (*Id*. ¶ 99.) Sotheby's advised the Borders that the University wanted to have a call with them to obtain more information about how the Borders came to possess the Artwork. (*Id*. ¶ 100.)

On or about June 1, 2020, the Borders participated in a conference call with the University and Sotheby's. (*Id*. ¶ 101.) The University had several representatives on the call, including its General Counsel, Florence Prioleau, and its Senior Counsel, Lisa Jones. (*Id*. ¶ 102.) The Borders participated in the call without legal counsel, and neither Ms. Jones nor Ms. Prioleau advised the Borders to obtain legal counsel, despite using the conference call to threaten to call the FBI if the Artwork was not immediately returned to the University. (*Id*. ¶¶ 103-105.)

Despite multiple subsequent requests to the University seeking whatever documentation or evidence it had to support its claim that the Artwork was stolen, the University's representatives refused to produce any documentation to support its claim. (*Id*. ¶ 107.) Instead, the University filed its Complaint against the Borders. (*Id*. ¶ 108.) In its Complaint, the University alleges that the Artwork was stolen at some point "in the period of January 1973 to…1976." (*Id*. ¶ 158.) To support this allegation, the University asserts that when "the Gallery's then-curator, Dr. A.J. Carter, retired in 1976, he left his successor with a comprehensive inventory of the entire contents of the Gallery's

3

collection." (*Id*. ¶ 159.) The University further alleges that the "Carter inventory indicates that the [Artwork] was missing as of the time the inventory was completed." (*Id*. ¶ 160.) The University goes on to allege that the Borders "have been in unauthorized possession of the Work since sometime in the mid-1970s." (*Id*. ¶ 161.)

**Discovery Confirms that the University's Claim that the Artwork was Stolen is Unsupported**

While the "1976 Carter Inventory" was compiled over many years (and the year the Artwork was added is unknown), by no later than 1976, the University was on notice that it was no longer in possession of the Artwork. (*Id*. ¶¶ 113, 147.) In the University's own words, it had "documentation proving that…as of the 1976 [Carter] Inventory, the Work was missing from the Collection." (*Id*. ¶ 138.) Yet, at no time prior to May 2020 did the University report the Artwork as missing or stolen to law enforcement, and nor did the University list or register the Artwork as missing or stolen. (*Id*. ¶¶ 114-115.) When artworks from the University's collection were lost or stolen, it was noted in the Annual Report for the school year in which the loss occurred, or in the occasional inventories the University prepared. (*Id*. ¶¶ 117-120.) Similarly, the University has never filed an insurance claim concerning the alleged theft of the Artwork. (*Id*. ¶ 116.)

Over the years, the University retained several third parties (including Sotheby's) to appraise the University's art collection. (*Id*. ¶ 129.) The University, however, never sought (nor received) an appraisal of the Artwork, despite compiling and providing to Sotheby's, and others, "Inventory" lists identifying artworks that were in the University's collection, clearly evidencing that the University did not consider the Artwork to still be part of its collection. (*Id*. ¶¶ 130-131.)

On a call on May 28, 2020, between Sotheby's and the University, the University representatives who had been investigating the University's prior ownership of the Artwork admitted that the Artwork may have been consigned by the University to the Barnett-Aden Gallery in the 1970s, where it could have been consigned and sold by the University. (*Id*. ¶ 135.) As the

4

University's motion papers note, the Barnett-Aden Gallery was "the first privately owned black gallery" and was co-founded by the chair of the University's department of art and the curator of the University's Gallery of Art. (Harvey Decl., Ex. 9.) Indeed, the Artwork was exhibited at the Barnett-Aden Gallery in 1947 and it may have originally sold the Artwork to the University. (*Id*., Ex. 8.) Records from the archives of Charles White, held by the Smithsonian Institute, confirm that the Barnett-Aden Gallery was still operating in the 1970s. (*Id*. ¶ 137.)

**The University's Limited Records Reflect that Artworks
Went In and Out of Its Collection During the 1960s and 1970s**

In or about 1964, Dr. A.J. Carter, the then-Curator of the Gallery, prepared an inventory of artworks in the University's collection (the "1964 Carter Inventory"). (*Id*. ¶ 142.) The 1964 Carter Inventory identified 87 drawings as being in the University's collection. (*Id*. ¶ 144.) In 1971, Dr. Carter prepared another inventory of the drawings in the University's collection (the "1971 Carter Inventory"). (*Id*. ¶ 143.) The 1971 Carter Inventory identified 61 drawings as being in the University's collection. (*Id*. ¶ 144.) The University was unable to explain why the number of drawings in the University's collection had decreased by 26 over a seven-year period. (*Id*. ¶ 146.) While the 1976 Carter Inventory identified 113 drawings as being in the University's collection, many of the drawings from the 1964 Carter Inventory are not included in the 1976 Carter Inventory, indicating that those drawings were transferred and that new drawings were acquired by the University. (*Id*. ¶ 148.) The University's Annual Reports also indicate that artworks were "Removed From The Gallery Collection Permanently" from time to time, including artworks not identified as being on loan. (*Id*. ¶ 145.)

The University also kept close track of every other artwork by Charles White in its collection, including prints and other artworks that are much lower in value and art historical importance. (*Id*. ¶ 126.) In 1981, the University lent nearly every Charles White artwork in its

possession[1] to the College Museum of Hampton Institute. (*Id*. ¶ 127.) Despite these loans of other Charles White artworks, the University could not identify any efforts that it made to locate the Artwork at this time or at any other time prior to being contacted by Sotheby's. (*Id*. ¶ 128.)

