UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                       :

HOWARD UNIVERSITY,                   :

                          Plaintiff     :

           -v-                        :           20-cv-4716 (LJL)

                                         :

LARRY BORDERS and VIRGINIA BORDERS.   :      OPINION AND ORDER

                      Defendants,   :

                                         :

and                                       :

*CENTRALIA MADONNA*, A DRAWING,     :

                     Defendant-in-rem.  :

------------------------------------------------------------------------X

                                         :

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _03/01/2022_

LEWIS J. LIMAN, United States District Judge:

Plaintiff Howard University ("Plaintiff" or "Howard" or "the University") moves, pursuant to Federal Rule of Civil Procedure 56, for summary judgment in its favor on each of its claims and for summary judgment dismissing the remaining counterclaim and affirmative defenses of defendants Larry Borders and Virginia Borders (collectively, "Defendants" or "the Borders").[1] Dkt. No. 37.

For the following reasons, the motion for summary judgment is granted in part and denied in part.

## BACKGROUND

This case revolves around the dispute over the ownership of a 1947 drawing by Charles White titled *Centralia Madonna* (the "Artwork").[2]

---

[1] The Borders are also counterclaim plaintiffs with respect to their remaining counterclaim and Howard is the counterclaim defendant; however, for ease of reference, the Court refers to the Borders as Defendants and Howard as Plaintiff throughout.

[2] Charles White, a renowned African American artist and teacher, is particularly known for his

The broad contours of this case are undisputed.  Howard, a federally chartered HBCU[3] located in Washington, D.C., possessed the Artwork beginning in the fall of 1947.  Dkt. No. 38 ¶ 6; Dkt. No. 46 ¶ 6.  According to an October 26, 1947 *Washington Post* article, the "Barnet-Aden [sic] Gallery" held an exhibition of paintings by Charles White; the article states that "[i]n 1945, he was artist-in-residence at Howard University," and that "Howard owns" a different Charles White artwork, and "from the current show has acquired the drawing, 'Centralia Madonna.'"  Dkt. No. 40, Ex. 8; *see also* Dkt. No. 38 ¶ 6; Dkt. No. 46 ¶ 6.  The Barnett-Aden Gallery was "the first privately owned black gallery in the United States," and was co-founded by the chair of the University's Department of Art and the curator of the Howard University Gallery of Art.  Dkt. No. 40, Ex. 9.

In the early 1970s, the Artwork came to be possessed by the Borders.  Dkt. No. 38 ¶ 42; Dkt. No. 46 ¶ 83.  How this came about is the central question in this case; the parties' competing narratives are outlined below.  The instant dispute arose when, in January 2020, the Borders decided to explore selling the Artwork.  Dkt. No. 38 ¶ 70; Dkt. No. 46 ¶ 70.  They reached out to Sotheby's, an auction house located in New York City; Sotheby's provided estimates of $300,000 to $500,000 for the Artwork.  Dkt. No. 38 ¶¶ 71–72; Dkt. No. 46 ¶¶ 71–72.  On February 28, 2020, the Borders signed a consignment agreement with Sotheby's, authorizing Sotheby's to sell the Artwork on the Borders' behalf at an auction scheduled to take place in New York City in May 2020.  Dkt. No. 38 ¶ 73; Dkt. No. 46 ¶ 73.  In March 2020, the Artwork was retrieved from the Borders' private residence in Durham, North Carolina, by a

---

"commitment to creating powerful images of African Americans—what his gallerist and, later, White himself described as 'images of dignity.'"  *Charles White: A Retrospective*, MoMA, https://www.moma.org/calendar/exhibitions/3930 (last visited Mar. 1, 2022).

[3] An HBCU is "a historically Black college or university."  Merriam-Webster Online Dictionary, accessible at https://www.merriam-webster.com/dictionary/HBCU (last visited Mar. 1, 2022).

shipping service coordinated by Sotheby's.  Dkt. No. 38 ¶ 75; Dkt. No. 46 ¶ 75.  The Artwork was delivered to Sotheby's in New York City, where it has remained.  Dkt. No. 38 ¶ 75; Dkt. No. 46 ¶ 75.

On May 12, 2020, Howard was contacted by a representative of Sotheby's by email—the email raised a "question . . . regarding provenance for a work by Charles White which we are including in our upcoming *American Art* sale," saying that "our specialists believe that this may in fact have been owned by Howard University in the 1950s," and asking "if there is any record of this work in Howard's collection," because "[a]ny further information . . . would be extremely helpful for the purposes of our cataloguing."  Dkt. No. 40, Ex. 35; *see also* Dkt. No. 38 ¶ 76; Dkt. No. 46 ¶ 76.  After several calls with Sotheby's, on June 1, 2020, a representative of Howard notified the Borders via a telephone call on which representatives from Sotheby's were present that the Artwork "belonged to" Howard and that Howard "wanted it back."  Dkt. No. 38 ¶ 84; Dkt. No. 46 ¶ 84.  The Borders did not agree to return the Artwork to Howard, instead telling the University's representatives that they wanted to sell the Artwork.  Dkt. No. 38 ¶ 85; Dkt. No. 46 ¶ 85.  The Borders agreed that Sotheby's had the right to withdraw the Artwork from the *American Art* auction based on the University's claims, but they did not agree to transfer possession of the Artwork to Howard.  Dkt. No. 38 ¶ 86; Dkt. No. 46 ¶ 86.  As the matter stands now, the Artwork has remained in Sotheby's in New York City; both Howard and the Borders assert that they have proper title to the Artwork.

As noted above, the parties have different narratives as to how the Artwork left the University's possession and came to be possessed by the Borders.

The Borders' narrative is as follows:  They assert that the University either consigned the Artwork to the Barnett-Aden Gallery or otherwise voluntarily disposed of the Artwork, likely via

loan, in or about 1973.  Dkt. No. 46 ¶¶ 125, 135.  In the early 1970s, a friend of the Borders named J.D. Kibler ("Kibler") gave them the Artwork as a gift.  *Id.* ¶ 94.  At the time, the Borders did not believe that the Artwork was particularly valuable.  *Id.* ¶ 95.  The gift was accompanied by the gift of another work of art, which was not then and is not now particularly valuable, and which is not claimed by the University to have been stolen from its collection.  *Id.* ¶ 96.

For its part, the University does not dispute for purposes of this motion that the Borders received the Artwork from Kibler in the early 1970s as a gift, along with another piece of art which is not valuable and which the University does not claim was stolen from its collection.  Dkt. No. 52 ¶¶ 94, 96.  It disputes, however, how the Artwork left its possession.  Its narrative is as follows.  It asserts that the Artwork was removed from its collection without authorization.  Dkt. No. 39 at 1.  It states that the only loan agreement relating to the Artwork in Howard's records is a loan agreement executed in December 1969 between the University and the Museum of Fine Arts in Boston; the loan was for an exhibition from February 9 to March 10, 1970.  Dkt. No. 38 ¶ 13.  In January 1973, several years after that loan agreement, Scott Baker, the current Assistant Director of the Howard University Gallery of Art, personally viewed and documented the Artwork on the University's campus; at the time, he was a graduate student at the University.  *Id.* ¶¶ 8, 14.  According to the University, there is no record of the Artwork being loaned to any other third party.  *Id.* ¶ 15.  Nor is there any record of the University selling or loaning the Artwork to Kibler, *id.* ¶¶ 34, 36, or of the University selling the Artwork to any other third party, *id.* ¶ 35.

## PROCEDURAL HISTORY

The complaint in this case was filed on June 19, 2020; it asserts a claim for declaratory judgment that the University is the true owner of the Artwork, a claim to quiet title, and a claim for replevin under New York common law.  Dkt. No. 1.  The Borders filed their answer along

with three counterclaims—a claim for declaratory judgment that the Borders have the proper

right, title, and interest in and to the Artwork, a claim for slander of title, and a claim for tortious

interference with contract—on June 22, 2020.  Dkt. No. 6.  On July 10, 2020, Howard filed a

motion to dismiss the second and third counterclaims, Dkt. No. 13; on July 17, 2020, the parties

entered a stipulation of voluntary dismissal of the second and third counterclaims, and the

then-pending motion was denied as moot, Dkt. No. 16.  Howard filed its answer to the sole

remaining counterclaim on July 30, 2020.  Dkt. No. 17.

      Howard filed a motion for summary judgment on both its claims and the sole remaining

counterclaim on May 3, 2021.  Dkt. No. 37.  The Borders filed an opposition to the motion on

June 28, 2021, and the University filed a reply on July 21, 2021.  Dkt. Nos. 45, 51.

## LEGAL STANDARD

      Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the moving party is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "When the burden of proof at

trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a

lack of evidence to go to the trier of fact on an essential element of the non-movant's claim."

*Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  If the movant meets its

burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a

genuine issue of fact for trial in order to avoid summary judgment."  *Id.*  "An issue of fact is

'material' for these purposes if it 'might affect the outcome of the suit under the governing

law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could

return a verdict for the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92,

97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In

determining whether there are any genuine issues of material fact, the Court must view all facts

"in the light most favorable to the non-moving party," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

"[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).  Nor may the non-moving party "rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).  Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  To defeat a motion for summary judgment, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).

The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented. Any party moving for summary judgment must "annex[] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." L.R. 56.1(a).  Local Rule 56.1(b), in turn,

requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." L.R. 56.1(b).  All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible." L.R. 56.1(d).  "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." L.R. 56.1(c).

## CHOICE OF LAW

A preliminary question in this case is what law governs the dispute over the Artwork. Three jurisdictions are relevant to the dispute:  The University possessed the Artwork in Washington, D.C.; the Borders possessed the Artwork in North Carolina; and the Artwork is now in New York, where it is being held by Sotheby's.

### I.      Conflicts Between the Laws of New York, North Carolina, and Washington, D.C.

The parties appear to agree that there is an actual conflict of laws between the three jurisdictions; however, they disagree as to what that conflict is.  The Borders assert that "an actual conflict exists, as the University's claims are untimely and subject to dismissal under the laws of both Washington D.C. and North Carolina." Dkt. No. 45 at 10.  The University asserts that there is no conflict regarding the statutes of limitations in the three jurisdictions but that the jurisdictions "differ on the allocation of burdens as to whether the object was stolen or otherwise transferred in a manner that conveyed valid title." Dkt. No. 51 at 2.

A.      **The Second Circuit Decision in *Bakalar***

The starting point for the conflict of law analysis must be the Second Circuit decision in

*Bakalar v. Vavra*, 619 F.3d 136 (2d Cir. 2010).  *Bakalar* involved facts similar to those presented

in this case; the case revolved around a dispute over the ownership of an Egon Schiele drawing.

The drawing had been owned by Franz Friedrich Grunbaum in Austria, before he "was deprived

of his possession and *dominium* over the Drawing after being arrested by the Nazis and signing a

power of attorney while imprisoned at Dachau" in 1938.  *Id.* at 137.  The drawing made its way

from Austria to a Swiss art gallery in 1965, which then sold it in Switzerland to a New York art

gallery later that year.  *Id.* at 139.  The drawing was shipped to the gallery in New York, where it

was sold to David Bakalar, a Massachusetts resident, in 1963.  *Id.*  In 2004, Bakalar consigned

the drawing for auction at Sotheby's, *see Bakalar v. Vavra*, 2008 WL 4067335, at \*1 (S.D.N.Y.

Sept. 2, 2008); after the winning bid was withdrawn,[4] "apparently because of a letter written on

behalf of Milos Vavra and Leon Fischer"—who were heirs to Grunbaum's estate—challenging

Bakalar's title, Bakalar filed an action for declaratory judgment, and Vavra and Fischer filed

counterclaims for, *inter alia*, declaratory judgment and replevin, 619 F.3d at 139.

Following well-settled law, the Second Circuit started with the proposition that,

"[b]ecause jurisdiction in this case is predicated on diversity of citizenship, New York's

choice-of-law rules apply."  *Id.* (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496

(1941)).  The *Bakalar* court turned first "to the threshold question whether there is a difference

between the laws of Switzerland and New York upon which the outcome of the case is

---

[4] Although the drawing was originally consigned to Sotheby's to be sold at a November 2004 auction in New York, Sotheby's withheld the drawing from that auction "to conduct further research into its provenance," and ultimately auctioned it in London in February 2005.  *Id.*

dependent." *Id.*  It "conclude[d] that there is a significant difference that is reflected in the laws and policies of these two jurisdictions." *Id.*

In determining the New York law principles that would be applied to the action, the court looked to the New York Court of Appeals' decision in *Lubell v. Guggenheim*, 569 N.E.2d 426 (N.Y. 1991), which is "[t]he leading New York case in this area." *Bakalar*, 619 F.3d at 141.  As *Bakalar* explains, *Lubell* "was decided against the backdrop of the New York market in stolen artwork." *Id.*; *see also Lubell*, 569 N.E.2d at 427 ("The backdrop for this replevin action is the New York City art market, where masterpieces command extraordinary prices at auction and illicit dealing in stolen merchandise is an industry all its own.").  *Bakalar*'s discussion of New York law began with the principle that "in New York, a thief cannot pass good title." *Bakalar*, 619 F.3d at 140.  This is because "New York case law has long protected the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good-faith purchaser for value"; the rule "reflects an overarching concern that New York not become a marketplace for stolen goods and, in particular, for stolen artwork." *Id.* at 141 (internal quotation marks omitted) (quoting *Lubell*, 569 N.E.2d at 429).  The *Bakalar* Court emphasized two holdings of *Lubell*, both of which are part of this broad policy of protecting true owners and the integrity of the New York art market, and both of which are relevant to the analysis in *Bakalar* and to the instant case.

First, "[o]ne aspect of that protection" is that "a cause of action for replevin against the good-faith purchaser of stolen property 'accrues when the true owner makes demand for return of the chattel and the person in possession of the chattel refuses to return it.  Until demand is made and refused, possession of the stolen property by the good-faith purchaser is not considered wrongful' and the statute of limitations does not begin to run." *Id.* (quoting *Lubell*, 569 N.E.2d

at 429).  *Lubell* adopted this rule because it is "the rule that affords the most protection to true owners of stolen property," and because a discovery rule, which would have afforded less such protection, had already been rejected by New York, on the grounds that such a rule would have made New York "a haven for cultural property stolen abroad since such objects would be immune from recovery under the limited time periods established by the bill."  *Id.* (alteration adopted) (quoting *Lubell*, 569 N.E.2d at 430).  This holding was "in part influenced by [the *Lubell* court's] recognition that New York enjoys a worldwide reputation as a preeminent cultural center," and the fact that "[t]o place the burden of locating stolen artwork on the true owner and to foreclose the rights of that owner to recover its property if the burden is not met would . . . encourage illicit trafficking in stolen art."  *Id.* (quoting *Lubell*, 569 N.E.2d at 431).

Second, the *Bakalar* Court emphasized *Lubell*'s holding "agree[ing] with the Appellate Division, 'for the reasons stated by that court, that the burden of proving that the painting was not stolen properly rests with the possessor.'"  *Id.* (alteration adopted) (quoting *Lubell*, 569 N.E.2d at 431).  That holding, too, was in line with the principle that New York affords great protection to true owners over current possessors; *Bakalar* noted that "[w]hile the Appellate Division recognized that the burden it was placing on the good-faith possessor was an 'onerous one,' it held that 'it well serves to give effect to the principle that persons deal with the property in chattels or exercise acts of ownership over them at their peril.'"  *Id.* (quoting *Solomon R. Guggenheim Found. v. Lubell*, 550 N.Y.S.2d 618, 624 (1st Dep't 1990)).

The Second Circuit then turned to Swiss law and explained that "[u]nder Article 934 of the Swiss Civil Code, as summarized by Bakalar's expert, 'a buyer acting in good faith will *acquire valid title to stolen property* after a period of *five years*.'"  *Id.* at 140 (emphasis in original).  It further stated that "Swiss law . . . presumes that a purchaser acts in good faith, and a

plaintiff seeking to reclaim stolen property has the burden of establishing that a purchaser did not act in good faith."  *Id.*

Having decided there was a conflict between New York law and Swiss law, the Second Circuit turned to the choice of law issue; it held that the proper framework for that analysis is the interests analysis, under which "the law of the jurisdiction having the greatest interest in the litigation is applied and . . . the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict."  *Id.* at 144 (quoting *Karaha Bodas Co., LLC v. Perusahaan Pertambangan Dan Gas Bumi Negara*, 313 F.3d 70, 85 (2d Cir. 2002)).

In applying the interests analysis, the Second Circuit looked to "[t]he alternative basis for Judge Mishler's holding in *Elicofon*"[5] as "a clear example of the application" of that analysis. *Id.* at 144 (citing *Kunstammlungen Zu Weimar v. Elicofon*, 536 F. Supp. 829, 846 (E.D.N.Y. 1981)).  Under the interests analysis in *Elicofon*, "[w]hile the theft of the paintings occurred in Germany, [Judge Mishler] concluded correctly that the locus of the theft was simply not relevant to the interest underlying [the German law]," whereas "'the contacts of the case with New York, *i.e.*, Elicofon purchased and holds the paintings here, are indeed relevant to effecting its interest in regulating the transfer or title in personal property in a manner which best promotes its policy.'"  *Id.* (quoting *Elicofon*, 536 F. Supp. at 846).  The *Bakalar* Court further emphasized Judge Mishler's reasoning that:

> In applying the New York rule that a purchaser cannot acquire good title from a thief, New York courts do not concern themselves with the question of where the

---

[5] The Second Circuit had already rejected Judge Mishler's first holding, along with the holding in *Bakalar* below, because it relied on the "traditional situs rule," but "'the New York Court of Appeals explicitly rejected the "traditional situs rule" in favor of interest analysis in *Istim*.'"  *Id.* at 143 (quoting *Karaha Bodas*, 313 F.3d at 85 n.15 (citing *Istim, Inc. v. Chemical Bank*, 581 N.E.2d 1042 (N.Y. 1991))).

theft took place, but simply whether one took place. Similarly, the residence of the true owner is not significant, for the New York policy is not to protect resident owners, but to protect owners generally *as a means to preserve the integrity of transactions and prevent the state from becoming a marketplace for stolen goods*.

