UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                     :

HOWARD UNIVERSITY,                  :

          *Plaintiff-Counterclaim Defendant*,  :              20-cv-4716 (LJL)

-against-                              :         OPINION AND ORDER

LARRY BORDERS and               :
VIRGINIA BORDERS,              :

       *Defendants-Counterclaim Plaintiffs*,  :

and                                  :

*CENTRALIA MADONNA*,          :
a DRAWING,                      :

                  *Defendant-in-rem*  :
------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      This lawsuit concerns a dispute over the ownership of an artwork titled *Centralia Madonna* by the renowned American artist Charles White (the "Artwork").  Plaintiff and Counterclaim Defendant Howard University ("Howard") brings claims for replevin for the return of the Artwork and to quiet title in it and for a declaratory judgment that it is the rightful and true owner of the Artwork.  Dkt. No. 1.  Defendants and Counterclaim Plaintiffs Larry and Virginia Borders (the "Borders") bring a counterclaim for a declaratory judgment that they have the proper right, title, and interest in and to the Artwork.[1]  Dkt. No. 6.

      By opinion and order of March 1, 2022, the Court granted Howard's motion for summary judgment in part and denied it in part.  Dkt. No. 58.  The Court determined that Howard's claims

---

[1] The Borders also originally asserted counterclaims for slander of title and for tortious interference with contract.  By stipulation dated July 17, 2020, the parties agreed to the dismissal of those counterclaims.  Dkt. No. 16.

were timely under the applicable New York statute of limitations, *id.* at 25, and that Howard had established its claim to title in the Artwork because it had made a threshold showing of an arguable claim to ownership and the Borders had presented no evidence that would satisfy their burden to prove that the Artwork left Howard's possession lawfully, *id.* at 26–31.  The Court also granted summary judgment in favor of Howard on all but one of the Borders' affirmative defenses.  *Id.* at 36–40.  The Court, however, denied Howard's motion for summary judgment on the Borders' claim of laches, finding that there existed triable issues regarding both whether Howard engaged in unreasonable delay in bringing its claims and in whether the Borders suffered prejudice as a result of that delay.  *Id.* at 31–35.

In September and October 2022, the Court conducted a three-day bench trial on the claim of laches.  This Opinion and Order constitutes the Court's findings of fact and conclusions of law for purposes of Federal Rule of Civil Procedure 52(a)(1).  The Court received testimony on direct examination by declaration of the following witnesses: Larry Borders, Virginia Borders, Sotheby's, Inc. ("Sotheby's") employees Kayla Carlsen and Katharine Richardson, Howard employees Scott Baker, Lisa Farrington, and Lisa Jones Gentry, and Howard's expert Russell Panczenko.  The Court also received testimony from Elizabeth Pisano, a former Sotheby's employee, through deposition designations.  To the extent any statement labeled as a finding of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa.

## FINDINGS OF FACT

### I.   Charles White

The Artwork is a 1947 drawing on paper by a renowned African American artist named Charles White.  *See* PLT Ex. 53.  White was one of the most important black artists of the 20th century.  Trial Transcript ("Tr.") 192.  He was a painter, printmaker, and teacher who died in 1979.  PLT Ex. 53.  His work is included in the permanent collections of the Los Angeles

County Museum of Art, the Metropolitan Museum of Art, the Whitney Museum of American Art, the Newark Museum, and the Santa Barbara Museum of Art. *See* Charles White, National Gallery of Art (last visited Oct. 11, 2022), https://www.nga.gov/collection/artist-info.3394.html. One of his pieces, *Progress of the American Negro*, was loaned by Howard to the Whitney Museum of American Art. Tr. 130. Another of his pieces, *Native Son*, was loaned by Howard to the Metropolitan Museum of Art. *Id*. He is considered to be a very important artist and the market value of his work recently has increased exponentially. *Id*. at 65. He was an artist-in-residence at Howard in 1945. PLT Ex. 3.

## II.    Howard's Possession of the Artwork

Howard is a renowned Historically Black College and University ("HBCU"). Panczenko Decl. ¶ 74. At present, it has more than sixty buildings on its sprawling campus. Tr. 136–137. The Howard University Gallery of Art (the "Gallery") was founded on the principle that everyone, but especially young students, "should have the opportunity to visit and to enjoy exposure to good works of art." Panczenko Decl. ¶ 68; PLT Ex. 46 at Howard1001. It describes itself as a "a learning laboratory" whose aim "historically, has been to make its collection accessible on a permanent basis to the University community." Panczenko Decl. ¶ 68; PLT Ex. 1 at p. 2. It also hails itself as "a national and historic forum for artists of African descent" and as "a pedagogical resource for curriculum concerned with sociopolitical, cultural, and historical issues related to Africa and the African Diaspora." Panczenko Decl. ¶ 68; PLT Ex. 1 at 2. Consistent with that mission, the Gallery not only displays its artworks in the Gallery's exhibit and display areas, but through the more than sixty buildings across Howard's campus. The primary reason for this is to ensure that students and faculty have the ability to observe, learn from, and enjoy the artworks and be inspired by them. Farrington Decl. ¶ 13. The Gallery currently has over four thousand artworks. *Id.* ¶ 15.

The Artwork is a historically significant and highly valuable work of art by White.  Tr. 192.  It was acquired by Howard in 1947, two years after White completed his artist-in-residency there.  *See* PLT Ex. 2 at HOWARD00012; PLT Ex. 3; PLT Ex. 33 at HOWARD00932; Farrington Decl. ¶ 39.  Its acquisition is reflected in valuation analyses and an inventory prepared by Howard, which give it a number 47 followed by a D, signifying that it was a drawing acquired by Howard in the year 1947.  *See* PLT Ex. 2 at HOWARD00012.  A 1947 article in the *Washington Post* on an exhibition of White's works at the Barnett-Aden Gallery in Washington D.C. reports that Howard owned it.  PLT Ex. 3.  The Barnett-Aden Gallery is no longer in operation.  Tr. 117.

From 1946, around the time the Artwork was acquired, and until his retirement in 1976, the curator of the Gallery was Dr. Albert Carter.  *Id*. at 99, 104.  Hughie Lee Smith was the Chair of Howard's Art Department and the Director of the Gallery until 1970, *id.* at 115, and was replaced by Dr. Jeff Donaldson who served in that role until 1976, *id.* at 107.  Carter was replaced by Alden Lawson who served as Curator of the Gallery from 1976 to approximately 1987.  *Id.* at 100, 115.  At that time, management of the Gallery was taken over by a Director named Tritobia Benjamin, who served in that capacity for a little over twenty years.  *Id.* at 100, 116.  Carter, Smith, Donaldson, Lawson, and Benjamin are no longer alive; each passed away prior to 2020, the year this action was commenced.  *Id.* at 114–16, 192.  White also passed away prior to 2020.  *Id.* at 116.  In 1992, Baker became Assistant Director of the Gallery, a position he held until mid-2022.  *Id.* at 98–99.

The Gallery is thinly staffed.  For a portion of the time relevant to this case, including throughout the 1970s, it had only a single full-time employee—the curator, Carter—who served under the Chairperson of the Art Department, Panczenko Decl. ¶ 77, and from 1976 until 2019,

there was no more than one student worker for any sustained portion of time, Tr. 134.  After Carter's retirement and throughout the period culminating in May 2020, the Gallery continued to have no more than one or two full-time staff members.  Panczenko Decl. ¶ 78.  The Gallery has never had a full-time Director and each Director during the relevant period has fulfilled multiple roles and worn many hats, including substantial teaching and publishing responsibilities as well as administrative responsibilities related to either the Art Department or the Division of Fine Arts, in addition to their work with the Gallery.  *Id.* ¶ 81.

Carter prepared a valuation report of the Gallery's permanent collection in 1964.  DT Ex. 4.  The valuation listed that Howard had 231 oil paintings in its collection, of which ten were on loan, with a total valuation of $104,052.00.  *Id.* at HOWARD00591.  The valuation of the oil paintings ranged from $50.00 at the low end, *id.* at HOWARD00584, to $15,000 at the high end, *id.* at HOWARD587.  The 1964 valuation also listed 47 watercolors ranging in value from $10 to $1,000 with a total value of $2,880, *id.* at HOWARD00595–96, 117 sculptures ranging in value from $5.00 to $6,000 with a total value of approximately $30,588, *id.* at HOWARD00597–600, and 87 drawings ranging in value from $5 to $300 for a total of a little under $3,000, *id.* at HOWARD00601–602.  The White *Centralia Madonna* was valued at $75.00.  *Id.* at HOWARD00602.

In December 1969, the Gallery agreed to loan the Artwork to the Museum of Fine Arts in Boston for an exhibition to be held from February 9 to March 10, 1970.  PLT Ex. 7; DT Ex. 28.  This loan of the Artwork is reflected in a written loan agreement, *see* PLT Ex. 7; DT Ex. 28, and documented in the Annual Report of the Howard University College of Fine Arts for the 1969–70 academic year, *see* PLT Ex. 39 at HOWARD00952.  There are no other records of any loan of the Artwork by Howard to a third party.

In 1971, Carter submitted a revised valuation report of the permanent collection of the Gallery which he sent to Donaldson.  DT Ex. 5.  The valuation listed 236 oil paintings, 53 watercolors, 584 sculptures (including ceramics and handicrafts), and 61 drawings.  The total valuation of the collection was $246,207 which—when added to the Locke Collection—summed to $281,207.  *Id.* at HOWARD00609.  The Artwork was valued at $1,000, *id.* at HOWARD00633, and was one of the higher value items in the collection, *id.*

On the first page of the 1971 valuation report, Carter wrote: "for 25 years I have been constantly adding to my many notes, acquisition sheets, record cards, Daily Log and photographs attempting to keep as accurate a record as possible." *Id.* at HOWARD00608.  Other than his notebooks, none of those materials survives to the present day.  Tr. 110–11, 175.

In 1976 to 1977, Carter prepared an inventory of the Gallery's holdings titled "Holdings of the Howard University Gallery of Art" (hereafter, "1976 Carter Inventory" or "Inventory"). Farrington Decl. ¶ 30; PLT Ex. 2.  It lists 269 oil paintings, 58 watercolors, 113 drawings, among other works of art.  PLT Ex. 2 at HOWARD00014, HOWARD00108, HOWARD00123.  The list contains columns for the name of the artist, the title, medium, and size of the work, its condition and origin, the race of the artist, its origin, and its valuation; the list also contains a "Misc." column which primarily identifies the location of the artworks on Howard's campus.  *Id.*

In the 1976 Carter Inventory, the Artwork is valued at $1,000.  *Id.* at HOWARD00012–13.  No drawing has a higher valuation, although one other drawing has an equal valuation.  *Id.* Some oil paintings have a higher valuation but not many of them.  *Id.* at HOWARD00108–123. In the "Misc." column for the Artwork, Carter noted "Loan (?)."  *Id.* at HOWARD00012–13. The Artwork is the only work in the Inventory with that identification.  Tr. 112, 114.  Stolen artworks from the University's collection were also identified in the Inventory.  *See, e.g.*, *id.* at

HOWARD00117.  The Artwork is not listed as stolen in the 1976 Carter Inventory.  *Id.* at HOWARD00012–13.