**The University's Delay in Asserting the Loss of the Work Has Unfairly Prejudiced the Borders' Ability to Prove that the Artwork was Not Stolen**

Very few records remain concerning the University's art collection and how it dealt with artworks from the 1960s through the 1980s. The University's "artist file" for Charles White consists only of a single news article and a 1969 loan agreement with the Museum of Fine Arts, Boston (the "1969 Loan Agreement"). (*Id*. ¶ 140.) The University discarded or otherwise destroyed certain records referenced in the preface to the 1976 Carter Inventory that could have, and, based on Dr. Carter's writings, likely did, concern the Artwork, including "acquisition sheets," "record cards," and a "daily log." (*Id*. ¶ 141.) Indeed, the University admits that while the "Artwork *could* have been stolen" (HU Memo of Law at 4; emphasis added), it has no idea what the *actual* disposition of the Artwork was due to paucity of remaining records.

Witnesses concerning the University's claim to the Artwork, including Charles White, have died and, upon information and belief, the memories of others with information that may bear on the University's claims have faded since the University knew or should have known of its claim. Charles White passed away in 1979. (*Id*. ¶ 150.) Dr. Carter passed away prior to 2020. (*Id*. ¶ 151.) Dr. Jeff Donaldson, who was the Chair of the University's Department of Art and the Director of the Gallery from 1970 to 1976, passed away prior to 2020. (*Id*. ¶ 152.) Hughie Lee Smith, who was the Chair of the University's Department of Art and the Director of the Gallery prior to Dr. Donaldson, passed away in 1999. (*Id*. ¶ 153.) Alden Lawson, who handled the day-to day

---

[1] With the notable exception of the 60 x 155 inch mural *Five Great American Negroes*, that White painted in 1939.

operations of the University's Gallery in the 1970s and 1980s, passed away prior to 2020. (*Id*. ¶ 154.) Dr. Benjamin Tritobia, who would have assisted in appraisals of the University's art collection and had knowledge of the scope of the University's art collection over the last several decades, passed away prior to 2020. (*Id*. ¶ 155.) J.D. Kibler passed away in 1998. (*Id*. ¶ 149.)

**The University Has Failed to Produce Several Relevant Witnesses Under Its Control
And Has Otherwise Sought to Impede the Borders' Efforts to Obtain Relevant Discovery**

During discovery, the University did not produce any of the artwork lists that it created and provided to Sotheby's, despite agreeing to produce "all of the prior Gallery inventories" (those lists were only produced by Sotheby's). (*Id*. ¶ 162.) Indeed, the University denied even creating the "Inventory" lists despite Sotheby's testimony that the lists had been created by, and provided to Sotheby's, by the University. (*Id*. ¶ 163.)

Seeking to obstruct the Borders' ability to investigate the likelihood that the University sold the Artwork through the Barnett-Aden Gallery in or about 1973 (as representatives of the University proffered in a May 28, 2020 call with Sotheby's), the University did not make available for depositions either (a) University trustee, Dr. Charles Boyd, or (b) Ms. Jones. (*Id*. ¶¶ 164, 165.) Both Dr. Boyd and Ms. Jones were on the May 28, 2020 call with Sotheby's. (*Id*. ¶ 135.)

Despite the fact that Dr. Boyd clearly possessed relevant information concerning the University's potential sale of the Artwork through the Barnett-Aden Gallery, the University refused to produce him as a witness, asserting that he did not possess relevant information and that he was too busy to have to devote time to a deposition. The University went as far as to move to quash his deposition subpoena in the Eastern District of Michigan. That motion was denied on April 26, 2021, but, despite being ordered to make Dr. Boyd available for a two-hour deposition within 30 days, the University went ahead with its motion for summary judgment and did not offer any dates for the deposition of Dr. Boyd. (*Id*. ¶ 165.)

The University was served with a Notice of Deposition for Ms. Jones on September 14, 2020. (*Id*. ¶ 164.) While the University agreed to produce Ms. Jones for a deposition, it requested a postponement of her deposition due to family health issues, which the Borders agreed to without objection. (*Id*.) However, despite agreeing to the initial postponement of Ms. Jones's deposition (including until after the close of discovery), the University failed to subsequently produce Ms. Jones for a deposition despite the many requests that were made to schedule her deposition.[2] (*Id*.) The University's failure to produce her at all despite the Borders being willing to accommodate Ms. Jones's schedule, has prejudiced the Borders' ability to establish their case.[3]

Additionally, the University's Rule 30(b)(6) witness, Dr. Lisa Farrington, failed to adequately prepare to testify on the topics set forth in the Notice of Deposition. Dr. Farrington, the Associate Dean of Fine Arts at the University, had only been hired by the University in 2020. (*Id*. ¶¶ 166-169.) Dr. Farrington did not conduct any independent investigation into what records or information the University possessed concerning the topics of inquiry in the Notice of Deposition. (*Id*. ¶ 167.) Instead, she simply reviewed the documents provided to her by the University's counsel and spoke with the University's counsel. (*Id*. ¶ 168.) Dr. Farrington, for example, made no effort to determine if inventories of the University's collection had been prepared between 1976 and 2020. (*Id*. ¶ 169.) If she had, she would have learned that several inventories (including its high-value works by Charles White) were prepared by the University and delivered to Sotheby's as part of Sotheby's appraisal process, none of which listed the Artwork. (*Id*. ¶¶ 129-132.)

---

[2] The failure to produce Ms. Jones was even noted in a letter the Borders sent to the Court on December 21, 2020 (ECF No. 31 at n. 4) but was never addressed or remedied by the University.

[3] In the event of a trial, the Borders seek to preclude both Dr. Boyd and Ms. Jones from being offered as witnesses in light of their failure to appear for their depositions.