*Id.* (quoting *Elicofon*, 536 F. Supp. at 846) (emphasis added by the Second Circuit).

Reasoning from *Elicofon*'s analysis of this "compelling New York interest," and *Lubell*'s articulation of the same interest, the *Bakalar* court concluded that, "if the claim of [the plaintiffs] is credited, a stolen piece of artwork was delivered in New York to a New York art gallery, which sold it in New York to [the defendant]. Indeed, [the defendant] concedes that 'a substantial part of the events or omissions giving rise to the claims herein' occurred in New York. These 'events and omissions' made New York a 'market place for stolen goods' and, more particularly, for stolen artwork, which was of special concern in *Lubell*." *Id.*

In contrast, the Second Circuit emphasized Switzerland's "tenuous interest" in the case—specifically, the fact that although the drawing "was purchased in Switzerland by a Swiss art gallery, which resold it within five months to a New York art gallery," application of New York law would not "affect any other Swiss citizen or Swiss interest," beyond the fact that application of New York law "may adversely affect the extra-territorial sale of artwork by Swiss galleries." *Id.* at 145. Those interests, the court said, "must yield to the significantly greater interest of New York, as articulated in *Lubell* and *Elicofon*, in preventing the state from becoming a marketplace for stolen goods." *Id.*

    **B.**    **Application of *Bakalar***

        **1.**    **Conflicts Between New York, North Carolina, and Washington, D.C. Law**

            **a.**    **Statute of Limitations**

Applying the *Bakalar* framework to this case, the Court cannot say that there is no conflict between New York law and the laws of Washington, D.C. and North Carolina. *See*

*Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001) ("It is only when it can be said that there is no actual conflict that New York will dispense with a choice of law analysis." (internal quotation marks omitted) (quoting *Curley v. AMR Corp.*, 153 F.3d 5, 11 (2d Cir. 1998))).  The New York law that would be applied to this dispute is set forth in *Bakalar* and *Lubell*.  Two particular laws are relevant to this dispute.

First, New York would apply a "demand and refusal" rule for cases seeking recovery of a stolen chattel from a good faith purchaser; "a cause of action for replevin against the good-faith purchaser of a stolen chattel accrues when the true owner makes demand for return of the chattel and the person in possession of the chattel refuses to return it." *Lubell*, 569 N.E.2d at 429. "Until demand is made and refused, possession of the stolen property by the good-faith purchaser is not considered wrongful."[6]  *Id.*; *see also DeWeerth v. Baldinger*, 38 F.3d 1266, 1272 (2d Cir. 1994) (noting that the New York Court of Appeals "held that New York ha[s] a clearly established rule that the statute of limitations does not start to run until a *bona fide* purchaser refuses an owner's demand for return of a stolen art object"); *see also Grosz v. Museum of Modern Art*, 772 F. Supp. 2d 463, 477, 483 (S.D.N.Y. 2009) (applying the demand and refusal rule in an action to recover three paintings, one of which was gifted to the museum), *aff'd*, 403 F. App'x 575 (2d Cir. 2010), *cert. denied*, 565 U.S. 819 (2011).  Accordingly, applying New York law to the instant dispute, the statute of limitations did not begin to run until June 1, 2020, when Howard made a demand of the Borders for return of the Artwork and that demand was refused; the action thus is timely under New York law.[7]

---

[6] The New York Court of Appeals noted that a "different rule applies when the stolen object is in possession of the thief"; in such a case, although it is "seemingly anomalous," the statute of limitations runs "from the time of the theft, even if the property owner was unaware of the theft at the time that it occurred." *Id.* (internal citations omitted).

[7] Whether the University unreasonably delayed in making this demand would still be relevant to

North Carolina law does not squarely address the issue of whether a demand and refusal rule applies to a good faith purchaser.  It has a three-year statute of limitations for recovery of a chattel.  N.C. Gen. Stat. § 1-52 ("Within three years an action - . . . [f]or taking, detaining, converting or injuring any goods or chattels, including action for their specific recovery."). North Carolina also recognizes a demand and refusal rule in some conversion claims:  "When there has been no wrongful taking or disposal of the goods, and the defendant has merely come rightfully into possession and then refused to surrender them, demand and refusal are necessary to the existence of the tort."  *Hoch v. Young*, 305 S.E.2d 201, 203 (N.C. 1983) (quoting Prosser, *The Law of Torts* 4th, § 15 at 89–90 (1971)); *see also White by Brown v. White*, 331 S.E.2d 703, 705 (N.C. 1985) (quoting *Hoch* for this proposition); *White v. Consolidated Planning, Inc.*, 603 S.E.2d 147, 165 (N.C. 2004) (same).  North Carolina recognizes the demand and refusal rule in conversion claims where the defendant rightfully came into possession of the property; it is not clear whether the same rule would apply in an action for replevin where the property is alleged to have been stolen, but the defendant in the action is not the thief but rather a good faith possessor of the property.  The limited case law addressing the demand and refusal rule neither compels nor forecloses this result.

Washington, D.C. too has a three-year statute of limitations for recovery of a chattel. D.C. Code § 12-301 ("[A]ctions for the following purposes may not be brought after the expiration of the period specified below from the time the right to maintain the action accrues: . .

---

the affirmative defense of laches under New York law.  *See Lubell*, 569 N.E.2d at 427 ("We agree . . . that the timing of the museum's demand for the [art] and the appellant's refusal to return it are the only relevant factors in assessing the merits of the Statute of Limitations defense. . . .  Appellant's affirmative defense of laches remains viable, however, and her claims that the museum did not undertake a reasonably diligent search for the missing painting will enter into the trial court's evaluation of the merits of that defense.").

. for the recovery of personal property or damages for its unlawful detention—3 years."). Washington, D.C. also recognizes the demand and refusal rule for the accrual of a claim of conversion or replevin where the initial possession was rightful. *See Shea v. Fridley*, 123 A.2d 358, 361 (D.C. 1956) ("[W]here the defendant's initial possession is lawful, the settled rule is that it [sic] the absence of other facts and circumstances independently establishing conversion, a demand for its return is necessary to render his possession unlawful and to show its adverse nature."); *Hunt v. DePuy Orthopaedics, Inc.*, 636 F. Supp. 2d 23, 28 (D.D.C. 2009) ("The District of Columbia Court of Appeals has not addressed the issue of when a replevin claim accrues in a situation where a plaintiff agreed to give property to a defendant and only later demanded its return. . . . Prior to [plaintiff's] request, there was no wrongful withholding, which is required to bring a replevin claim."). As with North Carolina case law, this case law does not squarely address whether the same rule would apply when the initial transfer of the property at issue was not lawful, but the defendant is a good faith possessor of the property.

Although there appears to be a conflict between the relevant jurisdictions' statutes of limitations, under the law of all three jurisdictions, statutes of limitations—as opposed to, for example, statutes of repose—are considered to be procedural rather than substantive. *See Portfolio Recovery Assocs., LLC v. King*, 927 N.E.2d 1059, 1060 (N.Y. 2010) ("[S]tatutes of limitations are considered procedural because they are deemed as pertaining to the remedy rather than the right." (internal quotation marks omitted)); *Stokes v. Southeast Properties, Ltd.*, 877 F. Supp. 986, 995 (W.D.N.C. 1994) ("The statutes of limitation have been uniformly held by this Court, and so far as we know by other courts, to be governed by the law of the forum. . . . The plea of the statutes of limitation is a plea to the remedy and consequently the *lex fori* must prevail." (internal quotation marks omitted)); *Youkelsone v. F.D.I.C.*, 910 F. Supp. 2d 213, 221

15

(D.D.C. 2012) ("In the District, statutes of limitations are procedural, which means that the statues of limitations of the forum . . . apply . . . ."). "Traditional choice of law analysis [does] not apply to determine the applicable statute of limitations because the issue is procedural." *Abbott Laboratories v. Fineberg*, 477 F. Supp. 3d 57, 61 (S.D.N.Y. 2020). Consequently, the Court concludes that New York's applicable statute of limitations—the demand and refusal rule—applies to this action. The same result would be compelled by an application of New York's choice of law principles, as addressed below in the choice of law analysis.