The last time there is evidence the Artwork was seen at Howard was in January 1973. Baker Decl. ¶ 11.  Baker was a graduate student at Howard from 1972 to 1974 pursuing a Master of Fine Arts degree and had a part-time position as a work-study student worker for the Gallery. *Id.* ¶¶ 4–5.  For his master's degree, Baker worked on a graduate thesis, comprised of creating a catalogue of works of art in the Gallery's collection that had been created by Black artists.  *Id.* ¶ 9; *see* PLT Ex. 5.  As part of his catalogue, Baker "personally viewed, examined, and documented the Artwork on the campus of Howard University."  Baker Decl. ¶ 11.  Baker saw the Artwork on Howard's campus on two occasions in January 1973: (1) in a storage room of the Gallery (located on Howard's campus), and (2) on what he believes was the next day, in the office of the Gallery's then-Curator, Carter, in Room 1010 of Childers Hall, which today is Baker's office.  *Id.* ¶¶ 11–13; Tr. 103.  During this second viewing, Baker "personally viewed and examined the Artwork in Carter's office and took notes describing the Artwork's visual appearance."  Baker Decl. ¶ 13.  Carter returned the Artwork to the storage room after the second viewing.  Tr. 106.  Baker later described the Artwork in his master's thesis dated July 15, 1974. See PLT Ex. 5 at HOWARD00376.  The thesis describes the Artwork as a 24x32-inch drawing, in colored pen and ink, with a "[f]rontal portrait of standing man immersed in swirling lines."  *Id.* A notation indicates that it was acquired by Howard in 1947.  *Id.*

There is no evidence that the Artwork was seen at Howard anytime thereafter.  Tr. 106. Baker never attempted to locate the Artwork prior to 2020, *id.* at 126, and there is no evidence that anyone else employed by Howard attempted to locate the Artwork between 1976 and 2019, *id.* at 126–27, 192–94.  Baker gave the following explanation for his decision not to look for the

Artwork: "the reason is it was already assumed that it was in the university collection somewhere.  Now, it could be in the storage room, it could be on loan to the president's house or the president's office.  But there was no particular reason to look for it other than if requested." *Id.* at 136.

The Artwork was never reported as stolen to law enforcement.  *Id.* at 193.  Howard never filed an insurance claim for the Artwork, *id.*, never reported the Artwork as missing, *id.* at 193–94, and never registered the Artwork as stolen with the Art Loss Register, *id.* at 86.

The College of Fine Arts at Howard would issue annual reports that, among other things, would identify artwork that was stolen and artwork that was on external loan.  *See* Tr. 128, 177–78.  The annual reports from the 1960s through the 1970s listed a single theft of artwork from Howard's collection—the theft of sculptures in wood.  *Id.* at 177–78.  The Artwork was never listed as stolen in one of these reports.

In 1981, Howard loaned six White artworks to the College Museum of Hampton Institute.  DT Ex. 11; Tr. 129.  The Artwork was not among those works and there is no evidence that Howard attempted to locate the Artwork at the time it loaned those items to the Hampton Institute.  Tr. 129–30.  A retrospective of the works of White took place at the Studio Museum in Harlem in 1982.  *Id.* at 195–96.  Howard loaned works to the exhibition.  *Id.* at 195–96.

In 2019, an entity named Melanin & Co. conducted an appraisal of artworks from Howard's art collection for risk management purposes.  *Id.* at 117.  As part of the appraisal, Baker retrieved high-end items from brand name artists in the storage room.  *Id.* at 117, 135.  However, Baker did not look for the Artwork to be appraised.  *Id.* at 120.

Prior to 2020, Sotheby's conducted appraisals of artworks from Howard's collection.  Richardson Decl. ¶ 4; Tr. 120.  The appraisals were based, in part, on lists of artworks that were

created by Howard and delivered to Sotheby's.  Richardson Decl. ¶ 5.  In particular, Howard

sought an appraisal from Sotheby's of the "high-value" art in its collection (works with a value

believed to be in excess of $10,000).  *Id.* ¶ 7.  To select the works for appraisal, Baker went

through the same process he had done with respect to Melanin—he went into the storage rooms

and selected the high-end works by brand name artists.  Tr. 135.  The Artwork would have

qualified as a high-value piece of art worthy of appraisal, Richardson Decl. ¶ 9; Tr. at 120, and

other works of art by White that were of a lower value than the Artwork were selected for

appraisal; nonetheless, Baker did not bring the Artwork to the attention of Sotheby's for

purposes of the appraisal, Richardson Decl. ¶ 10.  Indeed, at no point in the course of seeking

appraisal services from Sotheby's did anyone from Howard mention the Artwork.  *Id.* ¶ 13.

In 2019, Howard started using an inventory program called The Museum System

("TMS").  Baker Decl. ¶ 18; Tr. 164.  TMS contains the record of the current holdings of

Howard; it lists the Artwork as being accessioned into the Howard collection at some point and

as being part of the collection.  Tr. 206.  TMS appears to have drawn information about the

Artwork from the loan agreement to the Museum of Fine Arts in Boston.  *Id.* at 165–67.

The TMS inventory is still in progress and has not been completed.  Baker Decl. ¶ 18.  It

is the first known inventory of the Gallery's collection after the end of the 1976–77 academic

year.  *Id.*  As part of compiling that inventory, Howard tasked five university students with the

responsibility of visiting all 63 buildings on Howard's campus to look for artwork.  Baker Decl.

¶ 19; Tr. 122–23, 135, 144.  The students looked both for artwork in storage facilities as well as

for artwork on display.  Baker Decl. ¶ 19.  Spreadsheets were generated as part of the inventory

process.  PLT Ex. 8; Baker Decl. ¶ 20; Tr. 124.  The spreadsheet listed the Artwork as being part

of Howard's collection; it also indicated in the notes section: "Noted in loan agreement to

Museum of Fine Arts, Boston, Massachusetts."  PLT Ex. 8.  The location of the Artwork, among over 100 others, is listed as "unknown."  *Id.*

### III.    The Borders

Larry and Virginia Borders are a married couple living in Durham, North Carolina.  *See* L. Borders Decl. ¶¶ 10, 22; V. Borders Decl. ¶¶ 3–4, 12.  In approximately 1972 or 1973, they came into possession of the Artwork.  L. Borders Decl. ¶ 23; V. Borders Decl. ¶ 13.  They were married on January 30, 1971, L. Borders Decl. ¶ 11; V. Borders Decl. ¶ 4, and moved into a home at I 56 Broadmoor Apartments, Durham, North Carolina, L. Borders Decl. ¶ 22; V. Borders Decl. ¶ 12, where they lived until 1973, L. Borders Decl. ¶ 34; V. Borders Decl. ¶ 25.  While the Borders were living at the I 56 Broadmoor Apartments, a family friend of theirs named J.D. Kibler Jr. who lived in South Carolina, gifted the Artwork to the Borders.  L. Borders Decl. ¶¶ 12, 19, 23; V. Borders Decl. ¶¶ 13–14.  The Borders did not pay any money for the Artwork and did not give anything of value for the Artwork.  Tr. 28.  The Artwork was accompanied by another gift of artwork, an abstract painting by Linda Neely, which was not then and is not now known to be particularly valuable.  L. Borders Decl. ¶¶ 24, 28; V. Borders Decl. ¶¶ 15, 20.  Kibler was a friend of Mr. Borders's father and had been his teacher.  L. Borders Decl. ¶ 16; Tr. 7, 27.  Kibler did not tell the Borders how he came to possess the Artwork or where he obtained it.  Tr. 8.  He never gave the Borders a bill of sale for the Artwork or a certificate of authenticity for the Artwork and the Borders never asked for one.  *Id*. at 10–11.  Mr. Borders testified that asking Kibler for proof of ownership "would have been rude" and he trusted Kibler's character.  *Id*. at 22.  At the same time, Mr. Borders testified that, until recently, he had not known what Kibler's first name was, never visited Kibler in South Carolina as an adult, was not sure if Kibler was married or had children, and had not been aware of the fact that he had passed away.  *Id*. at 24–25.

The Borders displayed the Artwork in their home as they moved from the Durham apartment to a house in Durham and then to another house in Durham where they have lived until the present day.  The Artwork hung either in a living room, a dining room, bedroom, or in a recreation room.  L. Borders Decl. ¶¶ 35, 37, 39, 40; V. Borders Decl. ¶¶ 26, 28, 30, 31.  Until 2020, the only persons who saw the Artwork were visitors to the Borders' home.  L. Borders Decl. ¶ 41; Tr. 14–15.  The Borders never had the Artwork appraised, never showed it to an art dealer, never had it shown on a college campus, and never described it to a newspaper or magazine or had it photographed by a newspaper or a magazine.  Tr. 13–14, 36–37.  They never put the Artwork on public display.  *Id*. at 18.  They did not insure it.  *Id*. at 39.

Sometime between approximately 1974 and 1975, an artist friend of the Borders named Willie Nash told the couple that the painting was by White and shared with the Borders his knowledge of White's prominence in the art world.  V. Borders Decl. ¶¶ 33–35; Tr. 20.  Nash mentioned that he felt this was an upcoming artist and said "I thought this might be an original. . . . I would hold on to it."  Tr. 31–32.  As a result of Nash's remarks in 1974 or 1975, the Borders became "aware of [the Artwork's] artistic importance."  PLT Ex. 11 at 3; L. Borders Decl. ¶ 56. Until that time, the Borders were not aware that the Artwork was by White and were not familiar with White or his work.  Tr. 40.  Between the time the Borders acquired the Artwork in the 1970s and the early 1990s, the Borders saw Kibler once or twice a year at Mr. Borders's parents' home in North Carolina.  *Id*. at 10–11, 32.  During those meetings, they never asked Kibler where he obtained the Artwork or from whom and never asked for a bill of sale for the Artwork or for a certificate of authenticity.  *Id*. at 11.  The Borders also had Kibler's address and telephone number and contact information.  *Id*. at 29.  They never called him or wrote him to ask from whom or how Kibler acquired the Artwork or whether he purchased the Artwork.  *Id*. at 30.

Mrs. Borders occasionally conducts research into pieces of art that she owns.  *Id*. at 32, 42. She first started to conduct research in 2015 or 2016 through the internet.  *Id*. at 43.  However, she did not conduct any research on the Artwork or on White, including to find out who owned the Artwork prior to her possession of it.  *Id*. at 32, 38, 40, 42.

Neither of the Borders has ever had any connection to Howard or knew Kibler to have any connection with Howard.  *Id*. at 9, 28.