**ARGUMENT**

**I.     LEGAL STANDARD**

On a motion for summary judgment, a district court "must determine (a) whether there is

a genuine issue as to any material fact,' and (b) whether, in light of the undisputed facts, the movant

is entitled to judgment as a matter of law." *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir.

2010) (quoting FED. R. CIV. P. 56). "The party seeking summary judgment bears the burden of

establishing that no genuine issue of material fact exists." *Id.* (citations omitted). In determining

whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all

reasonable inferences against the moving party. *Id*; *see also Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986). At this stage, "'[t]he evidence of the non-movant is to be

believed,'" *S.E.C. v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012) *quoting Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 255 (1986), while "the court . . . '*must disregard all evidence favorable to the*

*moving party that the jury is not required to believe*.'" *In re Dana Corp.*, 574 F.3d 129, 151-152

(2d Cir. 2009) *quoting Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)

(emphasis added by Second Circuit).

If the non-moving party offers admissible material that either "generates uncertainty as to

the true state of any material fact" or "'make[s] it arguable' that the claim has merit," summary

judgment is "inappropriate." *In re Dana Corp.*, 574 F.3d at 151. Thus, "[n]ot only must there be

no genuine issue as to the evidentiary facts, but there must also be no controversy as to the

inferences to be drawn from them," *Schwabenbauer v. Bd. of Ed. of City School Dist. of City of*

*Olean*, 667 F.2d 305, 313 (2d Cir. 1981), because "[t]he impact of particular circumstances upon

an inference arising from an admittedly existing factual situation calls for a factual determination

which is the function of the trier of the facts and not that of the court in disposing of a motion for

summary judgment." *Katz v. Goodyear Tire and Rubber Co.*, 737 F.2d 238, 244 -245 (2d Cir. 1984) (citations omitted). In sum, "Rule 56 authorizes summary judgment only 'where the moving party is entitled to judgment as a matter of law' on the basis that 'no genuine issue remains for trial' because 'it is quite clear what the truth is.'" *Id.*, quoting *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 467 (1962)); *see also Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012).

Additionally, this Court may "grant summary judgment for a nonmovant" where, after "giving notice and a reasonable time to respond," the record shows that the nonmovant is entitled to it. FED. R. CIV. P. 56(f); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 326 (1986).[4]

## II.    CHOICE OF LAW

A federal court exercising diversity jurisdiction applies the law of the forum state to determine the applicable law. "In New York, the forum state in this case, the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws." *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001) (citations omitted). For the reasons set forth in Section III, an actual conflict exists, as the University's claims are untimely and subject to dismissal under the laws of both Washington D.C. and North Carolina.

The New York Court of Appeals has held that "'the relevant analytical approach to choice of law in tort actions in New York' is the 'interest test.'" *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 384 (2d Cir. 2006). Under this interest test, courts "seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 284 (2d Cir. 2006). "The

---

[4] While the Borders, who are of limited means when compared to the University, did not file a motion for summary judgment in light of this Action being subject to a bench trial, they respectfully submit that on the record before the Court, they are entitled to summary judgment based on the applicable statute of limitations and laches in accordance with FED. R. CIV. P. 56(f).

states' interests are defined primarily by 'the parties' domiciles and the locus of the tort.'" *Holborn Corp. v. Sawgrass Mutual Ins. Co.*, 304 F. Supp. 3d 392, 399 (S.D.N.Y. 2018) (citations omitted).

Here, the University is domiciled in Washington D.C. (Cossu Decl., Ex. A (Complaint ¶ 14)) and the Borders are domiciled in North Carolina. (*See* Borders 56.1 Statement ¶ 57.) The locus of the purported conversion was accordingly North Carolina,[5] where the Borders have kept the Artwork since the early 1970s. (*Id.*, ¶¶ 44, 57.)

The University asserts that, except for one loan, the Artwork was located in Washington D.C. from the late-1940s until the early-1970s. (University 56.1 Statement at ¶ 13.) From that time until March 2020, the Artwork was located exclusively in North Carolina. (*Id.* ¶ 57.) In March 2020, the Artwork was shipped to Sotheby's in New York for potential sale in a May 2020 auction. (Borders 56.1 Statement ¶ 75.) Within weeks of the Artwork's arrival at Sotheby's, Sotheby's had contacted the University as part of its standard provenance research, and the University had asserted a claim to ownership of the Artwork. (*Id.*, ¶ 83.) Sotheby's neither sold the Artwork nor even offered it for sale prior to the University's initiation of this Action; instead it has simply maintained possession of the Artwork as a bailee. (*Id.*, ¶ 106.)

The University's case citations in support of its assertion that New York law applies are unpersuasive. In *Solomon R. Guggenheim Found. v. Lubell*, the artwork at issue had been stolen from a New York museum, sold through a New York gallery, and remained on display in New York in the good faith purchaser's residence for over two decades. *Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 314 (1991). In *Bakalar v. Vavra*, the drawing at issue had been acquired by a New York gallery, and had remained in New York for seven years before it was

---

[5] *See* Comment i to Restatement (Second) of Conflict of Laws § 147 (whether conversion has occurred "is a tort question which, usually at least, will be determined by the local law of the state where the alleged converter dealt with the chattel").

purchased in New York by its good faith purchaser for value. *Bakalar v. Vavra*, 619 F.3d 136, 139 (2d Cir. 2010). In *Reif v. Nagy*, the artwork at issue had been purchased and sold in New York ***no less than four times***. *Reif v. Nagy*, 175 A.D.3d 107, 118 (1ˢᵗ Dep't 2019) (Cossu Decl. Ex. KK). And in *Angiolillo v. Christie's, Inc.*, the property at issue had been in New York for over ***three years*** before it was sold in New York. *Angiolillo v. Christie's, Inc.*, 64 Misc.3d 500, 517 (N.Y. Sup. Ct. 2019).[6]

Accordingly, New York law does not apply to the University's claims to the Artwork, as the Artwork has had no meaningful connection to New York, having never been sold here and only arriving in New York weeks before the University was contacted.