### b.    Burden of Proof

Second, under New York law, "the burden of proving" that the Artwork "was not stolen" would rest with the Borders. *Bakalar*, 619 F.3d at 142 (quoting *Lubell*, 569 N.E.2d at 431). Howard would need only to make "a threshold showing that they have an arguable claim" to the artwork for the burden to be placed on "the current possessor to prove that the [artwork] was not stolen." *Id.* at 147. Accordingly, under New York law, assuming that Howard can make this threshold showing, the burden of proof in this case is on the Borders to prove that the Artwork was not stolen. Placing this high burden on the current possessor is in line with the underlying policy interests of New York law in this area: "New York case law has long protected the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good-faith purchaser for value." *Id.* at 141 (internal quotation marks omitted) (quoting *Lubell*, 569 N.E.2d at 429).

The University appears to concede that the same burden-shifting scheme that would apply under New York law does not apply under North Carolina law and Washington, D.C. law. *See* Dkt. No. 51 at 2 (stating that the laws of New York, Washington, D.C., and North Carolina "differ on the allocation of burdens as to whether the object was stolen or otherwise transferred in a manner that conveyed valid title. . . . Washington, D.C. and North Carolina law would

likely place this burden on the non-possessor").  Accordingly, in the burden of proof context, a conflict exists between New York law and the relevant foreign law.

### 2.      Interests Analysis

The Court thus turns to "the choice-of-law issue, using New York choice-of-law principles."  *Fieger*, 251 F.3d at 394.  As stated in *Bakalar*, the relevant choice of law framework in New York for disputes over ownership of personal property is the interest analysis.  *See Bakalar*, 619 F.3d at 143 (rejecting the lower court's application of the "traditional situs rule," which "dictates that questions relating to the validity of a transfer of personal property are governed by the law of the state where the property is located at the time of the alleged transfer," because "'the New York Court of Appeals explicitly rejected the 'traditional situs rule' in favor of interest analysis in *Istim*'" (quoting *Karaha Bodas Co., LLC v. Perusahaan Pertambangan Dan Gas Bumi Negara*, 313 F.3d 70, 85 n.15 (2d Cir. 2002) (citing *Istim, Inc. v. Chemical Bank*, 581 N.E.2d 1042 (N.Y. 1991)))).

Under the interests analysis, "the law of the jurisdiction having the greatest interest in the litigation is applied and the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict."  *Karaha Bodas*, 313 F.3d at 85 (internal alteration and omission adopted) (quoting *Koreag, Controle et Revision S.A. v. Refco F/X Assoc. Inc.*, 961 F.3d 341, 350 (2d Cir.), *cert. denied*, 506 U.S. 865 (1992)).  Accordingly, before determining which jurisdiction has the greatest interest as related to the two laws in conflict—the statute of limitations laws and the burden of proof laws—the Court reviews in greater detail each jurisdiction's connection to and contacts with the instant dispute.  The facts relating to these contacts are undisputed except where otherwise stated.

This case is similar in some respects to *Bakalar*.  As in *Bakalar*, where the Schiele drawing was first possessed and transferred outside New York, so too here the case originates

with the University's possession of the Artwork in Washington, D.C.  The University acquired the Artwork in 1947, and it remained in the University's possession in Washington, D.C. for about twenty-five years, until around 1973.  Dkt. No. 38 ¶¶ 6, 8; Dkt. No. 46 ¶¶ 6, 8.  Although the parties disagree as to how the Artwork left the University's possession, under either theory— whether, as the Borders assert, the University consigned the Artwork to the Barnett-Aden Gallery or otherwise voluntarily disposed of it via a loan, or whether, as the University asserts, the Artwork was removed from its collection without authorization—the initial transfer, the circumstances and lawfulness of which is central to this dispute, must have occurred in Washington, D.C.

After the initial transfer of the Artwork, it is undisputed for purposes of this motion that the Artwork was gifted to the Borders in North Carolina in the early 1970s.  Dkt. No. 38 ¶ 44; Dkt. No. 46 ¶¶ 44, 94; Dkt. No. 52 ¶ 94.  From the time the Borders received the Artwork until February 2020—i.e., for over forty-five years—the Artwork was kept continuously in the Borders' home in Durham, North Carolina.  Dkt. No. 38 ¶ 57; Dkt. No. 46 ¶ 57.  Although the Borders moved several times during this period, *see* Dkt. No. 38 ¶¶ 58–60; Dkt. No. 46 ¶¶ 58– 60, these moves were all within Durham, North Carolina, and the Artwork traveled with them to their new home through each move.

The Artwork first arrived in New York in March 2020, when it was retrieved from the Borders' private residence in Durham, North Carolina by a shipping service coordinated by Sotheby's so that it could be sold on the Borders' behalf at Sotheby's *American Art* auction scheduled to take place in May 2020 in New York.  Dkt. No. 38 ¶¶ 73, 75; Dkt. No. 46 ¶¶ 73, 75. The Borders had signed a consignment agreement to that effect with Sotheby's on February 28, 2020; the agreement included a choice of law clause stating that it was governed by New York

law and that New York courts have exclusive jurisdiction over any disputes arising under the

agreement. Dkt. No. 38 ¶¶ 73–74; Dkt. No. 46 ¶¶ 73–74.  The Artwork has remained in

Sotheby's possession in New York since then.  Dkt. No. 38 ¶ 75; Dkt. No. 46 ¶ 75.  Although the

Artwork was shipped to New York with the intention of its being offered for sale at auction in

New York in May 2020, once the dispute over ownership of the Artwork arose, the Borders

agreed that Sotheby's could hold back the Artwork from the auction, and Sotheby's has neither

sold the Artwork nor offered it for sale prior to the University's initiation of this action.  Dkt. No.

46 ¶ 106; Dkt. No. 52 ¶ 106.

As articulated above, in performing choice of law analysis, "New York courts have

adopted a flexible choice of law approach and 'seek to apply the law of the jurisdiction with the

most significant interest in, or relationship to, the dispute.'"  *White Plains Coat & Apron Co.,*

*Inc. v. Cintas Corp.*, 460 F.3d 281, 284 (2d Cir. 2006) (quoting *Lazard Freres & Co. v.*

*Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997)).  In the tort law context, "[t]he

states' interests are defined primarily by 'the parties' domiciles and the locus of the tort.'"

*Holborn Corp. v. Sawgrass Mutual Ins. Co.*, 304 F. Supp. 3d 392, 398 (S.D.N.Y. 2018) (quoting

*Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 684 (N.Y. 1985)).  "If conflicting

conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will

generally apply because that jurisdiction has the greatest interest in regulating behavior within its

borders."  *White Plains Coat*, 460 F.3d at 284 (internal quotation marks omitted) (quoting

*Cooney v. Osgood Mach., Inc.*, 612 N.E.2d 277, 280 (N.Y. 1993)).  In contrast, "if competing

'postevent remedial rules' are at stake other factors are taken into consideration, chiefly the

parties' domiciles." [8]  *Cooney*, 612 N.E.2d at 281.  The competing rules at issue here—the statute

---

[8] Such rules are also referred to as "loss distribution" rules.  *See Cooney*, 612 N.E.2d at 280.

of limitations rules and burden of proof rules—are post-event remedial rules rather than conduct-regulating rules; as such, under standard choice of law interests analysis, the parties' domiciles—and the interests of those jurisdictions in protecting the property of their domiciliaries—are relevant.

New York's interest in the application of its rules here is strong and is the same as that articulated in *Bakalar* and repeatedly emphasized by federal and state courts in New York: the interest in "protect[ing] owners generally *as a means to preserve the integrity of transactions and prevent[ing] the state from becoming a marketplace for stolen goods*." *Bakalar*, 619 F.3d at 144 (quoting *Elicofon*, 536 F. Supp at 846); *see also, e.g.*, *Reif v. Nagy*, 80 N.Y.S.3d 629, 632 (Sup. Ct. N.Y. Cnty. 2018) ("In New York, a thief cannot pass good title, as New York refuses to become a marketplace for stolen artwork. New York's overwhelming interest in preserving the integrity of its market warrants the application of New York law." (internal citations omitted)); *Angiolillo v. Christie's, Inc.*, 103 N.Y.S.3d 244, 259 (Sup. Ct. N.Y. Cnty. 2019) (applying New York law, and in particular, the law that "[t]he burden of proving title under New York law rests with the possessor," for the reasons articulated in *Lubell*, *Bakalar*, and *Reif*, because "New York clearly has the greater interest in seeking to preserve the integrity of transactions within its borders and preventing the state from becoming a marketplace for stolen goods").