## IV.     The Attempted Sale Through Sotheby's

In or about February 2020, the Borders were watching the Antiques Roadshow and saw several prints created by White that were identified as being valuable by an appraiser on the television show.  L. Borders Decl. ¶ 42; V. Borders Decl. ¶ 36.  The Borders contacted Sotheby's on February 21, 2020 through the Sotheby's website.  L. Borders Decl. ¶ 43; V. Borders Decl. ¶ 37; Carlsen Decl. ¶ 4.  The Borders provided information about the Artwork, including photographs of the Artwork and that the Artwork was a gift from a family friend over forty years earlier.  V. Borders Decl. ¶¶ 39–40.  In response, and after reviewing the information and photographs sent by Mrs. Borders and speaking with the Borders, Sotheby's provided the Borders with options for selling the Artwork, either through private sale or by public auction and proposed to sell the work at public auction with estimates of $300,000 to $500,000.  Carlsen Decl. ¶ 5; V. Borders Decl. ¶ 43.  The Borders elected to sell the Artwork at Sotheby's American Art public auction, which was then scheduled for May 2020.  Carlsen Decl. ¶ 6; Tr. 67.  On February 28, 2020, the Borders executed a consignment agreement (the "Consignment Agreement") dated February 26, 2020, for the sale of the Artwork at Sotheby's American Art auction.  Carlsen Decl. ¶ 7; L. Borders Decl. ¶¶ 49, 51, 53; V. Borders Decl. ¶¶ 45, 47, 49; DT Ex. 17.  The Artwork was going to be presented as a highlight of the Sotheby's 2020 spring American Art sale.  Tr. 67.  The Consignment Agreement allowed Sotheby's to contact experts

and other third parties concerning the authenticity and provenance of the Artwork.  L. Borders Decl. ¶ 54; V. Borders Decl. ¶ 50; DT Ex. 17.

In March 2020, for the first time since they came to possess it decades earlier, the Artwork left the Borders' private residence.  *See* PLT Ex. 16.  The Artwork was shipped to Sotheby's in New York so that Sotheby's could proceed with its due diligence related to the Artwork prior to offering it for sale at the auction.  *See id.*

Sotheby's researched the Artwork and engaged in its standard due diligence process, which included contacting a scholar on White.  Carlsen Decl. ¶¶ 9–10.  The scholar responded attaching a Washington Post newspaper article that indicated that the Artwork had been purchased by Howard in 1947 from the Barnett-Aden Gallery.  *Id.* ¶ 11.

At the time, Sotheby's Department of Museum, Private and Corporate Art Services had concluded an appraisal for Howard and was scheduled to have a call with Howard to discuss selling certain artworks from Howard's collection.  *Id.* ¶ 12; Richardson Decl. ¶ 4.  A Sotheby's representative suggested asking Howard about the Artwork and one of her colleagues agreed, while also noting that she doubted that Howard could provide more information "considering how disorganized the whole situation there is."  Carlsen Decl. ¶¶ 12–14.  On May 12, 2020, Richardson, a senior manager in the Department of Museum, Private and Corporate Art Services at Sotheby's, reached out to Howard on behalf of Sotheby's American Art Department, to obtain information regarding the provenance of the Artwork.  Richardson Decl. ¶ 17; DT Ex. 26. Richardson noted that the Artwork was to be included in Sotheby's upcoming American Art sale and that its specialists had obtained information that the Artwork may have been owned by Howard in the 1950s.  DT Ex. 26.  Richardson asked if there was any record of the Artwork in Howard's collection or any other information regarding the Artwork.  *Id.*

Two days later, on May 14, 2020, Howard responded.  Richardson Decl. ¶ 18.  Gentry, Senior Counsel for Business Transactions and Technology at Howard, emailed Richardson, stating Howard had done "some investigation" and that the Artwork "was definitely owned by Howard" but to "complete the research," Howard would need to know the name of the current owner and from whom they acquired the Artwork.  *Id*. ¶ 18.

A conference call was scheduled for May 28, 2020, with representatives of Howard (including Gentry) who were now investigating the Howard's prior ownership of the Artwork, and representatives of Sotheby's (including Richardson and Carlsen).  Richardson Decl. ¶ 22; Carlsen Decl. ¶ 19.  There is some ambiguity about statements made by Gentry during the May 28th call and, in particular, how definitive those statements were.  Two Sotheby's representatives swore in declarations, which were admitted as their direct testimony, that Gentry stated that Howard did not have any loan paperwork related to the Artwork because it "wasn't the done thing then" and Howard knew that the Artwork was loaned at some point because someone who had worked for Howard since the 1970s recalled the loan, but also knew that some artworks from Howard's collection went back and forth to other places without paperwork.  Richardson Decl. ¶¶ 24–25; Carlsen Decl. ¶¶ 25–26.  The declarations also state that Gentry stated that the Barnett-Aden Gallery, in addition to possibly having sold the Artwork to Howard, would have appeared after Howard in the provenance (ownership history) of the Artwork, and that the Barnett-Aden Gallery may have sold the Artwork to the South Carolina collector who ultimately gifted it to the Borders.  Richardson Decl. ¶ 26; Carlsen Decl. ¶ 27.  The declarations reflect that during the call, Howard's Trustee, Dr. Charles Boyd, stated that the University's recordkeeping practices were poor.  Richardson Decl. ¶ 27; Carlsen Decl. ¶ 28.  The testimony of Richardson and Carlsen mirrors (and largely repeats *in haec verba*) an account of the conversation contained in a May 28

14

email from Carlsen to her colleague Pisano.  DT Ex. 27.  The email reads, in pertinent part, as

follows:

> They confirmed that they have an original inventory from 1949 that lists this piece with the same dims, etc.  They may also have a bill of sale of the purchase from 1947 or 1949.
> They think the provenance is wrong—they have it as purchased in 1947/49 and then Jane Henry (A professor) and Alanzo Aden (Director??) owned a private gallery that they organized out of their home where they would show things from the collection.  There is NO loan paperwork—because it 'wasn't the done thing then.'  They know it was loaned because someone who works for the university since the 1970s knows that some things went back and forth without paperwork based on his experience.
> They note that the Barnett Aden Gallery was after Howard (although they may also sold it to them as well) and the gallery (i.e. Alanzo and Jane) may have sold the work to a South Carolina collection before the gallery was resold.
> Gallery was resold twice with the inventory – which may or may not have included this work but can't be confirmed because they didn't disclose which works

*Id.*

When asked for her independent recollection of the conversation, Carlsen expressed that

Gentry's statements were somewhat less definitive than what is reflected in the declarations.  She

testified: "there was confusion surrounding—you know, we had assumed that the Barnett-Aden

Gallery would have gone before Howard.  But then I do recall Ms. Jones noting that it *could

have also come after Howard* or then meant to be sort of in both lines, excuse me, of the

provenance."  Tr. 79–80 (emphasis added).  The Court credits this testimony.

On June 1, 2020, Howard had a call with the Borders, during which Howard demanded the

return of the Artwork and stated that it might contact the Federal Bureau of Investigation if the

Artwork was not returned.  V. Borders Decl. ¶¶ 53–55.

On June 2, 2020, Gentry, following several weeks of Howard's investigation into the

Artwork, sent an email to multiple representatives of Sotheby's stating that "Howard has

documentation proving that the work was in the University's possession as late as 1971 but that

as of the 1976 Carter Inventory, the work was missing from the Collection."  Richardson Decl.
¶¶ 32–33; DT Ex. 20.

In its due diligence process, Sotheby's identified no instance in which the Artwork was
publicly exhibited from 1972 to 2020.  Tr. 53–54.  There was also nothing in the public record to
demonstrate that Howard ever sold the Artwork or that it loaned it from 1972 to 2020.  *Id*. at 54.
Sotheby's also found nothing in the public record to indicate that the Artwork was ever in the
possession of the Borders or Kibler or to indicate how it left Howard and to whom it went.  *Id*. at
55.  There was nothing in the public record to indicate that it was ever in the states of North
Carolina or South Carolina.  *Id*. at 55–56.  The only owner of the Artwork that Sotheby's was
able to verify in the public record was Howard and all references to the Artwork in the public
record and literature reflect that it is still owned by Howard.  *Id*. at 56.

## V.      The Expert Testimony

Howard offered the expert testimony of Russell Panczenko.  Panczenko is a museum
administrator who for four decades was the director or assistant director of a college or
university art museum.  Panczenko Decl. ¶ 1.  He was the Assistant Director of the Williams
College Museum of Art from 1980 to 1984.  *Id.* ¶ 8.  From 1984 until his retirement in 2017, he
served as Director and Chief Curator of the Chazen Museum of Art at the University of
Wisconsin-Madison.  *Id.* ¶ 12.  In addition, for 28 years, from 1989 to 2017, he was a member of
the Association of Art Museum Directors ("AAMD") and, as a member, participated in biannual
meetings where directors of other university or college art museums or galleries would discuss
the issues and challenges relevant to their institutions and how best to address them.  *Id.* ¶¶ 16–
17.  Through these experiences, he has become familiar with the issues facing college and
university art galleries generally.  *Id.*

Panczenko offers four principal opinions.  First, Howard has operated in a manner consistent with the ordinary standard of care applicable to small college and university art galleries and museums during the time period relevant to the case.  *Id.* ¶ 97.  That standard of care includes having at least one dedicated full-time professional staff member responsible for operational activities at the Gallery on a continuous basis and having a paper inventory in the form of the 1976 Carter Inventory along with annual reports that updated accessions to the collection in a given academic year.  *Id.*  Second, the fact that the Gallery did not create a new inventory of its holdings between the 1976 Carter Inventory and the 2019 efforts to create a new inventory is consistent with the ordinary standard of care for collection management in small college and university art galleries and museums during the relevant time period.  *Id.* ¶¶ 98–99. He also opines that this is in no way out of the ordinary for institutions of this type during that time period and, in particular, that it was typical for small college and university art galleries and museums not to conduct annual or even regular physical inventories, to go decades in between inventories, and to rely on ad hoc paper records along with knowhow of staff members to track the holdings of a given institution.  *Id.*  Third, he opines that the fact that the Gallery had not yet confirmed the precise location of the Artwork on Howard's campus as of the time Howard was contacted by Sotheby's in May 2020 regarding the Artwork is not at all inconsistent with the ordinary standard of care for collection management in small university college and university art galleries and museums during the relevant time period.  *Id.* ¶¶ 101, 106.  He also states that it is not at all uncommon or inconsistent with the ordinary standard of care for a college or university art gallery or museum, particularly a small one, not to know the precise location on campus of a given artwork at a given time.  *Id.*  Fourth, during the time period relevant to this case, the standard of care applicable to small college and university art galleries and museums

did not require a manual, campus-wide search to be conducted any time gallery or museum staff is not able to locate a given work. *Id.* ¶ 109.