## III.   THE UNIVERSITY'S CLAIMS ARE BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS

### A.   North Carolina's Statute of Limitations for Replevin Claims

Under North Carolina law, replevin and conversion claims are subject to a three-year statute of limitations running from the date of the alleged wrongful conduct. N.C. GEN. STAT. § 1–52(4); *see also White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 310-11 (N.C. Ct. App. 2004) (demand and refusal only applies to conversion claims when "there has been no wrongful taking or disposal of the goods, and the defendant has merely come rightfully into possession and then refused to surrender them…") (citations omitted).

The University alleges that the Artwork was stolen at some point "in the period of January 1973 to…1976." (Cossu Decl., Ex. A (Complaint ¶ 50).) Not only has the University failed to

---

[6] Equally unavailing is *Kunstsammlungen Zu Weimar v. Elicofon*. In that case, the paintings at issue had been purchased in New York and had remained there for over two decades before their return was sought. *Kunstsammlungen Zu Weimar v. Elicofon*, 536 F. Supp. 829, 830 (E.D.N.Y. 1981). Far from establishing that "New York law applies" in the current instance (HU Memo at 10), the Court in *Elicofon* held that "New York's choice of law dictates that questions relating to the validity of a transfer of personal property are governed by the law of the state where the property is located at the time of the alleged transfer." *Elicofon*, 536 F. Supp. at 845-46.

assert that the Borders had "come rightfully into possession of the Artwork" (*see White*, 166 N.C.App. at 311), it has specifically alleged to the contrary that the Borders "have been in unauthorized possession of the Work since sometime in the mid-1970s." (Cossu Decl., Ex. A (Complaint ¶ 72.) Accordingly, the University's claims are barred by North Carolina's statute of limitations.

### B.      Washington D.C.'s Statute of Limitations for Replevin Claims

Even if the law of North Carolina does not apply to the University's claims, the law of Washington D.C., where the Artwork was located for over two decades and the situs from where the University claims it was stolen, also has a three-year statute for claims relating to "the recovery of personal property or damages for its unlawful detention." D.C. CODE § 12–301(2). When, as the University alleges here, "the defendant did not acquire the property lawfully in the first instance, the claim accrues immediately and there is no need for a demand and refusal to trigger the statute of limitations." *See Shea v. Fridley*, 123 A.2d 358, 361 (D.C. 1956).

As set forth above, the University alleges that the Artwork was stolen at some point "in the period of January 1973 to…1976" and that the Borders "have been in unauthorized possession of the Work" since that time. (Cossu Decl., Ex. A (Complaint at ¶¶ 50, 72.) Accordingly, the University's claims are also barred by Washington D.C.'s statute of limitations.

## IV.      THERE IS NO EVIDENCE THAT THE ARTWORK WAS STOLEN AND MUCH EVIDENCE THAT IT WAS NOT

The University claimed for the first time that the Artwork was "stolen" only after Sotheby's reached out in the course of doing its standard provenance research. There is no evidence—not the proverbial scintilla—that indicated it was stolen before that: there was no report to law enforcement; no insurance claim; no internal record of a theft made; and no effort to look for or notify others that the Artwork was stolen (*e.g.*, via a stolen art registry). Having done literally

nothing that theft victims—especially University employees with fiduciary duties to the institution—routinely do when there is a theft of valuable property, the University does not have even an arguable claim that it was stolen. Indeed, their record is such that it cannot reasonably be argued that "no genuine issue of material fact exists" with respect to the University's claims.

### A.   The University Never Identified the Artwork as Stolen and, by No Later Than 1976, Stopped Identifying the Artwork as Being in the University's Collection

As set forth in the Statement of Facts, there is no evidence in the record that (a) the University ever believed or identified the Artwork as stolen prior to 2020 despite admitting that, at a minimum, it knew the Artwork was not located on campus since 1976, or that (b) the University ever identified the Artwork as being a part of its collection after 1976. (Borders 56.1 ¶¶ 115-123, 129-131, 138)[7] Further, the University has admitted, through representatives it tasked with looking into the Artwork, that it believes the Artwork could have been sold through the Barnett-Aden Gallery in the 1970s, resulting in Mr. Kibler's, and then the Borders', acquisition of the Artwork. (Declaration of Kayla Carlsen ("Carlsen Decl."), ¶¶ 9-12; Ex. D (May 28 Call Notes at SOTH000133).) On these facts alone, the University's motion must be denied.

The University failed to identify the Artwork as being part of its collection in any of the collection lists that it provided to third-parties, despite the Artwork unquestionably qualifying to be included in its "Inventory" of artworks to be insured over "$10k." (Borders 56.1 Statement ¶¶ 129-131.) After over 40 years, and at a time when the University is looking to monetize its

---

[7] The 2019 Inventory "entry" is nothing more than a digitized copy of the 1969 Loan Agreement. (*Compare* Harvey Decl., Ex. 14 (1969 Loan Agreement, HOWARD00184) *with* Ex. 24 (TMS Electronic Record for Artwork, HOWARD00549).) Even the University's representative described the "TMS Electronic Record for Artwork" as simply "a reproduction of a record that had existed for years before." (Cossu Decl., Ex. F (Farrington Tr. at 153:8-13).) Indeed, the "TMS Electronic Record for Artwork" misidentifies the Artwork as being created in 1949 (not 1947), because the year of creation in the 1969 Loan Agreement was incorrect. (Cossu Decl., Ex. R (1947-48 Annual Report at HOWARD00932).)

collection during what were, and are, difficult economic times, the University suddenly claimed the Artwork was stolen when presented with information about the Artwork's prior connection to the University.