The interests of Washington, D.C. and North Carolina in applying their statute of limitations and burden of proof rules to this dispute are tenuous at best. The rules at issue here, like those of Switzerland in *Bakalar*, are not conduct-regulating rules.[9]

---

[9] When asked to articulate North Carolina's interests in the application of its law, the Borders identified the interest by saying that "to the extent that this work was in North Carolina for over 45 years, that the allegation is that the work was converted in North Carolina, when the Borders took possession of it, North Carolina has an interest in determining alleged conversions that took place within its state." Oral Argument Tr. at 19. Such an argument might be persuasive if the

North Carolina and Washington, D.C. have an interest in their courts not being used to prosecute "stale" claims where "memories may have faded, witnesses may have died, and evidence may have been lost." *Goad v. Celotext Corp.*, 831 F.2d 508, 510–511 (4th Cir. 1987). As outlined above, that interest is procedural and not substantive—the state has an interest in its courts not being burdened with old claims and an interest in the efficient and fair administration of justice when cases are prosecuted on fresh evidence. Unlike with a statute of repose, with a statute of limitations such as those at issue here, "the repose of defendants is merely an incidental benefit of such statutes." *Id.* at 511. Moreover, even to the extent that the rules at issue here are intended to be substantive and to permit the owner of property in North Carolina to quietly enjoy property it has acquired and possessed in North Carolina, that interest is attenuated when the conduct at issue relates not to the continued enjoyment and possession of the property but to its sale in New York.[10]

The interests of North Carolina or Washington, D.C. in the application of their rules regarding burden of proof is also attenuated. A burden of proof, unlike a statute of limitations, "is a rule of substantive law." *Director, Office of Workers' Compensation Programs v. Greenwich Collieries*, 512 U.S. 267, 271 (1994); *see also Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 249 (1942) (holding, in the admiralty context, that "the burden of proof . . . [is]

---

rules at issue were conduct-regulating rules—rules relating to whether the alleged actions in fact constitute conversion in North Carolina or in Washington, D.C., wherever the conversion is alleged to have taken place. *See White Plains Coat*, 460 F.3d at 284 ("If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." (internal quotation marks omitted) (quoting *Cooney*, 612 N.E.2d at 280)). For the reasons stated above, the rules are not conduct-relating rules.

[10] The Court therefore need not address the issue it raised at oral argument whether New York law would apply to a dispute over the ownership of the property if its location in New York was merely transient and not in connection with a sale transaction.

part of the very substance of [the] claim and cannot be considered a mere incident of a form of procedure"). Howard's cause of action for replevin arose in New York when the Artwork was held in New York on behalf of the Borders, a demand was made for the return of the work, and that demand was refused. *See Lubell*, 569 N.E.2d at 429; *see also Nissan Motor Acceptance Corp. v. Scialpi*, 944 N.Y.S.2d 160, 162 (2nd Dep't 2012) ("A cause of action sounding in replevin must establish that the defendant is in possession of certain property of which the plaintiff claims to have a superior right." (internal citations omitted)).[11] It is difficult to see the interest of North Carolina, or Washington, D.C., for that matter, in the application of its rules regarding burden of proof to a dispute in New York courts regarding a claim for replevin arising in New York and relating to property the Borders moved to New York in order to consummate a sale in New York. Indeed, the only interest North Carolina appears now to have is that the Borders are North Carolina residents.

The choice of law decision here is governed by *Bakalar*. New York's interest in the application of its law regarding statute of limitations and burden of proof to an art sale to be consummated in New York is superior to the laws of Washington, D.C. where the initial transfer took place or North Carolina where the Artwork was located before it was shipped for sale to New York. The application of New York law is necessary "to preserve the integrity of transactions and prevent[ing] the state from becoming a marketplace for stolen goods." *Bakalar*, 619 F.3d at 144 (emphasis omitted) (quoting *Elicofon*, 536 F. Supp. at 846).

It is true that there are some factual differences between this case and *Bakalar*. In *Bakalar*, the drawing was shipped from Switzerland to New York before the time where under

---

[11] The Borders do not argue that there is any conflict between New York law, North Carolina law, and Washington, D.C. law in terms of the elements of a claim for replevin.

Swiss law, the statute of limitations would have run and the possessor of the drawing would have been entitled to repose.  In this case, the Artwork was possessed by the Borders not for a fleeting period of time but for over forty-five years during which the North Carolina statute of limitations ran.  Moreover, in this case, the Borders have not sold the Artwork in New York and Howard is not suing a defendant who consummated a purchase in New York whereas in *Bakalar*, suit was not brought until after a sale had been consummated in New York.

Neither difference appears to be material.  The *Bakalar* court put no weight on the fact that the statute of limitations did not run while the drawing was located in Switzerland; it did not even mention that fact.  That would be for good reason.  As stated above, a state's interests in the application of its statute of limitations is procedural, not substantive.  It primarily is in the avoidance of its courts being used to prosecute stale claims.  It thus makes no difference whether the North Carolina statute of limitations ran while the Artwork was located in North Carolina.  If New York wants to open its courts to claims that would be stale in North Carolina, North Carolina law does not prevent it from doing so.

Nor is the fact that Howard sued before a sale was consummated in New York, rather than after, material.  The Borders consigned the Artwork to Sotheby's in New York and shipped it to New York for the explicit purpose of having Sotheby's sell it on their behalf in New York.  New York is thus the forum with which they "have voluntarily associated themselves" in connection with the potential sale of the Artwork.  *Cooney*, 612 N.E.2d at 283.  Moreover, the interest of New York "in preventing the state from becoming a marketplace for stolen goods," *Bakalar*, 619 F.3d at 145, is just as strong before the gavel hits as after.

Indeed, the adoption of a rule that would have the choice of law turn upon the vagaries of whether an agreement to sell had already been made in New York or title had transferred in the

state would lead to untenable results.  It is undisputed that if the Borders sell the Artwork in New York, New York law would apply to a lawsuit brought by Howard against the purchasers. Howard would win such a lawsuit if, in response to its threshold showing of an arguable claim to the Artwork, the purchasers were not able to prove the Artwork was not stolen.  Howard would have the rights to the Artwork.  As the Borders themselves candidly admitted at argument, however, if their argument were to be accepted and if, based upon the burden-shifting rules set forth in North Carolina law, they were to win this lawsuit, they would have a superior claim to that of Howard in the Artwork and the Court could not prevent them from selling the Artwork in New York.  *See* Oral Argument Tr. at 18.  Different rules would apply to the seller and to the purchaser and depending upon the precise moment of sale. The seller would have the right to sell but the purchaser would not have the right to buy and to own.

The rule for which the Borders argue is thus as illogical as it is impracticable.  It cannot be true that New York only has an interest in *undoing* sales of artwork as to which title is questionable, but no interest in preventing such sales from occurring in its art market in the first place.  From the perspective of the auction house that stands in the middle, and indeed, from the perspective of the purchaser and the seller, the issue is the same—if a person cannot buy the artwork in New York, then a person should not be able to sell it.  The rule is also impracticable. It would incentivize an original owner to wait until a sale was consummated before asserting its claim to an artwork, rather than asserting that claim in advance, making the New York art market *more* unstable.  It could call into question whether the purchaser who thought—with reason—he was acquiring good title to an artwork that the seller was able to convey could recover against the seller for the funds he paid or whether different rules with respect to the conveyance of title would apply to the seller than to the buyer.  Either New York's interest in preserving the

integrity of its art market is superior or it is not.  The result cannot be different the moment after a sale is completed than the moment before it is completed.

Consequently, as in *Bakalar*, the Court concludes that the interests of the other jurisdictions at issue here, i.e., Washington, D.C. and North Carolina "must yield to the significantly greater interest of New York, as articulated in *Lubell* and *Elicofon*, in preventing the state from becoming a marketplace for stolen goods."  *Bakalar*, 619 F.3d at 145.

## DISCUSSION

Having decided the choice of law issue, the Court now turns to the questions of whether Howard's claim is timely and whether Howard is entitled to summary judgment.

## I.      Timeliness

First, Howard argues that it is entitled to summary judgment that its claims are timely under New York's demand and refusal rule.  Dkt. No. 39 at 10.  The Borders' response relies entirely on the statutes of limitations under North Carolina and Washington, D.C. law.  Dkt. No. 45 at 12–13.  The Borders do not dispute that Howard asked for the Artwork back on June 1, 2020 and that they did not agree to return it.  Dkt. No. 46 ¶¶ 84–85.  Because the Court has determined that New York law applies, and because there is no genuine dispute that Howard's claims are timely under New York law, Howard is entitled to summary judgment on this point.