Panczenko explains that college and university art galleries and museums differ from traditional independent private and public collecting art museums. *Id.* ¶ 21. Specifically, college and university art galleries and museums are teaching museums and their focus is on serving the pedagogical needs of students and faculty within their parent college or university. *Id.* ¶ 23. In addition, they are typically nested within a college or academic department and their goals and their funding thus are dependent on the goals and the funding, and the allocation decisions, of the parent department. *Id.* ¶ 26. As a result, it is common for college and university art galleries and museums to permit works from their collection to be displayed in buildings on the campus or the college or university apart from the gallery or museum itself; such a practice serves the educational interests of the university or college to display artworks in multiple locations across a college or university campus where they can be viewed by students, visitors, prospective students, and alumni. *Id.* ¶ 24. In addition, and as a result, for the vast majority of college and university art galleries and museums, while collection management is important, it is not the "overarching focal point of the institution." *Id.* ¶ 31. The core day-to-day operations of college and university galleries and museums include installing, planning, and preparing exhibitions, facilitating faculty and student research and teaching requests, providing educational tours to classes, student groups, and other gallery visitors, and facilitating loans. *Id.* ¶ 46. A college or university art gallery or museum might not look for or locate a particular work of art until there is a request for that work of art. Tr. 331.

## CONCLUSIONS OF LAW

"The doctrine of laches 'protects defendants against unreasonable, prejudicial delay in commencing suit.'" *Zuckerman v. Metropolitan Museum of Art*, 928 F.3d 186, 193 (2d Cir.

2019) (alteration adopted) (quoting *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 960 (2017)).  The party asserting the defense of laches has the burden on both elements—that delay was unreasonable and that it was prejudicial.  *See Abbott Lab'ys v. Feinberg*, 506 F. Supp. 3d 185, 198 (S.D.N.Y. 2020).  "A party asserting a laches defense must show that the plaintiff has inexcusably slept on its rights so as to make a decree against the defendant unfair."  *Zuckerman*, 928 F.3d at 193 (quoting *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 132 (2d Cir. 2003)).  To establish the first element, the party asserting laches—here, the Borders—must prove that Howard was "aware of [its] claim" and "inexcusably delayed in taking action."  *Bakalar v. Vavra*, 819 F. Supp. 2d 293, 303 (S.D.N.Y. 2011).  It need not show that Howard "had actual knowledge of the claim; rather, it is sufficient that [it] *should have known.*"  *Id.*  Laches is addressed to the plaintiff who had or should have had the information necessary to "initiat[e] an action" and who unreasonably delayed resulting in unfair prejudice to the defendant.  *Robins Island Preservation Fund, Inc. v. Southold Dev. Corp.*, 959 F.2d 409, 423 (2d Cir. 1992); *see United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 829 F. Supp. 608, 615 (S.D.N.Y. 1993) ("Laches bars a claim where it is clear that a plaintiff unreasonably delayed in initiating action and this delay prejudiced the defendant.").  Where the evidence does not support that the true owner knew or should have known of the information necessary to bring its claim at that earlier point in time, it cannot be said that the true owner unreasonably delayed her lawsuit. *See Abbott Lab'ys*, 506 F. Supp. 3d at 198–99; *see Williams v. Nat'l Gallery of Art, London*, 2017 WL 4221084, at *12 (S.D.N.Y. Sept. 21, 2017), *aff'd*, 749 F. App'x 13 (2d Cir. 2018) ("Laches bars a plaintiff's claim when [] the plaintiff was aware of the claim."); *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 829 F. Supp. at 615; *cf. Pecorino v. Vutec Corp.*, 6

F. Supp. 3d 217, 224 (E.D.N.Y. 2013) ("[T]he essence of laches is to prevent 'sandbagging' in which plaintiffs unfairly delay litigation in order to gain some tactical or other advantage with respect to the litigation.").  In conducting the laches analysis, courts take into account both parties' diligence.  *See Solomon R. Guggenheim Found. v. Lubell*, 550 N.Y.S. 2d 618, 623 (1st Dep't 1990) ("[D]efendant's vigilance is as much in issue as plaintiff's diligence . . . .  The reasonableness of both parties must be considered and weighed.").

The knowledge prong of the laches analysis is intertwined with the scope of required diligence, as any potential claimant must act reasonably on the basis of any information it possesses or should possess.  *See Republic of Turkey v. Christie's, Inc.*, 2021 WL 4060357, at *9 (S.D.N.Y. Sept. 7, 2021); *Bakalar*, 819 F. Supp. 2d at 304.

## I.   *Daubert* Challenge

The Borders filed an in limine motion to exclude the testimony of Howard's expert, Panczenko, on *Daubert* grounds.  "Because [the Borders's] *Daubert* challenges were raised just prior to trial and this trial was conducted as a bench trial, the court elected to hear the *Daubert* proof during the trial itself."  *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 486 (S.D.N.Y. 2002), *aff'd sub nom. In re Omeprazole Pat. Litig.*, 84 F. App'x 76 (Fed. Cir. 2003).  "Although a court has general discretion to hear expert testimony and reserve on a *Daubert* motion until the conclusion of a bench trial, it still must perform a Rule 702 and *Daubert* analysis before it relies upon expert testimony."  *Town & Country Linen Corp. v. Ingenious Designs LLC*, 2022 WL 2757643, at *3 (S.D.N.Y. July 14, 2022).

The Borders challenge Panczenko's testimony on two grounds.  First, the Borders argue that Panczenko's testimony is irrelevant as the evidence clearly demonstrates that Howard knew the Artwork was missing around the time of the 1976 Carter Inventory.  Dkt. No. 69 at 19.  The Borders therefore argue that Panczenko may not opine that Howard "could not reasonably have

been expected to have discovered that the Artwork was missing from its collection prior to May 2020." *Id.*  In support of this argument, the Borders largely point to Howard's judicial admissions in its complaint that the 1976 Carter Inventory indicates that the Artwork "was missing as of the time the inventory was completed."  Dkt. No. 1 ¶¶ 53–54.  Second, the Borders argue that Panczenko's testimony is unreliable as it is centered around a single book he read, and Panczenko failed to review certain materials in the field of museum management.  Dkt. No. 69 at 22–24.

The Court rejects the Borders' arguments.  As to their first point, contrary to the Borders' contention, the evidence—including the judicial admissions—does not clearly demonstrate that Howard knew that the Artwork was missing in the sense that it had been absent from its collection prior to 2020.  While the Court accepted the Complaint's allegations as judicial admissions, it left open the inferences to draw from those admissions.  Dkt. No. 75 at 12.  And, for the reasons discussed *infra* pp. 27–28, the appropriate inference to draw from those admissions—that the Artwork was "missing"—is not that the Artwork was missing from Howard's collection in a permanent sense, but that it was missing in the sense that Howard did not know the Artwork's exact whereabouts.  Thus, Panczenko's opinions concerning whether Howard could have reasonably discovered that the Artwork was "missing from *its collection*" is not rendered irrelevant by these judicial admissions.

The Borders' other arguments as to why Panczenko's testimony is irrelevant are also unavailing.  The Borders take issue with Panczenko's explanation that Howard would not have known that the Artwork was missing at the time of the 1976 Carter Inventory because the Gallery did not have "sufficient staffing and resources to parse through every single entry in the Carter Notebook for purposes of collection inventorying and tracking."  Dkt. No. 69 at 20–21

(citation omitted).  The Borders argue that this opinion ignores that Carter himself knew that the

Artwork was missing and Carter's knowledge suffices to establish Howard's knowledge.  *Id.* at

21.  But, again, for the reasons discussed in greater detail *infra* pp. 27–33, the evidence does not

unequivocally establish that Carter knew that the Artwork was missing in a permanent sense

from Howard's collection at the time of the inventory.  The only fact arguably not in dispute is

that Carter appeared to question whether the Artwork was on loan (whether within the university

or to a third party) at the time he prepared the 1976 Carter Inventory.  Panczenko's testimony is

thus not inadmissible on this basis.

The Borders also argue that Panczenko's opinion that the word "Loan (?)" may have

referred to a loan to other academic departments or facilities on the campus (rather than a third

party) is inadmissible as it ignores the fact that Howard admitted that the Artwork was not loaned

out to any other institution and that loans within Howard were specifically identified in the 1976

Carter Inventory.  Dkt. No. 69 at 21.  This argument is meritless:  Panczenko's opinion—which

opines that the Artwork may have been loaned within the university—is not at all inconsistent

with the fact that Howard's records indicate that the Artwork was not loaned out to any third-

party institution during the relevant period.  Furthermore, the fact that known loans to

departments within the university were noted in the 1976 Carter Inventory is immaterial to the

question of what the word "Loan (?)" generally could mean.

Yet, while the Court rejects the Borders' arguments as to relevance, the Court does not

rely on Panczenko's expert testimony concerning the meaning of the term "Loan (?)" in the 1976

Carter Inventory and whether Howard should have known that the Artwork was missing at the

time of the 1976 Carter Inventory in reaching its decision on laches.  Such opinions concern

what inferences should be drawn about what Howard knew and when from the evidence

admitted—inferences that the Court is equally capable of drawing itself.  They are not helpful to

the "trier of fact [in] understand[ing] the evidence or [determining] a fact in issue."  Fed. R.

Evid. 702 (a); *see In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004)

("Examples of 'expert' testimony that courts have excluded on this basis include factual

narratives and interpretations of conduct or views as to the motivation of parties.").

Accordingly, the Court only relies upon Panczenko's expert testimony concerning the standard

of care and the customs and practices of university and college art museums and galleries.

The Court also rejects the Borders' argument that Panczenko's opinions are unreliable as

they lack any methodology, are centered around a single book that he read, and Panczenko was

unfamiliar with certain professional guidelines in the field.  Dkt. No. 69 at 22–23.  "In all cases,

'the test of reliability is flexible,' and a district court has 'the same broad latitude when it decides

how to determine reliability as it enjoys in respect to its ultimate reliability determination.'"

*Monterey v. City of New York*, 2019 WL 5884466, at *4 (S.D.N.Y. Nov. 12, 2019) (quoting

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999)).  "Not every expert admissible

under *Daubert* need rely on a method that conforms with 'the exactness of hard science

methodologies.'"  *United States v. Ray*, 583 F. Supp. 3d 518, 533 (S.D.N.Y. 2022) (citation

omitted).  Under Rule 702, "an expert's testimony may be based upon his or her experience" as

long as the expert shows why "that experience is a sufficient basis for [his or her] opinion."

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d

448, 463 (S.D.N.Y. 2010).  "In certain fields, experience is the predominant, if not sole, basis for

a great deal of reliable expert testimony."  *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d

396, 413 (S.D.N.Y. 2016) (quoting Fed. R. Evid. 702 advisory committee's note); *see*

*Carmichael*, 526 U.S. at 156 ("But no one denies that an expert might draw a conclusion from a

set of observations based on extensive and specialized experience."). However, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 405 (S.D.N.Y. 2013) (citation omitted); *see Ray*, 583 F. Supp. 3d at 533.