The University's attempt to backtrack on its own admissions that it knew the Artwork "was missing" as early as 1976 and did nothing about it, is unavailing. The University **now speculates** that 1976 Carter Inventory's "(?)" reference to the Artwork is "is consistent with references in the University's Annual Reports from this time period referring to 'loans' of artworks from the Gallery to other academic departments and University buildings." (HU Memo of Law at 12.) Of course, what the University ignores is that the use of 'loans' within the "University's Annual Reports" also refer to 'loans' **outside** of the University to third parties. (*See* Borders 56.1 Statement ¶ 127.)

Similarly, the University's assertion that "there is no evidence that the Barnett-Aden Gallery continued to exist subsequent to 1969, when the last of its founders died" (HU Memo of Law at 14), is plainly contradicted by Charles White's personal archives. (Border's 56.1 Statement ¶ 137.) Given the University's characterization of now-sworn, contemporaneous notes taken by a Sotheby's employee as "rank hearsay" (*see infra*), the University should be able to offer more than an inaccurate webpage from the Internet—but it has not, and such "evidence" should not be considered by the Court. Accordingly, the University's motion for summary judgment should be denied. *See In re Dana Corp.*, 574 F.3d at 151 (if the non-moving party offers admissible material that either "generates uncertainty as to the true state of any material fact" or "'make[s] it arguable' that the claim has merit," summary judgment is "inappropriate").

**B.    The May 28th Sotheby's Email Reflects Evidentiary Admissions by the University that a Sale or Other Authorized Transfer of the Artwork Took Place in the 1970s**

The University's attempt to diminish the admissions made by its own in-house counsel, Ms. Jones, and its board member, Dr. Boyd, are equally unavailing, particularly when taking into

account that these two individuals *led the University's 2020 investigation into the Artwork*. The email at issue reflects statements made by Ms. Jones and Dr. Boyd while they were on a call with Sotheby's concerning the Artwork, in particular, that it could have been sold by the Barnett-Aden Gallery in the 1970s. (Carlsen Decl., ¶¶ 9-12; Ex. D (May 28 Call Notes at SOTH000133).) The email was typed out by Kayla Carlsen, Senior Vice President, Head of Department, American Art at Sotheby's, as the call was taking place. (*Id.*) As addressed in Ms. Carlsen's Declaration, this is a regularly conducted business practice of Ms. Carlsen's when giving and receiving information on artworks. (*Id.*) The University's attempts to now call statements by its own counsel and board member "gossip" and "speculation" is self-serving and legally unsupported: the notes are admissible under the "business records exception" to the hearsay rule. *See* FED. R. EVID. 803(6); *see also U.S. v. Kaiser*, 609 F.3d 556, 574-75 (2d Cir. 2010) (witness's note taking on telephone conversations was admissible under business records exception).

Even if Ms. Carlsen's email notes are hearsay (which the Borders dispute), both her and the other Sotheby's employees on the call confirmed that the email accurately reflects the statements made by Ms. Jones and Dr. Boyd (Borders 56.1 ¶ 136). Thus, the statements, as party admissions, do not constitute inadmissible hearsay. *See* FED. R. EVID. 801(d)(2)(a)-(d).[8]

---

[8] The cases cited by the University in support of its assertion that *the email*, but not *the statements themselves* (which have been confirmed by multiple witnesses), is hearsay concern (a) statements attributed to "unidentified" employees (*see Thomas v. Stone Container Corp.*, 922 F. Supp. 950, 957 (S.D.N.Y. 1996)), or (b) instances in which purported party admissions were "heard on the grapevine" and not directly from the person statement was attributed to. *Massa v. N.Y.C. Hous. Auth.*, 95 Civ. 2712 (LAK), 1996 WL 655812, at *3 n. 5 (S.D.N.Y. Nov. 8, 1996). None of these cases address the current facts, where witnesses have confirmed the statements directly from the University's authorized representatives. The University's citation of *Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 816-17 (2d Cir. 1983) is again, inapt; that case concerned notes summarizing conversations, as opposed to direct testimony that the statements were made by the opposing party. The Court also noted that "AT & T could have overcome the trial court's objections by examining Roberts himself or those Litton employees he interviewed." Here, the Borders were unable to examine either Ms. Jones or Dr. Boyd because both failed to appear for depositions. (Borders 56.1 Statement ¶¶ 164-165.)

16

### C.       The Remainder of the University's Assertions are Unavailing or Irrelevant

In support of its motion for summary judgment, the University asserts that there "is simply no evidence that explains how Kibler came to possess the Artwork" nor "is there any bill of sale or receipt evincing Howard's sale of the Artwork to anyone." (HU Memo of Law at 11-12.) Ignoring the most-likely explanation that Mr. Kibler came to possess the Artwork through a purchase from the Barnett-Aden Gallery or other party that had the Artwork on "loan" (as the University's representatives have conceded), the absence of a "bill of sale or receipt" from a long-deceased person is hardly dispositive, particularly given that the University, a highly sophisticated institution, does not itself possess one for its claimed acquisition of the Artwork. (Borders 56.1 Statement ¶ 109.) There is also ample evidence of transfers of artworks by the University (*id*., ¶ 144-148), contradicting its assertion that there is no "evidence in the undisputed factual record that the Gallery has ever sold *any* of its artworks to anyone." (HU Memo of Law at 12.) That the University *is currently in the process of privately selling artworks*—information disclosed by Sotheby's via subpoena but withheld by the University—is both probative and troubling. (Carlsen Decl. ¶ 7.)