## II.     Title to the Artwork

Next, Howard argues that it is entitled to summary judgment on its claims because the Borders cannot meet their evidentiary burdens as to title.  Dkt. No. 39 at 11.  Under New York law, if a plaintiff makes "a threshold showing that they have an arguable claim to" a piece of artwork, the burden is placed on "the current possessor[] to prove that the [artwork] was not stolen."  *Bakalar*, 619 F.3d at 147 (citing *Lubell*, 569 N.E.2d at 431); *see also Sotheby's Inc. v. Shene*, 2009 WL 762697, at *3 (S.D.N.Y. Mar. 23, 2009) ("New York law . . . requires the

possessor of an object to prove in a replevin action that the object was not stolen."). Thus, if Howard can make a threshold showing that it has an arguable claim to the Artwork, the burden shifts to the Borders to demonstrate that the Artwork left Howard's possession lawfully.

The undisputed evidence establishes that Howard has made a threshold showing that it has an "arguable claim" to ownership. Howard possessed the Artwork beginning in 1947. Dkt. No. 39 ¶ 6; Dkt. No. 46 ¶ 6. Scott Baker, who is the current Assistant Director of the Howard University Gallery of Art, testified that he personally viewed and documented the Artwork on the Howard campus in January 1973; at the time, he was a graduate student at Howard and was writing a thesis documenting works of art in the Gallery's permanent collection that had been created by Black artists. Dkt. No. 39 ¶¶ 8–9; Dkt. No. 46 ¶¶ 8–9. The documentary records reflect a single loan of the Artwork; there is no evidence of any other transfer or sale of the Artwork. The undisputed evidence that Howard owned the artwork and the absence of any record that it either sold or transferred it is sufficient to make out this low threshold showing. *See Lubell*, 550 N.Y.S.2d at 624 (holding, on a summary judgment motion, where evidence was undisputed that the plaintiff had once owned the artwork but the art was in defendant's possession, and defendant argued that the artwork "might have been disposed of by sale," that "the burden of proof with respect to this issue is on defendant, it being settled that a complaint for wrongful detention contains every statement of fact essential to a recovery where it alleges the plaintiff's ownership of the property and the defendant's possession and refusal on demand to deliver").

At oral argument, the Borders argued that Howard has not established a threshold claim to the Artwork because Howard "has not made an arguable *continuing* claim to ownership of the work." Oral Argument Tr. at 21 (emphasis added). They argue that "Howard has to show that

there is some belief that they continue to own the work because it was stolen," and that "there is absolutely no evidence that this work was stolen." *Id.* at 23. The case law, however, does not require that an original owner come forward with evidence that the work was stolen. That was precisely the point of *Lubell*, in which the court rejected the defendant's argument "that she should have been granted summary judgment because plaintiff did not come forward with proof that the gouache was stolen, suggesting that it might have been disposed of by sale." 550 N.Y.S.2d at 623. The Appellate Division held that despite the absence of evidence from the plaintiff that the work was stolen, "the burden of proof with respect to this issue is on defendant, it being settled that a complaint for wrongful detention contains every statement of fact essential to a recovery where it alleges the plaintiff's ownership of the property and the defendant's possession and refusal on demand to deliver." *Id.* at 624. Howard University has shown that it possessed the Artwork and that it has no records of its voluntary transfer or sale of the Artwork. It asserts a continuing claim to the Artwork. It has also shown that the Borders possess the Artwork and have refused on demand to return it. This is sufficient to make out Howard's threshold claim to the Artwork and to shift the burden to the Borders to show that the Artwork was not stolen.

Because the undisputed evidence establishes Howard's threshold claim to the Artwork, the burden of proof is on the Borders to demonstrate that they have lawful title to the Artwork, i.e., that it was not stolen or taken unlawfully from Howard but rather transferred, sold, or loaned out voluntarily. Howard has pointed to the absence of evidence that the Artwork was lawfully and voluntarily transferred. *See* Dkt. No. 39 at 11–12 ("There is simply no evidence that explains how Kibler came to possess the Artwork. Nor is there any bill of sale or receipt evincing Howard's sale of the Artwork to anyone."); Dkt. No. 38 ¶¶ 34–38, 40–41, 45–50, 53–56

(pointing out the absence of any records or evidence as to Howard selling or loaning the Artwork, other than the 1969 loan, and the absence of any records as to how Kibler got the Artwork and how the Borders came to possess the Artwork).   The burden is thus on the Borders, as the party opposing summary judgment, to point to some "admissible evidence sufficient to raise a genuine issue of fact for trial."  *See Jaramillo*, 536 F.3d at 145 (stating that, if the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment"); *Gottlieb*, 84 F.3d at 518 (stating that the nonmoving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible" (internal citation omitted)).

The Borders have not carried this burden.  They point to two pieces of evidence in the record which they argue combine to support their assertion that "[t]he University either (a) consigned the Artwork to the Barnett-Aden Gallery, or (b) otherwise voluntarily disposed of the Artwork, likely via loan, in or about 1973."  Dkt. No. 46 ¶ 125 (Borders' 56.1 statement, citing only the two pieces of evidence discussed below).[12]

---

[12] The Borders also argue that evidence that the Artwork was not included in various appraisals of artwork in the University's collection supports their claim.  Dkt. No. 45 at 14–15. Specifically, their 56.1 statement notes that "[t]he University never sought an appraisal of the Artwork despite compiling and providing to Sotheby's, and others, 'Inventory' lists identifying artworks that were in the University's collection."  Dkt. No. 46 ¶ 131.  Howard does not dispute that the University never sought an appraisal of the Artwork but does dispute the statement "to the extent that [it] states or implies that Sotheby's was provided with an inventory of the entire Howard University art collection, as unsupported by the record evidence cited by Defendants." Dkt. No. 52 ¶ 131.  Even assuming that the evidence does support that Howard sought an appraisal that would have included the Artwork if the University still possessed it—meaning that the University knew the Artwork was not in its possession—such evidence would be relevant only to the question of laches.  It speaks only to when the University knew it no longer had the Artwork; it does not speak to *how* the Artwork left the University's possession, i.e., whether it was transferred voluntarily or whether it was converted.

The first piece of evidence is an inventory from the 1976–77 academic year, which lists

the Artwork and, in a column titled "Misc.," reads: "Loan (?)."  Dkt. No. 40, Ex. 6.

The second piece of evidence is an internal Sotheby's email with call notes from a call

with representatives of Howard.  The email states:

> They think the provenance is wrong – they have it as purchased in 1947/49 and then
> Jane Henry (A professor) and Alanzo Aden (Director??) owned a private gallery
> that they organized out of their home where they would show things from the
> collection.  There is NO loan paperwork – because it "wasn't the done thing then."
> They know it was loaned because someone who works for the University since the
> 1970s knows that some things went back and forth without paperwork based on his
> experience.
>
> They note that the Barnett Aden Gallery was after Howard (although they may also
> sold it to them as well) and the gallery (i.e. Alonzo and Jane) may have sold the
> work to a South Carolina collection before the gallery was resold.

Dkt. No. 47, Ex. D.  The email then notes that a Sotheby's employee asked "what are the next

steps, what are the options and where to do [sic] we go from here?  What is the specific goal of

the museum?  What would you see as a successful outcome of this situation?"  *Id.*  Dr. Boyd,

from Howard, responded that:

> they want to build and restore the collection to the best of their abilities.  He noted
> that there are many other works that are affected in the same way and are out there
> without proof of sale.
>
> He thinks Howard should be as aggressive as they can be to reclaim the pieces that
> once belonged to them.

*Id.*

As a preliminary matter, the parties dispute whether this email, and the statements

contained therein, is admissible evidence.  The parties appear to agree that the email itself is

admissible as a business record under Federal Rule of Evidence 803(6).  *See* Dkt. No. 45 at 16

(the Borders' brief arguing that the email is admissible under 803(6)); Oral Argument Tr. at 8

(counsel for Howard agreeing that "it is a business record that is certainly able to be examined by

the Court under 803(6)"); *see also* Fed. R. Evid. 803(6); *U.S. v. Stein*, 2007 WL 3009650, at *1 (S.D.N.Y. Oct. 15, 2007) (holding that emails may be admitted as business records if "regularity of making such records and of the business activity" is shown).  Howard argues, however, that the statements contained within the email are inadmissible and speculative:  "This e-mail contains multiple levels of hearsay and speculation and does not offer any facts stated by anyone with knowledge about whether, in fact, the Artwork in question was removed from Howard's collection in the 1970s."  Dkt. No. 39 at 13.  Even assuming that the factual statements within the e-mail are admissible as party admissions under Federal Rule of Evidence 801(d)(2)—for example, the statements that Howard purchased the Artwork in 1947/49—the critical statement on which the Borders' case relies is entirely speculative.  That statement, that "the gallery (i.e. Alanzo and Jane) may have sold the work to a South Carolina collection before the gallery was resold," does not establish that the gallery had the right to sell the work to the collector nor that the gallery in fact did sell the work to a collector.  It reflects a hypothesis that may or may not be true.  It thus suggests an avenue of inquiry which the Borders could have pursued in discovery, but not a fact upon which a jury can ground a verdict.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (holding that to defeat a motion for summary judgment, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts"); *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) ("A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." (alteration adopted) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995))).