Here, Panczenko's experience in the field is undeniable. Panczenko's opinions on the management and operations of college and university galleries and museums are based on "four decades" of experience in the field. Panczenko Decl. ¶ 1. Panczenko served as the director or assistant director of college or university art museums for over forty years of his career. *Id.* ¶¶ 1, 7. In those roles, Panczenko visited surrounding college and university art galleries and museums to study, observe, and familiarize himself with their operations. *Id.* ¶ 9. Panczenko also served as an adjunct professor and taught graduate level courses in Museum Studies, covering subjects including museum collection management, museum staff responsibilities, as well as curatorial matters. *Id.* ¶ 14. For twenty-eight years, Panczenko was a member of the AAMD and, as a member, attended two meetings per year, each of which typically lasted three full days, and were held at sites of art museums or galleries. *Id.* ¶¶ 15–16. The first two days of the meetings were spent examining the host site, learning about and discussing strategic issues of concern in the art museum field, hearing lectures and presentations from outside experts in the field, and attending meetings. *Id.* ¶ 16. On the third day of the meetings, members would break out into specialty group sessions and Panczenko's specialty group was the Directors of University and College Art Museums. *Id.* ¶ 17. During those specialty group meetings, Panczenko along with his fellow AAMD members who served as directors of university or

college art museums or galleries would discuss pressing issues and challenges relevant to their institutions.  *Id.*  Panczenko states: "my service on the AAMD allowed me to stay apprised of the issues facing . . . college and university art galleries and museums."  *Id.*

In addition to the AAMD, Panczenko was a member of the American Association of Museums ("AAM") and, in the 1990s, was invited by the AAM to serve as a site reviewer for college and university art galleries and museums that had applied for the AAM's rigorous accreditation process.  *Id.* ¶ 18.  Panczenko attests that he has personally toured or inspected over eighty different college and university art galleries or museums during his career.  *Id.* ¶ 20.

In offering each of his opinions, Panczenko also explained why his "experience [led] to the conclusion reached, why that experience [was] a sufficient basis for the opinion, and how that experience [wa]s reliably applied to the facts."  *Warner Chappell Music, Inc.*, 988 F. Supp. 2d at 405 (quoting Fed. R. Evid. 702 advisory committee's note).  For example, in offering his opinion that the purpose of collecting museums is different than the purpose of college or university art museums or galleries, Panczenko discusses in depth how he reached this opinion through direct reference to his experience and knowledge of other institutions (such as the Yale Gallery of Art) and then reliably applies that experience to the facts at hand.  Panczenko Decl. ¶¶ 21–43.  Panczenko thus does significantly "more than aver conclusively that his experience led to his opinion."  *Page Mill Asset Mgmt. v. Credit Suisse First Bos. Corp.*, 2001 WL 863552, at *3 (S.D.N.Y. July 30, 2001).

Panczenko's experience accordingly provides a reliable basis for his opinions on college or university museum or gallery operations and management.  *See Pereira v. Cogan*, 281 B.R. 194, 200 (S.D.N.Y. 2002) ("Kagan's thirty years of experience in the corporate governance field provides a reliable foundation for his opinions on good corporate practices.").

In light of this experience, it is clear that Panczenko's opinions are based on much more than a single book (referred to by the Borders as the Danilov publication).  Furthermore, when asked whether he was familiar with books that dealt with collection management other than the Danilov publication, Panczenko testified that he "taught museum studies for five years" and "[t]here was a bibliography that I shared with my students, there were books and articles that we all read together and discussed.  So, yes, there is a huge bibliography in the field."  Tr. 275. Panczenko continued that he has a "whole bibliography at home in my home library of books that deal with museums, hundreds of them."  *Id.* at 276.

That Panczenko failed to review certain professional guidelines prior to providing his opinions is not a basis for excluding his testimony.  *See Monterey*, 2019 WL 5884466, at *4 ("District courts should only exclude expert evidence based on questionable reliability when the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." (internal quotation marks and citation omitted)).  In support of this argument, the Borders note that Panczenko failed to review or was unaware of relevant guidelines published by the Association of Academic Museums and Galleries ("AAMG") and the College Art Association ("CAA") prior to issuing his expert report.  Tr. 264–65, 272.  However, Panczenko explained at trial why reviewing these guidelines would not have changed his opinion.  He testified that, based on his review of these guidelines after drafting his expert report, both the AAMG and the CAA state that they "draw their guidelines straight from the AAM," *id*. at 264–65, 272, and that he very is familiar with the AAM guidelines—which he described as a "standard that a lot of people strive for, and a lot of people apply"—since he used them when administering accreditations as a member the AAM.  *Id*. at 262.  Panczenko further testified that these guidelines—which dated from 2007 to 2017—were irrelevant to an analysis of Howard's conduct in the 1970s, 1980s, and

1990s as the guidelines were "nonexistent at that time." *Id*. at 347.  Panczenko also noted that he

was unaware of any of his peers in the field relying on those two guidelines as authoritative

sources on how to manage their respective college or university art gallery or museum

collections.  *Id.*  The Court therefore rejects the Borders' argument that Panczenko's testimony is

unreliable on this basis.

## II.    Unreasonable Delay

The evidence does not support that Howard knew or should have known that the Artwork

was stolen.  The Borders's case hinges on (i) a notation from the 1976 Carter Inventory that

reads "Loan (?)" for the Artwork; and (ii) Howard's statements in its complaint that the 1976

Carter Inventory indicates that the Artwork "was missing as of the time the inventory was

completed" and "Carter believed that it may have been on loan to another institution," but that

Howard's "records confirm that the [Artwork] was not loaned out to any other institution" at any

point between 1973 and the time the work was recorded as missing.  Dkt. No. 1 ¶¶ 53–54.

As noted, the Court has accepted the Complaint's allegations as judicial admissions, but

left open the inferences to draw from those admissions.  Dkt. No. 75 at 12.  Contrary to the

Borders' claim, Dkt. No. 69 at 20, these judicial admissions do not establish that Howard knew

or should have known of its claim at that time.  Although the admissions support that Carter

believed at the time he drafted the Inventory that the Artwork may have been on loan from the

Gallery and therefore was unsure of its exact whereabouts, they do not establish that he knew, or

should have known, that the Artwork was missing in a permanent sense from Howard's

collection.  A "loan" is defined as "a grant of something for temporary use."  *Loan*, Black's Law

Dictionary (11th ed. 2019); *see also Loan*, Merriam-Webster, https://www.merriam-

webster.com/dictionary/loan ("the grant of temporary use").  That interpretation is reinforced by

the testimony of Gentry, Howard's Senior Counsel, whose June 2, 2020 email formed the basis

for the allegations in the Complaint.  In her email to Sotheby's, Gentry wrote that Howard had "documentation proving that the work was in the University's possession as late as 1971 but that as of the 1976 Collection Inventory, the work was missing from the Collection."  DT Ex. 20.  Gentry testified that in writing that the Artwork was missing from the collection, she did not intend to convey that the University had transferred ownership or possession to a third party or that it no longer held title to the Artwork.  Jones Decl. ¶ 8.  Rather, she intended to communicate her understanding that it was "missing" in the sense that Howard did not know the specific whereabouts of the Artwork as it was not in a location in the Gallery where it was expected to be found.  *Id.* ¶ 7.

That the University's records do not indicate that the Artwork was on loan to a third-party institution at this time does not impact this conclusion.  The only reasonable inference that can be drawn from the Complaint's allegations are that Carter thought the Artwork was possibly on loan at the time he drafted the Inventory.  The Complaint does not address whether Carter or others who worked at the Gallery were ever disabused of this notion or indicate that Carter or these others knew or should have known that it was not somewhere on Howard's campus or on loan to another institution.  In fact, Baker testified that "loan" may indicate that the Artwork was "on loan" within the University, such as "to the president's house or president's office."  Tr. 136.

The underlying evidence also does not prove unreasonable delay.  The notation from the 1976 Carter Inventory does not demonstrate that Howard knew or should have known of its claim.  That the Artwork is listed in the 1976 Carter Inventory is evidence itself that, as of that date, Carter (the person most knowledgeable about the Gallery's collection) believed that Howard had not sold it, gifted it, or otherwise relinquished its ownership of it (or that it had been

stolen).[2]  After all, had an important piece of work such as the Artwork been sold in the first half

of the 1970s, Carter would have been expected to know about that sale, and perhaps have

arranged it, and would not have noted it as part of the Gallery's inventory.  The notation fairly

read thus supports the inference that at the time the Inventory was prepared Carter believed it

was still in Howard's collection but did not know exactly where the Artwork was located and

believed it may be temporarily on loan.

The evidence at trial supported that there are over sixty buildings spread over 256 acres

on the Howard campus, Jones Decl. ¶ 9, and that, in addition to being loaned externally from

time to time, items of art would be loaned or housed in other offices or locations at Howard other

than the Gallery.  Baker testified that, when he conducted the 2019 inventory, he expected to find

artwork in any of Howard's over sixty buildings and was able to find art in many of those

buildings, Tr. 139–40, and that art may be "on loan to the president's office, the president's

home, and then the president's outer office of his associates," *id.* at 136.  In addition, both he and

Farrington testified to the fact that during the 2019 inventory process, Howard discovered art in

locations where it did not previously know it had been placed, including at the Howard

University hospital and at an offsite storage space in Maryland.  *Id*. at 143–44, 190, 200.  The

expert testimony established convincingly that universities and college art galleries and

---

[2] That the 1976 Carter Inventory notes that the Artwork may be on loan undercuts the Borders's
theory that the Artwork left Howard's hands lawfully (through a sale, for example to the Barnett-
Aden Gallery and then to Kibler), and that Howard knew of this lawful sale and thus never
attempted to locate the Artwork for purposes of appraisal or for inclusion in outside exhibits.  As
the Borders themselves emphasize, Carter was the *sole* employee of the Gallery throughout the
time that the Artwork was last recorded as seen on campus and the time that the Borders received
the Artwork as a present.  Tr. 103–104, 108.  Carter was also known to be "very accurate" in his
recordkeeping.  Tr. 111.  One thus could presume that Carter would have been aware of all
lawful sales of Gallery artwork in the years directly prior to 1976 and would have been likely to
note any such sales on the Inventory.

museums, including Howard, place art in their possession outside the dedicated gallery space and in locations where it can be seen by students, prospective students, faculty, and alumni. Panczenko Decl. ¶ 73–75.  Panczenko testified that he understands that at various points, artwork has been loaned from the Gallery to Howard University Law School for display in the Dean's Office, the University Cashier's Office, the University Chapel Lounge, and the Cramton Auditorium.  *Id.*  The fact that Carter did not know in 1976 where the Artwork was located thus does not establish that he knew, or should have known, it was stolen or unlawfully possessed by another.