A genuine issue of fact clearly exists as to whether the University voluntarily transferred the Artwork in the early 1970s. Further, to the extent that the University intends to rely on the "absence of evidence," it has only confirmed that the Borders will likely prevail on their laches defense for the reasons set forth below.

## V.       THE BORDERS' LACHES DEFENSE IS ADEQUATELY SUPPORTED BY THE LIMITED DOCUMENTATION AND THE LOSS OF RECORDS AND WITNESS TESTIMONY, AND AS SUCH CANNOT BE DISMISSED AT THIS STAGE

The University's efforts to dismiss the Borders' laches defense at this stage reflects a fundamental misunderstanding of the application of laches to this Action. To prevail on a laches

defense, a defendant must show that (1) the claimant was aware of its claim, (2) the claimant inexcusably delayed in taking action, and (3) the defendant was prejudiced as a result. *See Bakalar v. Vavra*, 819 F. Supp. 2d 293, 303 (S.D.N.Y. 2011) (holding that the "opposing party need not have had actual knowledge of the claim; rather, it is sufficient that the opposing party *should have known.*") (emphasis in original). Here, the Borders can satisfy the elements of their laches defense.

### A.    The University Had Knowledge of Its Claim to the Artwork No Later Than 1976

As noted in *Bakalar*, the "opposing party need not have had actual knowledge of the claim; rather, it is sufficient that the opposing party *should have known.*" *Bakalar*, 819 F. Supp. 2d at 303 (emphasis in original). Presently, the Court does not need to even assess if the University *should have known*, as the University's counsel has affirmatively acknowledged that the University "has documentation proving that…as of the 1976 Collection Inventory, the Work was missing from the Collection." (Borders 56.1 Statement ¶ 138.) It is well-established that "employees' knowledge acquired within the scope of their employment is imputed to the corporation." *State v. United Parcel Service, Inc.*, 253 F. Supp. 3d 583, 669 (S.D.N.Y. 2017) (citing *Apollo Fuel Oil v. United States*, 195. F.3d 74, 76 (2d Cir. 1999).

Here, as confirmed by Ms. Jones, Dr. Carter, who wrote the Gallery portion of the Annual Reports and never identified the Artwork as missing or stolen, knew by 1976 that the Artwork was not in the University's collection, which was noted in writing and provided to his superiors at the University. Therefore, the University knew in 1976 that the Artwork was not in its collection. That the University claims to have been unaware and unable to locate the Borders is irrelevant to the issue of knowledge of its purported claim. *See Bakalar*, 819 F. Supp. 2d at 304 ("To have 'knowledge' of their claim, [Claimants] need not have been aware of a claim against Bakalar specifically; it is enough that they knew of—or should have known of—the circumstances giving rise to the claim, even if the current possessor could not be ascertained.")

**B.**     **The University Inexcusably Delayed in Taking Action**

Having conceded that the University was aware that the Artwork was not in its collection as of 1976, the next question is whether the University "inexcusably delayed in taking action." *Bakalar*, 819 F. Supp. 2d at 303. There are several instructive cases on this point.

In *Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc.*, the plaintiff claimed ownership of a tenth century palimpsest containing two works by Archimedes. *Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc.*, 98 Civ. 7664(KMW), 1999 WL 673347, at *1 (S.D.N.Y. Aug. 30, 1999). The Court in *Greek Orthodox* found that, despite evidence that the palimpsest was no longer in the monastery's collection in the 1930s, the monastery did not bring a claim, conduct any search for the palimpsest, or announce the palimpsest's disappearance until just before seeking to enjoin its sale in 1998. *Id.*, at *10. Based on these facts, the Court granted summary judgment to Christie's on laches, finding that the monastery "was not diligent at all." *Id.*

Similarly, in *Bakalar*, neither the claimants to a drawing, nor their ancestors, made any "effort to locate or claim title to [the drawing]." *Bakalar*, 819 F. Supp. 2d at 305; *see also Sanchez v. Trustees of the Univ. of Perm.*, 04 Civ. 1253(JSR), 2005 WL 94847, at *1 (S.D.N.Y. Jan. 18, 2004) (plaintiff "offered no evidence that their grandfather, from whom the collection was allegedly stolen, undertook any search or made any effort whatever to recover the [c]ollection").

Despite being aware of a potential claim to the Artwork, the University concedes that it did absolutely nothing for over four decades. (Borders 56.1 Statement ¶¶ 113-124.) No police reports were filed, no insurance claims were made, and the Artwork was never registered in any stolen art database prior to the University being contacted by Sotheby's. (*Id.*) While the University continued to lend and have its other artworks by Charles White appraised, it did not take any action to locate the Artwork or "announce[]" its disappearance. *Greek Orthodox*, 1999 WL 673347, at *10. Such inaction falls far below the standard of diligence required under New York. *See, e.g.*, *Wertheimer*

*v. Cirker's Hayes Storage Warehouse, Inc.,* 300 A.D.2d 117 (1st Dep't 2002) (plaintiff lacked reasonable due diligence despite reporting the theft of painting in 1947 due to their later inaction to recover the painting).

Even if this Court is not prepared to rule that "the record is sufficiently clear on summary judgment to establish" that the University's search was not diligent, there is more than sufficient evidence in the record to make the "application of the laches defense…an issue for trial." *Greek Orthodox*, 1999 WL 673347, at *9; *see also Lubell*, 77 N.Y.2d 321.