All that these two pieces of evidence offer, considered together and in the light most favorable to the Borders, as the non-moving party, is "speculation," "conjecture," and

"metaphysical doubt" as to whether the University *may have* given, loaned, or consigned the Artwork to the Barnett-Aden Gallery, which in turn *may have* resold it to Kibler, or to someone else from whom Kibler then acquired it.[13]  The Borders' burden under New York law is not discharged by argument that there exists a hypothetical set of facts under which they could have gained good title to the Artwork; their burden is to present evidence from which a jury could find that they in fact did gain good title to the Artwork, and that it was not converted.  The two pieces of evidence they point to offer only speculation, and therefore would be insufficient to sustain a jury verdict in their favor.  As the Appellate Division in *Lubell* recognized, the burden that New York law chooses to place on defendants like the Borders, who are the current possessors of artwork that a previous owner asserts a claim to, is an "onerous one."  The Borders have not presented evidence that could carry that burden here.

## III.   Laches

Howard also argues that it is entitled to summary judgment as to the Borders' affirmative defense of laches.  "The doctrine of laches 'protects defendants against unreasonable, prejudicial delay in commencing suit.'"  *Zuckerman v. Metropolitan Museum of Art*, 928 F.3d 186, 193 (2d Cir. 2019) (alteration adopted) (quoting *SCA Hygiene Prods. Aktiebolag v. First Quality Baby*

---

[13] Howard argues that adding to the inherently speculative nature of these theories is doubt as to whether the Barnett-Aden Gallery existed in the early 1970s, when this transfer is alleged to have taken place.  Howard asserts that "[t]here is no evidence in the record that the Barnett-Aden Gallery continued to exist after the year 1969, following the death of its last surviving co-founder, James Vernon Herring in that year."  Dkt. No. 38 ¶ 7.  It cites to a webpage about the Gallery, which states that "[a]fter Herring's death in 1969, the Gallery closed."  Dkt. No. 40, Ex. 9.  The Borders dispute this; they argue that the Gallery continued to exist after 1969, citing to a 1973 letter sent from Adolphus Ealey who states that "[s]ince the demise of Alonso Aden and James V. Herring," he has "been the director of the Gallery," and is "presently making many efforts to re-establish the Barnett-Aden Gallery."  Dkt. No. 49, Ex. S.  Even assuming that the Gallery existed, the Borders have not pointed to any evidence that could sustain a jury verdict in their favor based on theories that the Artwork made its way out of Howard's possession through the Gallery.

*Prods., LLC*, --- U.S. ---, 137 S. Ct. 954, 960 (2017)).  "A party asserting a laches defense must show that the plaintiff has inexcusably slept on its rights so as to make a decree against the defendant unfair.  Laches . . . requires a showing by the defendant that it has been prejudiced by the plaintiff's unreasonable delay in bringing the action."  *Id.* (quoting *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 132 (2d Cir. 2003)).  In other words, a party asserting the affirmative defense of laches—in this case, the Borders—has the burden to demonstrate two independent elements: (1) unreasonable delay; and (2) prejudice.

### A.     Unreasonable Delay

To establish this element of their laches defense, the Borders have the burden to prove that Howard was "aware of [its] claim" and "inexcusably delayed in taking action."  *Bakalar v. Vavra*, 819 F. Supp. 2d 293, 303 (S.D.N.Y. 2011), *on remand from Bakalar*, 619 F.3d 136.  "The opposing party need not have had actual knowledge of the claim; rather, it is sufficient that the opposing party *should have known*."  *Id.*  Howard argues that it is entitled to summary judgment as to this affirmative defense, both because "there is no record evidence that [it] would have discovered the whereabouts of the property if it had taken additional steps to locate it," and because "the Borders have the burden of proving . . . that Howard acted unreasonably in not bringing suit earlier," but, in Howard's view, the evidence does not support such a finding.  Dkt. No. 39 at 15.

In opposing summary judgment, the Borders argue that Howard had actual knowledge that the Artwork was missing as of at least 1976.  Dkt. No. 45 at 18.  Their evidence to support this assertion consists of one email from Lisa Jones of Howard to Sotheby's in June 2020, stating that "Howard has documentation proving that the work was in the University's possession as late as 1971 but that as of the 1976 Collection Inventory, the work was missing from the Collection."  Dkt. No. 49, Ex. AA.  The evidence, if credited, could support a finding by the jury that Howard

knew or should have known in 1976 that the Artwork was missing, and that the forty-four-year delay in bringing this action was unreasonable.

To be sure, there is evidence in the record suggesting that Howard believed, as late as 2020, that the Artwork was still part of its collection—specifically, the inclusion of the Artwork on a 2019 internal Howard University spreadsheet created as part of the Gallery's attempt to prepare an inventory of the artworks in its collection as well as the inclusion of the Artwork in 2020 in the Gallery's electronic inventory management system. Dkt. No. 38 ¶¶ 18–19. This evidence, while relevant, does not conclusively resolve the issue—a genuine fact issue remains. The same is true of Howard's arguments with respect to its expert's testimony. Howard argues that its expert, Russell Panczenko, "explains that it is neither common nor reasonably possible for institutions of the size and type of the Gallery to conduct regular or annual inventories of its collections," and that its expert "opines that the University could not reasonably have been expected to discover at an earlier date that the Artwork . . . was missing from its collection."[14] Dkt. No. 39 at 19. Once again, this expert testimony may be relevant to the question whether Howard knew or should have known that the Artwork was missing as of 1976, but it cannot usurp the role of the factfinder in answering that disputed question.

The Court also rejects Howard's argument that because the Artwork was kept by the Borders inside their private residence until it was shipped to New York, any attempts at investigation would have been unavailing and therefore a laches defense must fail. Howard

---

[14] In response, the Borders assert various *Daubert*-like challenges to the reliability of Panczenko's testimony. Dkt. No. 45 at 23–24. The Court reserves judgment as to whether "the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand" are reliable; such arguments are properly raised in a *Daubert* motion, and the parties will have an opportunity to raise them in that form. Fed. R. Evid. 702.

grounds this argument in cases like *In re Flamenbaum*, which rejected a laches defense in part because "the Estate provided no proof to support its claim that, had the Museum taken such steps, the Museum would have discovered, prior to the decedent's death, that he was in possession of the tablet." 1 N.E.3d 782, 784 (N.Y. 2013). The same is not true here, however. The appropriate time to measure whether the plaintiff's delay was unreasonable is as of the date the plaintiff knew or should have known the item in question was missing, not—as Plaintiff here necessarily suggests—as of a later date when it came into possession of Defendant. If the email is credited, Howard knew or should have known that the Artwork was missing in 1976. Had it investigated at that time, there is evidence to support a jury verdict that it may well have discovered the circumstances in which the Artwork left its possession—even if the documentation itself did not establish those circumstances. In particular, there is some evidence that, had Howard investigated in 1976, it might have discovered how the Artwork left its possession which in turn, on the Borders' theory, would have led the to the Barnett-Aden Gallery, Kibler, and the Borders. The issue of unreasonable delay thus must be left to the jury.

### B.     Prejudice

Howard's briefing makes no arguments about the prejudice element of a laches defense.

At oral argument, Howard asserted that there is no prejudice here, because:

> There was nothing that the defendants can point to in the record that says any one of these [witnesses] would have contradicted the existing record now. They just name names of people who are now dead. The defendants cannot point to any document that shows that Howard sold this work, that Howard gave it to a gallery for safekeeping or gave it to a gallery for purposes of sale, or that it left the campus. So these witnesses, even if dead, offer no prejudice to defendants, because defendants have not articulated what these witnesses would tell the Court with respect to this work or with respect to the work being sold . . . .

Oral Argument Tr. at 14–15.

Such an argument would place a burden on a party asserting that it is prejudiced by an unreasonable delay that would be effectively insuperable.  The party would have to identify precisely the evidence that the unreasonable delay has prevented it from identifying.  New York law does not support the imposition of such a burden.  It is true that "mere lapse of time, without a showing of prejudice, will not sustain a defense of laches."  *Saratoga Cty. Chamber of Commerce v. Pataki*, 798 N.E.2d 1047 (N.Y. 2003).  However, a showing that the lapse of time has led to "'deceased witnesses, faded memories, . . . and hearsay testimony of questionable value,' as well as the likely disappearance of documentary evidence" is sufficient to demonstrate prejudice.  *Zuckerman*, 928 F.3d at 194 (quoting *Lubell*, 550 N.Y.S.2d at 621).  Here, Defendant has made such a showing, at least to raise a jury question.  It is undisputed that many witnesses who would have been able to offer relevant testimony—including, perhaps most significantly, Kibler—are now deceased.  Dkt. No 46 ¶¶ 149–155; Dkt. No. 52 ¶¶ 149–155.  A defendant need not be able to prove or point to exactly what these witnesses or documents would have said— such a requirement would be impossible in many, if not most, cases, due to the same prejudice from unreasonable delay that the laches doctrine seeks to protect against.  As such, there is at least a triable issue as to whether the Borders suffered prejudice from any extended delay between when Howard knew or should have known of its claim and when this suit was filed.