The Borders contend that Carter knew or should have known that the Artwork was nowhere in Howard's collection and thus must have been stolen because the Complaint describes the inventory as "complete" and because Carter—as curator—would have known of all of the Gallery's works on loan to an outside institution.  In support of this argument, the Borders also note that the Inventory lists artworks in locations on Howard's campus other than the Gallery, that the Artwork is not listed as being in the storage room—the place where Carter and Baker had last seen it—and that it is the only work where the location is listed on the Inventory with a question mark.  At a minimum, the Borders suggest that such evidence should have led Carter to question whether the Artwork was stolen and that had he then investigated he would have known that the Artwork was missing in a permanent sense.  The evidence, however, does not support those inferences.  The Inventory was complete in the sense that it listed all of the works that were contained in the "Curator's Records and Documents."  PLT Ex. 2.  There is no evidence that it was the product of a search of all of Howard's buildings to determine what work was in its possession.  The fact that the 1976 Carter Inventory lists the location of some of the Gallery's collection as being outside the Gallery thus does not support the conclusion that such

identification was the product of a physical survey of the works; it is just as likely (indeed more likely) that it was the product of Carter's memory. He remembered where those works were located; he did not remember the physical location of the Artwork. And, as to Carter's knowledge of Howard's loans of artwork to third parties and the inference the Borders would have the Court draw—*i.e.*, that Carter would have known that the Artwork was not actually on loan to a third-party institution and thus must have been stolen—the conclusion does not follow from the premise. As the evidence at trial established, artworks were occasionally "loaned" to Howard buildings, such as the house of the President of Howard.

The unrebutted expert testimony also established that it is not the standard for university and college art galleries and museums to conduct periodic inventories or to attempt to account for every piece of work at a later date that at an earlier date the gallery or museum has been unable to locate. The mission of a university or college art gallery or museum is to further the pedagogical efforts of the school or department within which it is nested. It is not to buy and sell art. If there is no need for a piece of art at the moment, there would be no need for the curator or director to search for it. This conclusion is bolstered by the extensiveness of the Howard collection and the number of possible locations on Howard's campus where the Artwork may have been.

The Borders also attempted to prove at trial that, during the approximately fifty-year period in which the Artwork was missing and Howard brought the present action, there would have been a need to locate the Artwork. The Borders thus sought to create the inference that Howard must have searched for the Artwork or should have searched for the Artwork during this period, which would have resulted in the discovery that it was unlawfully possessed by another. The Borders point to the importance of White as an artist, the shows of White's work at the

31

Hampton Institute and the Studio Museum in Harlem, and the valuations conducted by

Melatonin and by Sotheby's.  This argument is insufficient to meet the Borders' burden,

however, for several reasons.  First, there is no evidence that a need to locate the Artwork

actually arose in any of these instances.  Panczenko testified that, in the event of the shows at the

Hampton Institute and the Studio Museum, unless the borrowing institution asked for the

Artwork itself, there would have been no reason for Howard to search for it.  Tr. 339.  Panczenko

testified that when borrowing institutions ask for art, they ask for particular works of art that

would contribute to the exhibition they are mounting.  *Id.*  He noted that: "If you talk about an

artist like Charles White, there are probably hundreds of works of art that he did.  Retrospectives

consistent of between 50 and 120, 150.  So, you're weeding down from a large body of work to

what fits around a theme."  *Id.*  More importantly, there is also no evidence that either Hampton

College or the Studio Museum asked for all works that Howard owned by White or for the

Artwork specifically.  Second, the importance of White as an artist also does not establish that

Howard would have gone in search of the work at some point during the relevant period of time.

White may today be well-recognized as an important and valuable artist.  But the Borders offered

little evidence that his importance was recognized to a similar degree in the critical periods of

time prior to 2019 or 2020 or that the importance of White itself would have led or did lead to his

exhibition by Howard.  The evidence is that consistent with its mission to serve the pedagogical

needs of Howard's students and faculty, the Gallery primarily exhibited student and faculty

works.  Panczenko Decl. ¶ 71.  For example, Panczenko testified that "[f]ive of the Gallery's

nine exhibits during the 1971–72 academic year likewise featured students works."  *Id.*

Panczenko also stated that he understands that the Gallery's exhibits in recent decades have

"remained disproportionally focused on exhibitions of student and faculty work."  *Id.* ¶ 72.  The

focus on student and faculty works, Panczenko testified, is consistent with the mission of a university or college gallery or museum which is centered around providing learning opportunities for students and faculty, as opposed to collecting and showcasing "the highest artistic achievements of a particular time and place in history." *Id.* ¶¶ 22, 23.  There is also no evidence that the Gallery ever mounted an exhibition of the White works in its collection. Finally, with respect to the appraisals, the evidence is that Howard wanted high value works to be appraised.  There is no evidence that it wanted all high value works in its collection to be appraised or that it provided all of the high value works save for the Artwork.  In fact, Baker testified that, in identifying works for the Sotheby's and Melanin appraisals, he was directed only to look in the storage room for high value works for art and did not look anywhere else on campus.  Tr. 135.  And, even if these appraisals should have led the Gallery to go in search of the Artwork, those appraisals took place in 2019 and 2020—within a year of Howard filing suit— and thus cannot form the basis for the Borders' claim of undue delay as the Borders have failed to show what prejudice they suffered in those intervening months.

However, even if Howard possibly should have known that the Artwork was stolen sometime in the 1970s or 1980s, there is no evidence that Howard could have traced the whereabouts of the Artwork to the Borders or Kibler and thus brought suit.  As counsel for the Borders conceded at closing arguments, under New York law, the Borders—to establish laches—must prove that Howard could have discovered through reasonable diligence the whereabouts of the Artwork prior to the time that they brought suit and nonetheless unreasonably delayed filing such suit.  *See In re Flamenbaum*, 1 N.E.3d 782, 784 (N.Y. 2013) (denying laches affirmative defense where defendant provided no "proof to support its claim that, had the Museum taken such steps, the Museum would have discovered, prior to the decedent's death,

that he was in possession of the tablet").  In other words, a museum or person that knows that it is missing artwork has not engaged in unreasonable delay if it does not know and reasonably could not have known the information sufficient to sue.  *See In re Flamenbaum*, 1 N.E.3d at 784. Without the ability to discover who to sue, a litigant has not "unfairly delay[ed] litigation," *Pecorino*, 6 F. Supp. 3d at 224 ("[T]he essence of laches is to prevent 'sandbagging' in which plaintiffs unfairly delay litigation in order to gain some tactical or other advantage with respect to the litigation."), or slept on its rights, *see Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 132 (2d Cir. 2003) ("A party asserting a laches defense must show that the plaintiff has inexcusably slept on its rights so as to make a decree against the defendant unfair." (cleaned up)).

In arguing that they have met this requirement, the Borders note that had Carter searched for the Artwork around the time of the 1976 Carter Inventory, he could have reached out to the Barnett-Aden Gallery who may have been able to direct Howard to Kibler who could then have directed Howard to the Borders.  As support for this claim, the Borders point to the internal Sotheby's email dated May 28, 2020, which documents a telephone conversation between Sotheby's and Howard regarding the Artwork on that same day.  As noted previously, the email starts with the statement that "They think the provenance is wrong" and concludes "They note that the Barnett Aden Gallery was after Howard (although they may also sold it to them as well) and the gallery (i.e. Alanzo and Jane) may have sold the work to a South Carolina collection before the gallery was resold."  DT Ex. 27.  Carlsen, who took these notes, testified that the person who made this statement was Gentry.  Carlsen Decl. ¶ 23.  The Borders would have it that this statement constituted an admission of a party representative concerning the results of an investigation into the history of the Artwork, which found that the Artwork was in the possession of the Barnett-Aden Gallery after Howard.  But the evidence does not support that conclusion.

The statement, according to the email, is speculative; it does not constitute a statement of fact. The speaker starts with the notion that he or she "think[s]" the provenance is wrong, not that the provenance is wrong.  The email then concludes that "the gallery . . . *may* have sold the work" and the "[g]allery was resold twice with the inventory . . . which *may or may not* have included this work but can't be confirmed because they didn't disclose which works."  *Id.* (emphasis added).  The reference in the email to the Artwork having been acquired in "1947/1949" tracks Howard's records which, along with reflecting that it was acquired in 1947, contain a notation that is difficult to read but could be deciphered as 1949.  The year provided thus does not appear to reflect any independent investigation aside from looking at the records that themselves were admitted in evidence at trial.  And, as to the statement about the history the Artwork, Carlsen recalled Gentry's statement in somewhat more tentative terms at trial:  "there was confusion surrounding – you know, we had assumed that the Barnett-Aden Gallery would have gone before Howard.  But then I do recall Ms. Jones noting that it *could have also come after Howard* or then meant to be sort of in both lines, excuse me, of the provenance."  Tr. 79–80 (emphasis added).

The evidence also does not support that Gentry's statement reports the result of an investigation.  On cross-examination, Gentry denied that she ever led any investigation into the Artwork and testified that the sole extent of her review consisted of a review of "the annual reports, Mr. Baker's thesis, and the loan document."[3]  Tr. 235.  She also stated that she has "no

---

[3] While Gentry testified that she asked Farrington, the Director of the Gallery from January 2020 to June 2021, in the Spring of 2020 to conduct an investigation into the Artwork, Tr. 150–51, 235–36, there was no testimony about whether Farrington reported her findings from that investigation to Gentry before or after the email.  The Borders also elicited no testimony from Farrington about her knowledge concerning the Barnett-Aden Gallery during trial and Farrington testified, via declaration, that she had "no personal knowledge of the Artwork ever being transferred by the University to a gallery called the Barnett-Aden Gallery in any manner at any time."  Farrington Decl. ¶ 56.

personal knowledge whatsoever as to whether the Artwork was ever loaned, transferred or

conveyed in any manner by Howard University to the Barnett-Aden Gallery or to any other third

party at any time, or whether the Barnett-Aden Gallery even existed at the time the Artwork was

last removed from Howard University's campus."  Jones Decl. ¶¶ 11, 13.  All that same evidence

was available to the Borders at trial and, to the extent it was offered, has been reviewed by the

Court, which is as able as Gentry to read it.  It does not establish that the belief that the Barnett-

Aden Gallery was in possession of the Artwork after Howard and transferred it to Kibler is

anything other than speculative.  Indeed, only a few days after the call—and presumably with

more information—Gentry sent an email to Sotheby's directly undercutting her prior theories.

Gentry stated that:

> Howard's position is that the work still belongs to Howard and was never sold to a
> third party.   Howard has documentation proving that the work was in the
> University's possession as late as 1971 but that as of the 1976 Collection Inventory,
> the work was missing from the Collection. That same inventory also confirms that
> the University purchased the work. The Washington Post article, that you
> forwarded to us also confirms the University's purchase of this piece.

DT Ex. 20.  The Borders thus have not presented any evidence to move this claim—that the

Barnett-Aden Gallery could have led Howard to Kibler and then to the Borders—past the point

of pure speculation.