### C.    The Borders Have Been Prejudiced by the University's Delay

"A defendant may suffer prejudice either because it would be inequitable, in light of a change in defendant's position, to allow plaintiff's claim to proceed or because the delay makes it difficult to garner evidence to vindicate his or her rights." *Robins Island Pres. Fund, Inc. v. Southold Dev. Corp.,* 959 F.2d 409, 424 (2d Cir.1992) (citations omitted). "A defendant has been prejudiced by a delay when the assertion of a claim available some time ago would be inequitable in light of the delay in bringing that claim." *Zuckerman v. Metro. Museum of Art*, 928 F.3d 186, 193-195 (2d Cir. 2019) (finding laches as a matter of law where delay in bringing claim resulted in absence of "first-hand witnesses who could testify to facts relevant to the Met's possible affirmative defenses").

The University's delay has "resulted in deceased witnesses, faded memories, lost documents, and hearsay testimony of questionable value." *Sanchez*, 2005 WL 94847, at *3 (granting defendant's summary judgment motion on finding of laches despite fact that possessor of the allegedly stolen property was unknown to plaintiff until shortly before lawsuit was filed). As set forth in the Statement of Facts, the following witnesses, all of whom are likely to have possessed relevant information given their connection to the Artwork and the University in the 1970s and thereafter, passed away prior to the University's initiation of this Action: (1) J.D. Kibler;

(2) Charles White; (3) Dr. A.J. Carter; (4) Dr. Jeff Donaldson; (5) Hughie Lee Smith; (6) Alden Lawson; and (7) Dr. Benjamin Tritobia. As in *Bakalar*, the death of Mr. Kibler makes it impossible to know how he came to possess the Artwork, and whether he possessed documents establishing valid ownership. *See Bakalar*, 819 F. Supp. 2d at 303 ("Of the greatest significance is the death of Mathilde Lukacs in 1979, perhaps the only person who could have elucidated the manner in which she came to possess the Drawing, or indeed, whether she owned it at all…").

The University's only living witness with even some familiarity with the Artwork (having viewed it as part of his thesis project), Mr. Baker, was a student in 1973 but did not begin working at the Gallery until 1992, and he candidly admitted that he knew nothing of the Gallery's operations while a student of the University. (Cossu Decl., Ex. H (Baker Tr. at 78:3-79:2).) The University also discarded or otherwise destroyed certain records referenced in Dr. Carter's notebook that could have, and, based on Dr. Carter's writings, likely did, concern the Artwork, including "acquisition sheets," "record cards," and a "daily log." (Borders 56.1 ¶¶ 141.) Because the University's delay in bringing this Action renders the Borders' case much more difficult to prove, the doctrine of laches should bar this Action. *See Greek Orthodox*, 1999 WL 673347, at *10.

### D.    The University's Arguments Against Laches are Unsupported

#### 1.    The Cases Cited by the University are Inapplicable

In reisisting Borders' laches defense, the University asserts that "a laches defense must fail if there is no record evidence that the original possessor would have discovered the whereabouts of the property if it had taken additional steps to locate it." (HU Memo of Law at 15.) That is an inaccurate statement of New York law. "To have 'knowledge' of their claim, [Claimants] need not have been aware of a claim against Bakalar specifically; it is enough that they knew of—or should have known of—the circumstances giving rise to the claim, even if the current possessor could not

be ascertained." *Bakalar*, 819 F. Supp. 2d at 304. Once knowledge is established, the claimant's obligation to take action and marshal information evidencing the purported theft arises. This is entirely logical and the right analysis for courts to undertake. As a matter of equity, the issue for the court to consider is not whether the University **would have discovered that the Borders were in possession of the Artwork** if it had not unreasonably delayed in taking action. Instead, the issue is whether the University **could have preserved documents and evidence that could establish whether or not a theft took place**.

The University's reliance on *Matter of Flamenbaum* is misplaced. (HU Memo of Law at 15.) In *Flamenbaum*, the court rejected a laches defense where, as a matter of law, the "spoils of war" theory proffered by the respondent would not have resulted in the claimant being divested of the gold table at issue. *Matter of Flamenbaum*, 22 N.Y.3d 962, 966 (2013). Of course, if the current possessor cannot proffer a theory under which good title could have transferred to property, a laches defense cannot survive. By contrast, Borders have presented valid explanations for how the University could have transferred good title to the Artwork, the validity of which the University has specifically acknowledged. (Borders 56.1 ¶¶ 125, 135-136.)

The same contrary fact pattern exists in *Sotheby's, Inc. v. Shene*, where the current possessor did not put forth a theory as to how he could establish that good title could have transferred to him if the claim had been brought sooner and documents and testimony were preserved. *Sotheby's, Inc. v. Shene*, 04 Civ. 10067 (TPG), 2009 WL 762697 (S.D.N.Y. Mar. 23, 2009). Further, not only did the claimant in *Shene* (unlike the University) preserve relevant documents despite (again, unlike the University) believing that the object "had been destroyed in a fire," it also "demonstrated that it diligently pursued claims for other objects that it believed had been stolen, rather than destroyed, and there was no reason for it to be any less diligent in attempting to recover the book here." *Shene*, 2009 WL 762697 at *4.

Because (1) the Borders have put forth valid explanations as to how good title to the Artwork left the University and, eventually, transferred to the Borders, and (2) the University failed to preserve documents that could either establish or rebut those explanations, the cases cited by the University do not apply and the Borders' laches defense not only cannot be dismissed "as a matter of law." Instead, it should be held to bar the University's claims.

**2.    The University's "Expert" Report Lacks Any Reliable Methodology and Must Be Excluded for Attempting to Usurp the Role of the Fact Finder**

While the Borders are persons of modest means when compared to the University, their decision not to "submit any expert testimony in this case" (HU Memo of Law at 19), had little to do with resources and everything to do with the fact that no rebuttal report was needed because the University's "expert" offered no admissible opinions.