## IV.    The Borders' Remaining Counterclaim

Howard moves for summary judgment on the Borders' remaining counterclaim for declaratory judgment that the Borders have the proper right, title, and interest in and to the Artwork.  Because the Court has denied Howard's motion for summary judgment as to the affirmative defense of laches, Howard's motion for summary judgment on this counterclaim is denied as well.

V.       **The Borders' Affirmative Defenses**

The Borders' first affirmative defense is that "[t]he University fails to state a claim against the Borders for which relief can be granted."  Dkt. No. 6.  Both parties argue that this defense is "subsumed by the above analysis of the University's claims."  Dkt. No. 39 at 20; *see also* Dkt. No. 45 at 24.  This affirmative defense is dismissed because it would "relitigate the legal sufficiency of claims already decided."  *See Town & Country Linen Corp. v. Ingenious Designs LLC*, 2020 WL 3472597, at *14 (S.D.N.Y. June 25, 2020).

The Borders' second affirmative defense—that Howard's claims are barred by the applicable statute of limitations—is resolved by the Court's analysis above.  Because New York law applies, Howard's claims are not barred by the applicable statute of limitations.

Laches, the Borders' third affirmative defense, is also resolved above.  As set forth *supra*, the Court denies summary judgment as to laches.

Entrustment—the Borders' fourth affirmative defense—"prevents a party from recovering an item knowingly entrusted 'to a merchant who deals in goods of that kind' if the merchant subsequently sells that item to a buyer in the ordinary course of business."  *Abbott Laboratories v. Feinberg*, 506 F. Supp. 3d 185, 201 (S.D.N.Y. 2020) (quoting N.Y. U.C.C. § 2-403(2)).  As Howard points out, the Borders cannot carry their burden to prove this affirmative defense.  *See* Dkt. No. 39 at 20–21.  Indeed, the Borders acknowledge that they lack the factual basis necessary for this defense:  "The relevant inquiry would then be . . . *what Mr. Kibler provided as consideration for the Artwork*.  Of course, the Borders' ability to determine that has been forever lost by the University's delay in asserting a claim, and the University should be equitably estopped from now, for the first time after over forty years, claiming the Artwork was stolen."  Dkt. No. 45 at 25 (emphasis in original).  The Borders thus concede that they lack the evidence to carry their burden as to this defense; their arguments regarding

Howard's delay speak to the affirmative defense of laches, not entrustment.  Summary judgment as to the fourth affirmative defense of entrustment is thus granted.

The Borders' fifth affirmative defense—that Howard's claims are barred under the doctrines of equitable estoppel, unclean hands, culpable conduct, and/or waiver also lacks any evidentiary basis.  Howard, in its brief in support of its motion, points out the absence of any such evidence, *see* Dkt. No. 39 at 22–23; the Borders, in response, reiterate their arguments about Howard's delay in bringing this motion.  Such arguments go to the affirmative defense of laches—as to which summary judgment is denied—but not to the defenses asserted here.  Accordingly, summary judgment is granted as to this defense.

The Borders' sixth affirmative defense—that Howard's claims are barred by the fact that the Artwork was not stolen and/or that Howard does not have title to the Artwork—and seventh affirmative defense—that Howard's claims are barred by its own intentional conduct, which may have included the voluntary transfer of title to an employee or other third party—are also resolved above.  Because the Borders do not point to evidence creating a genuine issue of material fact as to whether the Artwork was voluntarily transferred, summary judgment is granted as to these defenses.

The Borders' eighth affirmative defense is that Howard's claims are barred by its negligence in failing to secure and/or monitor the Artwork, and/or in entrusting the Artwork to a faithless agent.  The latter half of this defense is squarely addressed above; there is no evidence in the record that could support a finding that Howard entrusted the Artwork to a faithless agent.  Moreover, as Howard points out, "[n]egligence in failing to prevent or detect defendant's wrongful conduct is not a defense to an intentional tort."  *Forest Diamonds Inc. v. Aminov Diamonds LLC*, 2010 WL 148615, at *13 (S.D.N.Y. Jan. 14, 2010) (Lynch, J.).  The Borders do

not contest the legal issue, but rather only argue that factual issues remain as to whether Howard's practices as to the maintenance and inventory of its Gallery and records were reasonable; such arguments are more properly understood as going to whether Howard should have known earlier that the Artwork was missing in context of the affirmative defense of laches.

The Borders' ninth affirmative defense is that "[t]he Complaint, or portions thereof, should be stricken because in-house counsel for the University, Lisa Jones Gentry and Florence Prioleau, violated Rule 4.3 of the District of Columbia's Rules of Professional Conduct by not advising the Borders to obtain counsel when seeking information from the Borders and requesting that the Borders return the Artwork to the University."  Dkt. No. 6.  Rule 4.3 states:

> (a)  In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not:
>
> (1)  Give advice to the unrepresented person other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of the lawyer's client; or
>
> (2)  State or imply to the unrepresented person whose interests are not in conflict with the interests of the lawyer's client that the lawyer is disinterested.
>
> (b)  When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.

D.C. R. Prof'l Conduct 4.3.  Howard, in its briefing and 56.1 statement, points to the absence of evidence of any violation of this rule.  They state, and the Borders do not dispute, that Howard's in-house counsel had one direct communication with the Borders before the Borders retained counsel; that communication was a June 1, 2020 call attended by a Sotheby's in-house lawyer. Dkt. No. 38 ¶ 84; Dkt. No. 46 ¶ 84.  On that call, Howard's lawyers demanded that the Artwork be returned to Howard; the Borders refused the demand.  Dkt. No. 38 ¶¶ 84–85; Dkt. No. 46 ¶¶ 84–85.  The Borders assert in their 56.1 statement that "[n]either Ms. Jones nor Ms. Prioleau advised the Borders to obtain legal counsel before, during, or after the call," Dkt. No. 46 ¶ 104,

but fail to cite to any evidence in the record to support this assertion.  They also do not cite any evidence that Sotheby's in-house lawyer gave the Borders any advice.  She demanded return of the Artwork on behalf of Howard; she did not give the Borders any advice on their own behalf.  The Borders memorandum opposing Howard's motion that summary judgment should be granted as to this affirmative defense similarly fails to identify any evidence of a Rule 4.3 violation.  It states only: "The University's in-house counsel's decision to pressure an unrepresented elderly couple to return a valuable Artwork is also a matter of fact for the finder of fact to determine what the appropriate remedy should be."  Dkt. No. 45 at 25.  But there is no evidence that counsel engaged in any wrongful conduct.  In the absence of any evidence that Howard's in-house counsel offered the Borders any advice, implied that they were disinterested, or failed to correct a misunderstanding as to their role in the matter, summary judgment as to this affirmative defense is granted.

Finally, the Borders assert as their tenth affirmative defense "the University's failure to mitigate its damages."  Dkt. No. 6.  As Howard points out, it seeks only equitable relief, not damages.  Dkt. No. 39 at 25.  The Borders fail to respond to this argument in their briefing; as such, this affirmative defense is deemed abandoned.  *See, e.g.*, *Shenk v. Karmazin*, 868 F. Supp. 2d 299, 311 n.12 (S.D.N.Y. 2012) ("While [the plaintiff] originally alleged in his complaint that the defendants breached their fiduciary duties . . . , he has not responded to defendant's arguments on summary judgment.  Accordingly, he has conceded that defendants are entitled to summary judgment on this claim for breach." (citing *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."))); *Douglas v. Victor Capital Group*, 21 F. Supp. 2d 379, 393 (S.D.N.Y.

1998) (deeming claims alleged in the complaint abandoned where "Defendants' summary judgment motion specifically addressed all of these claims," but the plaintiff's "opposition papers, however, addressed none of these claims," and collecting cases where other courts have similarly deemed claims abandoned for failure to defend them in opposition to summary judgment).

## CONCLUSION

The motion for summary judgment is GRANTED IN PART and DENIED IN PART.

The Clerk of Court is respectfully directed to close Dkt. No. 37.

SO ORDERED.

Dated: March 1, 2022
       New York, New York                    _____
                                                      LEWIS J. LIMAN
                                                 United States District Judge