Moreover, the theory that the Barnett-Aden Gallery sold the Artwork to Kibler is

undercut by a letter that the Barnett-Aden Gallery wrote to White in late 1973,[4] around the same

time that the Borders claim to have received the Artwork from Kibler.  In that letter, the Director

of the Barnett-Aden Gallery wrote to White that the Barnett-Aden Gallery is preparing a formal

catalog for its collection and asked White if he would "be kind enough to write a few paragraphs

---

[4] While the letter from the Barnett-Aden Gallery is undated, White, in a subsequent letter, states
that he received it on September 24, 1973.  DT Ex. 12.

or a short essay about your association with the Barnett-Aden Gallery, Mr. Alonzo Aden, and Mr. James V. Herring." DT Ex. 12. The Director stated that "[i]n my association with Dr. James V. Herring, he often made mention of you and your comradeship with him and Alonzo Aden in the early years of the Gallery," and continued that "[s]ince the demise of Alonzo Aden and James V. Herring, I have been [made] the director of the Gallery." *Id.* It is apparent from the letter—and the fact that the Director introduces himself to White—that this is the first communication between the Director and White (or at least the first communication in a while). It further appears that the Director is trying to curry favor with White: he wants White to help the Gallery with the catalogue and so mentions the prior connections between the Gallery and White. Because this letter appears to be the first between the Director and White and the Director uses the opportunity to alert White to his connections to the Gallery, one expects that if the Gallery had recently sold an important work by White, that the Gallery would mention such a sale in the letter. However, the Director makes no reference to selling any of White's artwork or even having any of White's artwork on temporary loan at the Barnett-Aden Gallery.

Finally, the Borders emphasize that Howard did not report the Artwork as missing to the police or to the Art Loss Register. It thus seeks to create an inference that had it done so Howard would have discovered the Artwork in the possession of the Borders. There is no evidence, however, that had Howard taken such step, "such as reporting [the loss] to the authorities or listing it on a stolen art registry," it would have discovered the whereabouts of the Artwork. *In re Flamenbaum*, 1 N.E.3d at 784. The Artwork was in the hands of Kibler immediately prior to its transfer to the Borders and how Kibler came into possession of the Artwork is unknown. Kibler resided in South Carolina. Kibler had no known relationship with Howard or anyone associated with Howard. The Borders also had no relationship with Howard or anyone

associated with Howard.  If Howard had searched its records, it would not found any evidence of either.  Immediately thereafter, the Artwork was in the possession of the Borders in North Carolina from approximately 1973 to 2020.  It was displayed exclusively in the Borders' residence.  No one who was not a guest of the Borders would have seen it.  This is a case where "the lost property was difficult to locate."  *Zuckerman*, 928 F.3d at 194 (delay was unreasonable where stolen item was on display at the Metropolitan Museum of Art and had been published in the museum's published catalogue of French paintings for decades); *cf. Republic of Turkey*, 2021 WL 4060357, at *8 (finding unreasonable delay where stolen item was "widely discussed in the literature, starting in the 1960s, and it was in near-constant display at the Metropolitan Museum of Art for decades"); *In re Peters*, 821 N.Y.S.2d 61, 68–69 (1st Dep't 2006) (finding suit barred by doctrine of laches where missing art was exhibited "at prominent museums, galleries, and universities during the second half of the twentieth century").  There were no newspaper or magazine articles about it and no information in the public domain that the Borders possessed it or that it was in North Carolina.  Indeed, Sotheby's did extensive due diligence on the Artwork; it was unable to find anything in the public domain to indicate that anyone other than Howard was the owner of the Artwork.  There is no reason to believe that Howard—if it knew that the Artwork was missing from its collection (and not just missing from the Gallery)—would have been able to determine that it was in the possession of either Kibler or the Borders.  *See Stancioff v. Estate of Barbara Danielson*, 2018 WL 6930264, at *6 (N.Y. Sup. Ct. Dec. 31, 2018) (dismissing laches claim as "[w]hile the snuff box came into Rosemary Danielson's possession, it was never advertised for sale and appears to have been displayed only in Danielson's home").

"Instead, the picture that emerges from the record is of a party that took immediate action upon" learning that the Artwork was no longer in its possession as well as the identity of the

Borders. *Abbott Lab'ys*, 506 F. Supp. 3d at 199.  On May 12, 2020, Sotheby's notified Howard

that the Artwork was no longer in Howard's possession, *see* DT Ex. 26; Carlsen Decl. ¶¶ 12–14,

on March 14, 2022, Sotheby's provided Howard with the identity of the current owners,

Richardson Decl. ¶ 18, and approximately one month later, Howard filed suit against the

Borders, Dkt. No. 1.  The evidence therefore supports that Howard was not previously aware of

its claim and, as soon as it became aware, acted with due haste.

## III.    Prejudice

For the sake of completeness, the Court addresses the Borders' argument that they have

suffered prejudice as a result of Howard's unreasonable delay.  Howard argues that, even if the

Borders had proven that there was unreasonable delay, the Borders would not be able to

demonstrate prejudice.  The Court rejects that argument.  Howard is entitled to a judgment in its

favor of laches because the Borders have not established unreasonable delay.  Had the Borders

shown unreasonable delay, there would be evidence of prejudice.

Howard argues first that the Borders are not eligible to establish prejudice and second

that the evidence at trial fails to establish prejudice.  Dkt. No. 84 at 18–24.  The first argument is

easily disposed of.  Howard claims that only a good faith purchaser of an artwork can

demonstrate prejudice and that because the Borders did not pay for the Artwork or give anything

else in return for it, they cannot benefit from the doctrine of laches even if they were to

demonstrate unreasonable delay and prejudice.  Dkt. No. 84 at 18–19.  Such an argument would

mean that if Howard deliberately sat on its claim waiting for the death of all of the critical

witnesses upon whom the Borders would rely to demonstrate that the Artwork was not stolen, the

Borders would still not be able to benefit from laches and Howard could regain the right to the

Artwork.

The single case that Howard relies upon for this proposition does not support Howard's extreme claim.  In *Hoelzer v. City of Stamford, Conn.*, 933 F.2d 1131 (2d Cir. 1991), the City of Stamford, Connecticut brought suit to quiet title in a set of murals commissioned in 1934 by the Works Progress Administration from the artist James Daugherty for the walls of Stamford High School.  *Id.* at 1133, 1135.  In 1971, after the murals were accidentally discarded during a renovation of the school and then retrieved by an enterprising graduating high school student who turned them over to the federal government, they were given to an art restorer to restore them on behalf of the United States government.  *Id.* at 1134.  The federal government failed to pay the restorer for his work and for the storage of the murals.  *Id.* at 1134–35.  After the restorer refused to return the murals, the City brought suit.  *Id.* at 1135.  Applying the rule that the three-year statute of limitations for replevin did not begin to run until the owner made a demand for return of the artwork and the demand was refused, the Second Circuit affirmed Judge Stanton's ruling that the City of Stamford's claim was timely even though it did not sue until 1989.  *Id.* at 1137.  In passing, the court also stated that the restorer would not be able to take advantage of the equitable doctrine of laches.  It stated "[t]he doctrine of laches sufficiently safeguards the interests of a good faith purchaser of lost art by weighing in the balance of competing interests the owner's diligence in pursuing her claim."  *Id.* at 1137–38.  The court thus concluded that the restorer "would have failed to establish the prejudice necessary to sustain such a claim" because he "paid nothing for the murals and . . . never anticipated a proprietary interest in them."  *Id.* at 1138.  As a result, he would "receive a windfall were he granted title."  *Id.*

*Hoelzer* cannot reasonably be read to establish that only a good faith purchaser for value can avail herself of the doctrine of laches.  Although the court stated that the doctrine protects the interests of a "good faith purchaser of lost art," *Hoelzer*, 933 F.2d at 1137–38, its conclusion did

not rest upon the fact that the restorer had not exchanged consideration for the murals.  The restorer in *Hoelzer* was a bailee; he was entrusted with possession of the murals for a limited period of time and for a limited purpose.  He would not have had any reasonable expectation of ownership.  In that sense, a decree awarding him title would have conferred a "windfall"; the terms under which he came into possession of the murals never contemplated that he would have a "proprietary interest in them," and he was never under such an understanding.  *Id.* at 1138.

By contrast, in this case, the Borders were given the Artwork as a gift.  The terms of the transfer of the Artwork from Kibler to the Borders contemplated that Kibler would relinquish his ownership interest in the Artwork and that the Borders would acquire it.  As Mr. Borders testified, Kibler said "I have something for you" and then gifted them the Artwork as well as another piece.  L. Borders Decl. ¶¶ 23, 29.  "Most gifts transfer full ownership—absolute ownership (if personal property)" where the gift is made with "donative intent" and the gift is accepted.  Restatement (Third) of Property (Wills & Don. Trans.) § 6.1 cmt. a (2003); *see also* Restatement (Second) of Property, Don. Trans. § 31.1 (1992); *see also Gruen v. Gruen*, 496 N.E.2d 869, 873 (N.Y. 1986) ("As long as the evidence establishes an intent to make a present and irrevocable transfer of title or the right of ownership, there is a present transfer of some interest and the gift is effective immediately.").  The person who obtains the work by gift is thus entitled to enjoy it in the absence of a claim by a prior owner that enjoys priority.  By contrast, a bailee—such as Hoelzer—enjoys no rights of ownership.  He "is authorized to take possession" of the property, but the "transfer of possession is for some purpose more limited than a transfer of ownership."  Restatement (Fourth) of Property § 8 TD No 3 (2022).

Pieces of art are also frequently gifted rather than sold.  Indeed, the Court can take notice of the fact that the collections of many major art museums are comprised of gifts.  But that does

not mean that the museum is deprived of the equitable defense of laches if an original owner who long knew or should have known of its claim delays bringing suit to the prejudice of the institution.  *See Zuckerman*, 928 F.3d 186, 192, 196–97 (holding in favor of the Metropolitan Museum of Art on a laches defense, even though the Metropolitan Museum of Art had not paid for the artwork but instead had received the artwork as a donation from an "arts patron noted for her gifts of prized pieces to public institutions").

Howard's second argument is that Defendants cannot establish prejudice because they cannot show "that the testimony of Kibler or any other deceased witness or any purportedly lost document would have established their title to the Artwork."  Dkt. No. 84 at 20.  Howard argues that the Borders must show both that "specific evidence was lost due to the passage of time" and that it is "more likely than not that such evidence would have resulted in [the Borders] prevailing in the title dispute."  *Id.* (internal citations and quotations omitted).  In so arguing, Howard takes direct issue with the Court's holding in its order granting in part and denying in part summary judgment that the party asserting laches need only show that "the lapse of time has led to '"deceased witnesses, faded memories, . . . and hearsay testimony of questionable value," as well as the likely disappearance of documentary evidence'"; the Court noted that a contrary rule (*i.e.*, one that would require the party asserting laches to demonstrate that the specific evidence that was lost would have entitled it to prevail on the merits) would require proof of "precisely the evidence that the unreasonable delay has prevented it from identifying."  Dkt. No. 58 at 35.  Howard argues that the Court's articulation of the rule regarding prejudice would "collapse the prejudice requirement into a single 'mere lapse of time' element" and that it would also "shift the burden of proof to the original owner to disprove prejudice."  Dkt. No. 84 at 20.