*First*, as Mr. Panczenko concedes, he offers no opinion on whether or not the Artwork was stolen from the University. (Cossu Decl., Ex. J (Panczenko Tr. at 30:17-20).)

*Second*, the opinion that Mr. Panczenko does proffer is that the University "acted reasonably in managing its art collection and, specifically, acted reasonably in connection with the Artwork."[9] (Panczenko Decl., ECF No. 41, Ex. A (Report at 2).) Such testimony is not admissible under FED. R. EVID. 702 as it "undertakes to tell the jury what result to reach." *Nimely v. City of N.Y.*, 414 F.3d 381, 397 (2d Cir. 2005). The Second Circuit has determined that "expert" testimony on the reasonableness of a party's conduct "intrude[s] on the jury's exclusive role as the finder of facts." *Callahan v. Wilson*, 863 F.3d 144, 153 (2d Cir. 2017).

*Third*, even if Mr. Panczenko's opinions were not impermissible attempts to usurp the role of the fact finder, his report lacks any methodology and is centered around a single book he read,

---

[9] Mr. Panczenko deserves credit for being forthright about what he was retained for: (Q. "And you were retained to opine that Howard University met that standard of care; is that correct," A. "On how they met it, yes." (Cossu Decl., Ex. J (Panczenko Tr. at 41:11-14).)

Victor Danilov's *University and College Museum, Galleries, and Related Facilities: A Descriptive Directory* (the "Danilov Publication"). Mr. Panczenko parrots the statements contained in the Danilov Publication despite admitting that he took no actions to independently verify any of its contents. (Cossu Decl., Ex. J (Panczenko Tr. at 11:2-25).) Neither has Mr. Panczenko published any article on collection management practices, nor did he use any methodology beyond his "40 years of experience" to reach his conclusion that the University acted reasonably. (*Id*. at 37:11-18, 89:23-90:5, 122:16-25).) Mr. Panczenko was also unaware of professional guidelines set by the College Art Association ("CAA"), of which he was a former member, concerning practices at museums, including that curators should ensure "that records of works of art under their care are properly maintained." (*Id*. at 92:5-95:9).) As a result, Mr. Panczenko's conclusions are based in part on "presumptions" he had as to what Dr. Carter was thinking in 1976. (*Id*. at 115:22-117:12).)

Accordingly, no rebuttal expert was needed as Mr. Panczenko's proffered conclusions, while certainly "disputed," are inadmissible and will be the subject, if necessary, of a *Daubert* motion to be excluded in their entirety.

## VI.   THE BORDERS' ADDITIONAL AFFIRMATIVE DEFENSES ARE LEGALLY AND FACTUALLY SUPPORTED

The University disingenuously claims that the Borders "do not have knowledge of any facts that support any of their affirmative defenses." (HU Memo of Law at 20). The deposition testimony is clear that Mr. Borders was appropriately advised not to disclose information that he did not have personal knowledge of. and which he was only aware of through conversations with counsel. (Harvey Decl., Ex. 27 (L Borders Tr. at 10:18 – 53:24).) This is entirely consistent with the Affirmative Defenses, which concern the conduct of the University, and not the Borders.

For the reasons set forth *supra*, at a minimum, genuine issues of material fact exist as to the Borders' First, Second, Third, Sixth and Seventh Affirmative Defenses. Further, to the extent

this Action proceeds to a bench trial, the Borders intend to seek an order under FED. R. CIV. P. 37, including under Rule 37(b)(2)(A)(ii), "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence," in light of (a) Dr. Farrington's failure to adequately prepare herself as a Rule 30(b)(6) witness, and (b) Dr. Boyd's and Ms. Jones's failure to appear for their depositions. *See Kyoei Fire & Marine Ins. Co., Ltd. v. M/V Maritime Antalya*, 248 F.R.D. 126, 152-53 (S.D.N.Y. 2007).

Similarly, for the reasons set forth above, genuine issues of material fact exist (at a minimum) as to the Borders' Fourth, Fifth, and Tenth Affirmative Defenses. The entrustment of the Artwork to the Barnett-Aden Gallery, or any other art merchant or borrower, would enable that party to pass good title to a buyer in the ordinary course. *See* U.C.C. § 2-403 (which has been codified in Washington D.C., North Carolina, and New York). The relevant inquiry would then be ***not whether the Borders paid anything of value for the Artwork*** (which they concede they are not good faith purchasers for value), but rather ***what Mr. Kibler provided as consideration for the Artwork***. Of course, the Borders ability to determine that has been forever lost by the University's delay in asserting a claim, and the University should be equitably estopped from now, for the first time after over forty years, claiming the Artwork was stolen. (Borders 56.1 ¶¶ Statement 149-157.)

The University's negligence in failing to ensure that records of artworks under its care were properly maintained remains a valid Eighth Affirmative defense. Even Mr. Panczenko described some of the University's conduct as "not an advisable practice" and "often error prone." (Panczenko Decl., Ex. A (Report at ¶¶ 44, 61).) The University's in-house counsel's decision to pressure an unrepresented elderly couple to return a valuable Artwork is also a matter for the finder of fact to determine what the appropriate remedy should be, as set forth in the Ninth Affirmative Defense.

**CONCLUSION**

For the foregoing reasons, the Borders respectfully request that the Court deny the University's motion in its entirety and, as appropriate under FED. R. CIV. P 56(f), grant summary judgment to the Borders on their counterclaims and affirmative defenses.

Dated: New York, New York
2021-June-28

**OLSOFF | CAHILL | COSSU** LLP

By:         */s/ Paul S. Cossu*
Paul S. Cossu
John R. Cahill
Jonathan A. Olsoff
3 Water Street
Ellenville, NY 12428
212-719-4400

*Attorneys for*
*Larry Borders and Virginia Borders*