The Court disagrees.  The Second Circuit has held that a defendant may establish prejudice when "delay makes it difficult [for a defendant] to garner evidence to vindicate his or her rights."  *Robin Island Preservation Fund*, 959 F.2d at 424; *see Dziennik v. Sealift, Inc.*, 2013 WL 5502916, at *10 (E.D.N.Y. Sept. 30, 2013); *Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc.*, 1999 WL 673347, at *10 (S.D.N.Y. Aug. 30, 1999).  The defendant's articulation of prejudice cannot be purely speculative—a defendant must be able to identify witnesses who would have had knowledge of facts relevant to a viable defense or documents that would support such a defense that, through the passage of time, no longer exist.  *See Matter of Flamenbaum*, 1 N.E.3d at 784 ("[W]e can perceive of no scenario whereby the decedent could have shown that he held title to this antiquity."); *Reif v. Nagy*, 106 N.Y.S.3d 5, 23 (1st Dept. 2019) (holding that defendant did not show laches because the testimony of the decedent "would not have been probative").  But the defendant need not prove that such witnesses would have testified favorably to them at trial or that the documents, in fact, would have supported the defense.  Such a rule would permit the tardy plaintiff to benefit from the loss of evidence that he or she has created.  By intentionally (and unreasonably) delaying just long enough until all of the relevant witnesses are no longer alive, the crafty plaintiff could both defeat the defendant's ability to mount a defense and defeat the defendant's ability to complain about the delay by asserting that regardless of what the defendant thinks the missing witnesses would say, he or she cannot prove it and thereby cannot show prejudice.

The Court's articulation of the prejudice rule also would not collapse the requirements of unreasonable delay and prejudice or permit the party asserting laches to show prejudice on the fact of mere unreasonable delay itself, as Plaintiff suggests.  The delay element speaks to the information in the possession of the putative plaintiff and the reasons why it did not act on that

information more quickly in pursuing its claim.  The prejudice claim, by contrast, speaks to changes in the intervening time period that make it more difficult for the possessor of a work of art to garner the evidence to defend itself.  The two are not one and the same.  That there has been undue delay is not sufficient to establish prejudice and prejudice alone does not establish undue delay.  *See Stone v. Williams*, 873 F.2d 620, 625 (2d Cir. 1989) ("Laches is not imposed as a bar to suit simply because a plaintiff's delay is found unexcused; it must also be determined whether the defendants have been prejudiced as a result").  To establish prejudice, the possessor of the artwork must therefore show that, as a result of the delay, witnesses and documents that *could* have supported the possessor's claim are no longer available, *i.e.*, that she was unable to "garner" the evidence to vindicate her rights.  *Robin Island Preservation Fund*, 959 F.2d at 424.

*Abbott Laboratories*, 506 F. Supp. 3d 185, is not to the contrary.  There, the corporate owner of a painting, which was stolen by an art restorer and replaced by that restorer with a forgery, sought to recover the authentic painting from the estate of a woman who ultimately acquired it from an art gallery.  *Id.* at 188–97.  After a bench trial, the court rejected the estate's claim of laches.  *Id.* at 201.  The court found that the corporation did not unreasonably delay because it acted quickly to investigate and trace the real painting to its possessor as well as to demand its return shortly after a report from an expert demonstrated that the copy of the painting in its possession was a forgery; the court also found that the corporation should not have recognized the painting in its possession to be a forgery earlier.  *Id.* at 198–99.  The court also ruled that the estate could not demonstrate prejudice.  Although it pointed to persons such as the art restorer and those in the chain of custody of the real painting who were alive at the time the estate claims the corporation acted and who were no longer alive at the time the corporation did act on its claim, it failed to show how those persons would be in possession of information that

could "contradict the factual record in th[e] case." *Id.* at 201.  The court noted that there were "verified corporate records and circumstantial evidence showing that title to the Painting, which neither party claim[ed] [wa]s a major work by a popularly known artist, passed validly to [the corporation] in 1960," and that there also existed circumstantial and first-hand evidence of the chain of custody that resulted in the painting ending up in the hands of the estate's decedent.  *Id.* There thus did not exist an "evidentiary void" that could lead to a finding of unreasonable delay and prejudice.  *Id.*

This case is readily distinguishable from *Abbott Laboratories*.  In *Abbott Laboratories*, the testimony of the absent witnesses would not have impacted the factual record in the case: the absent witnesses could not have disputed that the real painting was owned by the plaintiff, the real painting was in the possession of the defendant, and the corporation was left with a forgery. There was no possibility that the corporation voluntarily parted with the real painting—it was stuck with a fake.  In other words, missing witnesses is not enough; the defendant must also be able to articulate that those missing witnesses could have had testimony probative of a viable defense.

In this case, by contrast, there is a plausible basis to believe that the missing witnesses could have had evidence relevant to a viable defense for the Borders and thus that their absence has made it difficult for the Borders "to garner evidence to vindicate [their] rights."  *Williams*, 2017 WL 4221084, at *13 (quoting *Greek Orthodox Patriarchate of Jerusalem*, 1999 WL 673347, at *10).  Howard made the requisite threshold showing in this case that it still owns the Artwork.  *See Howard Univ. v. Borders*, 2022 WL 602829, at *12 (S.D.N.Y. Mar. 1, 2022).  It did so by demonstrating that it purchased the Artwork in the 1940s, it continued to possess it shortly before the time the Howards came into possession of it, and—while there is evidence of a

loan of the Artwork—there is no record that it ever sold or transferred the Artwork. *Id.* That threshold showing is bolstered by the inference to be drawn from the 1976 Carter Inventory that, as of 1976, Carter believed the Artwork still to be the property of Howard and by the testimony of Baker that while he was a student worker from 1972 to 1974, he was in charge of packing and unpacking artwork for loans and that he had no recollection of the Artwork being packaged out for loan, Tr. 132–33, and that he believed Howard was still the owner of the Artwork up until the time that Sotheby's contacted Howard about the Artwork in 2020, Baker Decl. ¶ 15.

That evidence, however, was not irrefutable. The Borders would have had a viable defense if they could have tracked down evidence that the Artwork lawfully changed hands from Howard to Kibler. Their ability to conduct that investigation and to mount that defense has been compromised by the passage of time. Between the approximately fifty years that the Artwork was gifted to the Borders and when Howard brought suit, numerous key witnesses have died. Those witnesses include Kibler, Carter, White, and various Directors and Curators of the Gallery over the decades. Evidence has disappeared: Carter's "many notes, acquisition sheets, record cards, Daily Log and photographs attempting to keep as accurate a record as possible" are now gone. DT Ex. 5 at HOWARD00608. This evidence would have been probative of the Borders' claim that the Artwork was not stolen but instead transferred hands lawfully. The Borders could have explored whether Kibler, who the testimony establishes was a person of good reputation in the community, Tr. 22, trafficked in stolen art. They also could have explored discrepancies in the Gallery valuation records that could be read to show that Howard divested itself of certain artwork in the 1960s and 1970s (albeit not of the Artwork but certain artworks by Sidney Kellner and Jas. C. McMillian). *See* Tr. 175–79, 183. It may be that Kibler obtained the Artwork illegally or would not have had testimony helpful to the Borders or sufficient to rebut Howard's

threshold showing.  Alternatively, Howard may have been able to present evidence to show that none of the works that were included in earlier valuations but were missing from later valuations were still in Howard's possession.[5]  But the Borders have offered enough to show that evidence from the missing witnesses would have been probative.  And without those witnesses and those documents, the Borders were left prejudiced in their ability to follow up on what could have been a viable line of defense.  The Borders need not show that such defense would have been viable— if that were necessary, there would never been opportunity to invoke laches.  It is enough that the missing evidence has "ma[de] it extremely difficult for [D]efendants to establish [] that the [Artwork] was not stolen."  *Williams*, 2017 WL 4221084, at *13.

## IV.    Equities

"Laches is an equitable defense"; accordingly, the equities of the various parties are relevant to determining whether it applies.  *Zuckerman*, 928 F.3d at 190.  Both Howard and the Borders present compelling cases.

Howard's case is sympathetic.  It is an educational institution whose art gallery has a mission to use its collection to educate generations of students.  It has presented evidence that the Artwork was taken from it without its consent and without its knowledge.  As its lawful purchaser and owner, Howard has a powerful interest in its return so that it is available to educate future generations of students.

The Borders' position too is not unsympathetic.  They have been able to enjoy the Artwork for five decades believing (as the evidence at trial established) that they were its rightful

---

[5] Howard offered evidence that a number of McMillian drawings were located off campus during Ms. Farrington's tenure, Tr. 200–01, and that others were discovered in other buildings on campus, *id.* at 201–02, to support the contention that Howard did not dispose of art but only lost it on or off campus.  There also was evidence that Howard never sold any artworks through Sotheby's.  *Id*. at 84.

owners.  There is no evidence that they knew or believed the Artwork was stolen.  They agreed

to put it up for public auction knowing the extensive due diligence Sotheby's would engage in,

apparently without second thought.  As a result of the passage of time, they are not now able to

develop evidence of their rightful ownership of the Artwork.  At the same time, however, they do

not seek to continue to enjoy the Artwork but to sell it and their inability to access the

information necessary for them to sell it in New York is a problem of their own manufacture.

The evidence at trial established that in the mid-1970s, they were told that the Artwork was of

potential value and might be an original by a prominent artist.  Tr. 31–32; L. Borders Decl. ¶ 56.

That was a time when all of the witnesses whom the Borders now claim might have supported

them were still alive.  Had they wanted to be secure in their eventual ability to sell the Artwork,

they could have asked Kibler where he obtained it.  Perhaps that question would have led to the

Barnett-Aden Gallery and from the Barnett-Aden Gallery to a voluntary transfer from Howard.

Perhaps it would have established Howard's continued right to the Artwork.  We will never

know.  The Borders never asked the question.  Thus, the balance of the equities tips ever so

slightly in favor of Howard.  *See Solomon R. Guggenheim Found. v. Lubell*, 153 A.D.2d 143,

152 (1st Dep't 1990) ("[D]efendant's vigilance is as much in issue as plaintiff's diligence.").

## CONCLUSION

For the reasons stated above, the Borders' defense of laches does not bar Howard's

claims for replevin for the return of the Artwork and to quiet title in it and for declaratory

judgment that it is the rightful and true owner of the Artwork.  Howard thus prevails on each of

its claims and has title to the Artwork, free of any claims by the Borders.

The Clerk of Court is respectfully directed to enter judgment for Howard.

SO ORDERED.

Dated: October 20, 2022
     New York, New York
                                     LEWIS J. LIMAN
                             United States District Judge